**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **IN RE:  NAVISTAR 6.0L DIESEL ENGINE PRODUCTS LIABILITY LITIGATION** | * * * * * | **MDL Docket No. 2223** |
| | * | **Honorable Judge Kelly** |
| THIS DOCUMENT RELATES TO: | * * * | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| Civil Action: 1:11-cv-00613-DDD-JDK Carrol Duhon, et al v. Ford Motor Company | * * * | **JURY TRIAL DEMANDED** |

_____

**FIRST AMENDED CLASS ACTION COMPLAINT**

NOW COMES Plaintiff, Carrol Duhon, individually and on behalf of all others similarly situated, who is the current owner of Defendant Ford Motor Company's ("Ford") branded truck equipped with Ford's 6.0 L diesel engine, commonly known as Ford's Power Stroke Diesel Engine ("Subject Vehicle").  The Ford 6.0 L diesel engine was manufactured by Navistar, Inc. (formerly known as International Truck and Engine corporation) ("Navistar").  This engine powers the diesel version of Ford's Super Duty trucks and Ford Excursion vehicles for Model years 2003-2007.  This engine powering Ford vehicles has been plagued by serious and pervasive design and manufacturing defect that render the engines and vehicles unmerchantable and unsuitable for use.  The problems plaguing the engines are so prevalent that Ford has sued Navistar in Michigan State Court, alleging that Navistar has failed to shoulder its responsibility for paying its share of warranty costs that Ford has had to outlay in connection with warranty claims filed by owners and lessees of Ford vehicles equipped with the 6.0L diesel engine.  Yet, while Ford was internally, and in its lawsuit against Navistar, representing and documenting at length the pervasive design, manufacturing, and reliability defects of an unprecedented nature

1

that plagued the 6.0L diesel engine, it was at the same time concealing this knowledge from unsuspecting consumers like Plaintiff. Indeed, at the same time that it was internally cataloguing the systemic quality failure and defects in the 6.0L diesel engine, Ford was publicly disseminating advertisements to consumers that touted and boasted about the superior qualities of the very engine that Ford had privately repudiated as being plagued by "unprecedented problems."

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because the Complaint pleads a class action involving an amount in controversy of more than $5 million, exclusive of interests and costs, and also involves a putative Plaintiffs class of diverse citizenship than Defendants.

This Court has personal jurisdiction over Ford Motor Company ("Ford") because Ford transacts business within this judicial district, selling thousands of vehicles in this judicial district through its authorized dealers. Ford has a registered agent within the State of Louisiana that is authorized to accept service of process for lawsuits filed against these entities within this judicial district.

Venue is proper in this district because Plaintiff resides within this judicial district, and Plaintiff's Ford vehicle with the defective 6.0L diesel engine that forms the subject of this lawsuit is located within this judicial district. False advertisements made by Ford were also disseminated within this judicial district. Additionally, a substantial part of the events giving rise to Plaintiff's claims occurred in this district. Venue in this district is therefore proper pursuant to 28 U.S.C. § 1391.

## THE PARTIES AND THEIR EXPERIENCES

1.     Plaintiff, Carrol Duhon, is a citizen of Louisiana and is the owner of a 2004 F-350 Super Duty, Lariat Edition truck that is equipped with Ford's 6.0 L diesel engine.  Mr. Duhon is the first owner of the truck, having purchased it new on November 14, 2003.  The vehicle has experienced significant, persistent, and costly breakdowns, beginning with the failure of the turbo system. In addition, the EGR valves have broken and the computer system has failed.

2.     Defendant Ford Motor Company is a Delaware Corporation, having its principal place of business at One American Road in Dearborn, Michigan.  Ford is one of the world's largest automobile manufacturers boasting annual revenues in the billions of dollars.  Ford's F-Super Duty truck line has been one of Ford's best-selling vehicle lines over the years, and Ford has boasted about and touted the supposedly first rate quality, superiority, and toughness of these vehicles in its widespread advertisements across various media.  Yet, as detailed more fully below, while Ford publicly was making such representations to consumers, Ford internally recognized that the Ford 6.0L diesel engine powering its F-Super Duty Diesel trucks was plagued by significant quality, design manufacture and reliability issues.  So serious were Ford's concerns over the quality, design, and manufacture of the 6.0L diesel engine, that on or about January 11, 2007, Ford filed suit in Michigan state court against Navistar International Transportation Corporation and International Truck and Engine Corporation (the former name of Navistar, Inc.), the manufacturer of the 6.0 L Diesel engine powering Ford's F Super Duty diesel trucks.  Ford's lawsuit complained, *inter alia*, that Navistar was not living up to its obligation to contribute its share of the significant warranty costs that Ford was incurring in having to repair, replace, or repurchase significant numbers of Ford trucks equipped with the diesel engine.  In

Ford's lawsuit against Navistar, Ford represented through sworn affidavits and in legal memoranda filed before the Michigan state court that:

- "The 6.0L engine has experienced quality problems from the time of its November 2002 launch. It has the highest rates of any engine Ford has put into widespread distribution. As a result warranty ONP ["Owner Notification Programs"], and RAV ["Reacquiring A Vehicle"] spending have been enormous, and Ford ultimately was forced to dedicate a team of 70 engineers to assist Navistar on ways to fix the 6.0L engines already on the road and to improve the quality of the 6.0L engines still to be produced";

- "Ford has still incurred and $887 million warranty bill for 6.0L repairs";

- "ONP and RAV costs have also been substantial. Ford has spent more than $88 million in ONP directly related to the 6.0L engine, and $84 million on vehicle buy back due to problems with Navistar's 6.0L engine";

- "Navistar's 6.0 L Engine Experienced Immediate, Unprecedented Problems";

- "Ford has spent $227 million addressing injector problems with 6.0L";

- "Navistar used a new, non-industry standard fuel injector system for the 6.0L, which has resulted in a large numbers of warranty claims";

- "86% of the injectors [in the 6.0L diesel engine] replaced by dealers were confirmed to be problematic";

- "Navistar also used a new turbocharger on the 6.0L that is more complex than the turbochargers that Navistar had previously used in engines supplied to Ford. Ford received numerous warranty claims related to the turbocharger";

- "Ford has spent $182 million in warranty expenses for required turbocharger replacements in Ford vehicles equipped with the 6.0L diesel engine";

- "Ford has experienced unprecedented repair rates with the 6.0L engines. The 6.0L has had the largest R/1000 (repairs per thousand) rate ever experienced by Ford for and engine volume, accounts for approximately 80% of all Ford's warranty spending on engines. Additionally, warranty spending on the 6.0L accounts for approximately 25% of Ford's overall warranty spending"; and

- "Ford and Navistar participated in more than 1000 joint projects that focused on identifying and resolving specific issues with the 6.0L engine parts. For many of the engine parts, Ford Navistar, and/or Navistar suppliers, has identified specific design and manufacturing issues that are Navistar's responsibility and that have caused the parts to fail."

## DEFENDANTS' OMISSIONS, FAILURE TO DISCLOSE, AND AFFIRMATIVE MISREPRESENTATIONS CONCERNING THE 6.0 L DIESEL ENGINE AND THE VEHICLES IT POWERED

3.      As the forgoing allegations demonstrate, Ford knew from the outset that there were severe and pervasive design, manufacturing and quality issues plaguing the Ford 6.0L diesel engine powering Ford's trucks.  Yet, despite this knowledge, neither Defendant disclosed any of these issues to consumers.

4.      To the contrary, at the same time that Ford and Navistar were internally battling over the quality issues and defects plaguing the Ford 6.0 L diesel engine, Ford was making the opposite representations to consumers as to the quality of the engine and the vehicles it powered. For example, in its sales brochure for the 2005 Ford F-250 and F-350 truck, Ford touted to consumers that:

- The 2005 Ford-250 and Ford F-350 trucks had the "Best Power," explicitly referencing the "6.0L 32 Valve Power Stroke® V8 Turbo Diesel";

- The Ford F-250 and F-350 were equipped with a "Best in Class" and "Longest Lasting Diesel Engine";

- "Longest-Lasting Diesel: Cast Iron Block Head- This proven architecture withstands the higher combustion pressure of peak diesel operation. The stiff bedplate provides rigidity. Electro-Hydraulic Direct Injection (EDHI), 4-valve induction, and electronic engine control promote efficient combustion for optimized horsepower and torque. All together the 6.0L Power Stroke® is the longest-lasting diesel in its class";

- "Power Stroke V8 Turbo Diesel – F Series Super Duty out pulls the competition from a dead stop, in a 0-60 mph tow off.  It's done through careful power train management from engine to gearing to wheels and tire. The result is more capable trucks"; and

- Throughout the brochure, as in all Ford marketing materials about the subject trucks, Ford highlighted as its advertising slogan and sales pitch that the trucks were "Built Ford Tough."

5.      The website launched by Ford specifically to advertise the supposed merits of the Power Stroke diesel engine was just one discrete piece of a widespread and pervasive advertising campaign that Ford implemented to provide consumers, like Plaintiff and the members of the putative class, with the impression that Ford trucks equipped with the 6.0L diesel engine were of superior quality, reliability and durability, when in fact, Ford knew that the precise opposite was true.

6.      Ford's sales brochure and websites are but a couple of the many advertisements and representations that Ford disseminated about the Ford F-Super duty truck series that were equipped with the 6.0L Power Stroke diesel engine.  Despite knowing that the engines powering these trucks were plagued with what Ford internally described as "unprecedented problems," Ford orchestrated and implemented a widespread advertising and marketing campaign to convince consumers that the precise opposite was true; namely, that the engines and vehicles were of superior quality, design, manufacture, and reliability.  In this regard, Mark Fields, Ford's then President of the Americas, publicly proclaimed that the Navistar 6.0L Power Stroke diesel engine – the very same engine whose design and quality issues would lead Ford to sue Navistar — was a "great engine."  Despite its knowledge of the Power Stroke® 6.0L diesel engine's many flaws and quality concerns, Ford trained its dealers throughout the country to specifically tout the supposedly superior attributes of the engine, without ever mentioning its troubled history of design, manufacturing and reliability defects.

7.      Not only did Ford omit any mention to consumers about the significant design, manufacture and quality concerns it had identified with the Power Stroke [Navistar] diesel engine, but at the same time, Ford also failed to inform consumers that Ford, itself, had failed to adequately train or equip its dealers and their repair technicians to service, diagnose, or repair the engines.  Nor did Ford inform consumers that Ford had failed to timely provide to dealers and their repair technicians with the necessary tools required to repair and work on the engines.

## PRIOR AND CURRENT CLASS ACTIONS REGARDING THE POWER STROKE® DIESEL ENGINE

8.      This class action is not the first one to allege claims related to the pervasive defects and quality issues found in the Ford Power Stroke® diesel engine.  Ford has previously entered into a nationwide class action settlement in *Williams A. Ambulance, Inc. v. Ford Motor*

*Company*, No. 06-cv-776-MAC (E.D. Tex) that became final last year. That class action settlement was reached on behalf of a class of owners or lessees of model year 2003-2007 ambulances equipped with Ford's 6.0L diesel engines, who complained of pervasive defects and quality issues with the Ford engine.

9.     As part of the class action settlement in *Williams A. Ambulance, Inc.*, the United States District Court for the Eastern District of Texas, with Ford's consent or non-opposition, certified a nationwide class of owners and lessees of model year 2003-2007 ambulances within the United States equipped with ambulance prep package 47A and with Ford's 6.0L diesel engine. Under the terms of that settlement agreement, Ford agreed to, inter alia: extend the coverage of certan aspects of its express warranty for the vehicle and/or specific engine components thereof; implement a claims procedure by which qualified claimants could seek reimbursement for their prior repair expenses for repairs previously undertaken that involved components of the 6.0L diesel engine; cover 50% of the cost of an engine replacement where an engine replacement was needed, under certain circumstances; modify the warranty deductibles that qualifying class members paid as part of obtaining repair services for components of the 6.0L diesel engine covered by the settlement; provide, at a class member's request, a specific host of options to enhance the maintenance of the vehicles covered by the settlement; and, pay the class members' attorneys' fees and costs awarded by the district court, subject to the terms set forth in the settlement agreement.

10.     The settlement agreement entered into by Ford in *Williams A. Ambulance, Inc.*, purported to resolve the claims of owners and lessees of ambulances equipped with the Ford 6.0L diesel engines. That suit and that settlement did nothing to address the claims of non-ambulance owners, who formed part of the putative class alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

11.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action as a class action on behalf of all individuals and entities domiciled in Louisiana who are current or past owners or lessees of Ford vehicles equipped with a 6.0L diesel engine manufactured by Navistar, commonly referred to as the Power Stroke® V* Turbo diesel engine. Specifically excluded from the class definition are all Louisiana domiciled owners and lessees of ambulances equipped with a 6.0L diesel engine manufactured by Navistar and equipped with the 47A ambulance package. Also excluded from the class are all judicial officers presiding over this or any related case. The class definition also excluded all employees of Defendants or of their corporate affiliates. Plaintiffs reserve the right to modify this class definition as discovery or other case circumstances warrant.

12.     Although the exact number of class members is presently unknown, Plaintiffs allege that the class will number in the thousands of consumers, thereby making joinder impracticable. Ford has previously represented that the 6.0L diesel engine was found in approximately 275,000 Ford trucks annually. Even if a fraction of such vehicles are found in Louisiana, the class definition still readily satisfies the numerosity requirement for class certification. In addition, the NHTSA has logged hundreds of complaints from owners and lessees of these vehicles regarding fuel injector failures, coolant system and engine failures and oil cooling system failures.

13.     Class certification is also appropriate because there are questions of fact and/or law that are common to the Plaintiff and the class members. Among these common questions of fact and/or law are, *inter alia*:

a.   Whether the 6.0L diesel engine is defective and/or unmerchantable

b. Whether Ford negligently performed its contractual duties to manufacture and design the subject engine and to train technicians to repair, diagnose, and service the engine;

c. Whether Ford engaged in false advertising and/or violations of the Louisiana Unfair Trade Practices Act with respect to the 6.0L diesel engine;

d. Whether Ford breached its express and implied warranties pertaining to the 6.0L diesel engine;

e. Whether Ford Breached the warranty of redhibition and warranty of fitness for ordinary use pertaining to the 6.0L diesel engine;

f. Whether Plaintiffs and the member of the putative class intended third-party beneficiaries of Ford trucks equipped with the 6.0L diesel engine;

g. Whether Ford materially breached its contractual duties that were to be performed for the benefit of Plaintiff and the putative class members;

h. Whether class members are entitled to the relief sought, and if so, the proper scope of such relief; and

i. Whether Ford's practices violated Louisiana's lemon law, La. R.S. 51:1941 *et seq.*

14.     Plaintiffs' claims are typical of the claims of the absent class members in that Plaintiff, like all the absent class members, claim that they are domiciled in Louisiana and are the current or former owners or lessees of a Ford vehicle that is equipped with the 6.0L diesel engine that is defective.  Plaintiff is a member of the class he seeks to represent, and the claims he advances on his own behalf are identical to the claims asserted on behalf of the class.

15.     Plaintiff is an adequate class representative in that, as a member of the class and as a current owner of a Ford vehicle equipped with the defective 6.0L diesel engine, his interests are entirely aligned with those of the class.  There are no individual conflicts that prevent

Plaintiff from adequately representing the class. Plaintiff has also retained competent counsel experienced in class action litigation.

16.     Class certification is proper because common questions of fact and law predominate over questions that may affect only individual members of the class. The subject vehicles are manufactured on an assembly line setting, and this case involves a single engine designation – the Ford 6.0L diesel engine, that is subject to a common design and manufacturing plan, such that evidence of a defect in the design or manufacture of the engine would be one that would predominate over the entire class membership, as would evidence of Defendants' course of action, knowledge of the alleged defect, and any alleged concealment or misrepresentation thereof.

17.     A class action presents a superior form of adjudication over individual litigation. The costs of litigating this action against large and sophisticated entities like Defendants, in comparison to the recovery or relief sought, would make individual litigation impracticable. In addition, forcing individual litigation would risk the result of inconsistent rulings with respect to Defendants' duties owned to the various vehicle owners and lessees.

18.     This class action is manageable. The proposed class represents an identifiable community that can be readily identified, and the relief sought is one that can be overseen by the Court.

**CAUSES OF ACTION**

**COUNT I**
**CONSTRUCTION OR COMPOSITION**
**DEFECT UNDER LA. R.S. 9:2800.55**

19.     Plaintiff and the putative class members repeat and re-allege each and every allegation of this Amended Complaint as detailed above, with the same force and effect as if fully set forth herein.

20.     Defendant designed, developed, manufactured, tested, packaged, advertised, promoted, marketed, distributed, labeled, and/or sold the Subject Vehicle in a condition which rendered it unreasonably dangerous due to its propensity to break down, malfunction, and require costly repair.  The Subject Vehicle was unreasonably dangerous in construction or composition as provided in La.R.S.9:2800.55.

21.     The Subject Vehicle manufactured and/or supplied by Defendant was defective in construction or composition in that, when it left the hands of Defendant, it deviated in a material way from Defendant's manufacturing performance standards and/or it differed from otherwise identical products manufactured to the same design formula.  In particular, the Ford vehicle equipped with the 6.0L diesel Power Stroke engine is defectively designed in that it contains a design defect or flaw that causes the vehicle to be unduly prone to break down, malfunction, and require costly repair.

22.     The characteristics of the Subject Vehicle that render it unreasonably dangerous under R.S. 9:2800.55 existed at the time the product left the control of the manufacturer or resulted from a reasonably anticipated alteration or modification of the product.

23.     As a direct and proximate cause of Defendants' violation of this statutory duty, Plaintiff and the putative class have sustained and will continue to sustain injuries and damages,

12

including but not limited to loss of the use of his vehicle, economic losses, and other consequential damages.

### COUNT II
### DESIGN DEFECT UNDER LA. R.S. 9:2800.56

24.     Plaintiff and the putative class members repeat and re-allege each and every allegation of this Amended Complaint as detailed above, with the same force and effect as if fully set forth herein.

25.     At all times material hereto, Ford was engaged in the business of designing, manufacturing, assembling, promoting, advertising, selling, and distributing Ford vehicles in the State of Louisiana and throughout the United States, including, but not limited to, the Plaintiff's vehicle, as well as the vehicles of the putative class members.

26.     Thus, Defendant Ford, as the manufacturer of the vehicles in which the engine is included, are both entitles within the vertical chain of distribution of this defectively designed engine and, as such, are strictly liable for this defective design.

27.     The Ford vehicle equipped with the 6.0L diesel Power Stroke engine is defectively designed in that it contains a design defect or flaw that causes the vehicle to be unduly prone to break down, malfunction, and require costly repair.  The design defect renders the vehicle unfit and inherently dangerous for its ordinary use.  The design defect involving the engine and coolant system at issue is a latent one that would not be apparent to a reasonable consumer upon reasonable inspection.

28.     The Subject Vehicle manufactured and supplied by Defendant was defective in design or formulation in that, when it left the hands of the Defendant, it did not conform to federal and/or state requirements, and the foreseeable risk of the product exceeded the benefits associated with its design or formulation, or it was more dangerous than an ordinary consumer

would expect. In particular, the Subject Vehicle was unreasonably dangerous in design as provided by La. R.S. 9:2800.56.

29.     The engine defects in the Subject Vehicle could not have been contemplated by any reasonable person expected to operate the Subject Vehicle and, therefore, presented an unreasonably dangerous situation for expected users of the Subject Vehicle even though the Subject Vehicle was operated by the expected user in a reasonable manner.

30.     Plaintiff has used the Subject Vehicle reasonably and as intended, and nevertheless, has suffered damages through no fault of his own.

31.     As a direct and proximate result of the use of the Subject Vehicle as manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendant, Plaintiff and the putative class has sustained and will continue to sustain the loss of the use of their vehicles, economic losses, personal injury and consequential damages caused by the malfunction and disrepair of the vehicle.

32.     As a direct and proximate cause of Defendants' violation of this statutory duty, Plaintiff and the putative class has sustained and will continue to sustain injuries and damages, including but not limited to loss of the use of their vehicles, economic losses, and other consequential damages.

<u>**COUNT III**</u>
<u>**INADEQUATE WARNING UNDER LA. R.S. 9:2800.57**</u>

33.     Plaintiff and the putative class members repeat and re-allege each and every allegation of this Amended Complaint as detailed above, with the same force and effect as if fully set forth herein.

34.     The Subject Vehicle manufactured and supplied by Defendant was defective due to inadequate warning or instruction because Defendants failed to conform with federal and/or

state requirements for labels, warnings, and instructions, and/or alternatively, Defendants knew or should have known that the product created significant risks of serious bodily harm to consumers and Defendants failed to adequately warn consumers of such risks. Thus, the Subject Vehicle was unreasonably dangerous because an adequate warning was not provided pursuant to La. R.S. 9:2800.57.

35. The Subject Vehicle manufactured and supplied by Defendants was defective due to inadequate post-marketing warning or instruction because, after Defendants knew or should have reasonably foreseen that the dangerous and defective conditions caused by the defective engine in the Subject Vehicle would subject Plaintiff and the putative class to harm and injury, resulting from the defective 6.0L diesel engines, Defendants failed to provide an adequate warning to consumers of the defects of the product, and/or alternatively failed to conform to federal and/or state requirements for labeling, warnings and instructions, or recall, while knowing that the product was defective.

36. As a direct and proximate cause of Defendants' violation of this statutory duty, Plaintiff and the putative class hve sustained and will continue to sustain injuries and damages, including but not limited to loss of the use of their vehicles, economic losses, and other consequential damages.

### COUNT IV
### BREACH OF EXPRESS WARRANTY UNDER LA. R.S. 9:2800.58

37. Plaintiff and the putative class members repeat and re-allege each and every allegation of this Amended Complaint as detailed above, with the same force and effect as if fully set forth herein.

38.     Defendants expressly warranted to Plaintiff and the putative class that the Subject Vehicle was safe and fit for use by consumers and users for its intended purpose, that it was of merchantable quality, and that it was adequately tested and fit for its intended use.

39.     Ford knew and expected for the Subject Vehicle to eventually be sold to and operated by purchaser and/or eventual owners and leases of the Subject Vehicle, including Plaintiff and the putative class; consequently, Plaintiff and the putative class were expected users of the Subject Vehicle manufactured by Ford.

40.     At the time of the making of the express warranties, Defendants knew or should have known that, in fact, said representations and warranties were false, misleading, and untrue in that the Subject Vehicle was not safe and fit for its intended use.

41.     Plaintiff purchased and used the Subject Vehicle for its intended purpose.

42.     The Subject Vehicle reached Plaintiff without substantial change in the condition from the time of completion of manufacture by Defendants.

43.     As a direct and proximate cause of Defendants' violation of this statutory duty, Plaintiff and the putative class have sustained and will continue to sustain injuries and damages, including but not limited to loss of the use of their vehicles, economic losses, and other consequential damages.

**COUNT V**
**REDHIBITION**

44.     Plaintiff and the putative class members repeat and re-allege each and every allegation of this Amended Complaint as detailed above, with the same force and effect as if fully set forth herein.

45.     Defendants, as sellers of the Subject Vehicle and their defective engine systems, warranted the Plaintiffs and members of the class against redhibitory defects, or vices, in the thing sold.

46.     The Plaintiff's vehicle contains redhibitory defects, as these defects render the Subject Vehicle either useless or the use so inconvenient that it must be presumed that a buyer, such as Plaintiff and the putative class members, would not have bought the Subject Vehicle had Plaintiff and the putative class members known of the defects, or without rendering the vehicle totally useless, it diminishes the value so that it must be presumed that Plaintiff and the putative class members would still have bought the vehicle, but for a lesser price, pursuant to La. C.C. art. 2520.

47.     The defective engine system, contained in the Plaintiff's vehicle, render the vehicle so useless and inconvenient such that the Plaintiff and the putative class members would not have bought the vehicle had he known of the defects.

48.     The vehicle contained the redhibitory defects described herein at the time of purchase and the defect was not apparent to the Plaintiff and the putative class members. Consequently, Defendants knew, or are presumed to have known of the existence of the defects in the vehicle and failed to disclose the defect to Plaintiff and the putative class members. Additionally, Defendants, as manufacturers of the vehicle, are deemed to have known that the vehicle they sold had redhibitory defects.

49.     Having known of the defects in the engine systems, Defendants are liable to Plaintiff and the putative class members for the return of the purchase price with interest from the time that it was paid, for reimbursement of the reasonable expenses occasioned by the sale

and those expenses incurred for the preservation of the vehicle and also for damages and reasonable attorneys' fees.

50.     Defendant Ford, as the manufacturers in which the engine is included, is an entity within the vertical chain of distribution of this defectively designed engine and, as such are liable for sale of this defective product.

51.     As a consequence of Defendant being the manufacturer, and/or seller of Subject Vehicle containing the redhibitory defects, Defendant is liable to Plaintiff and the putative class, for the following:

a.  Return of the purchase price of the Subject Vehicle together with interest from the time the purchase price was paid;

b.  Reasonable expenses occasioned by the sales;

c.  Damages causes by the use of the defective vehicle, including, but not limited to, expenses incurred in attempted repairs and expenses incurred as a result of Plaintiff and the putative class being unable to use their vehicles for its intended use; and

d.  Reasonable attorney fees.

## COUNT VI
## BREACH OF WARRANTY OF FITNESS FOR ORDINARY USE

52.     Plaintiff and the putative class members repeat and re-allege each and every allegation of this Amended Complaint as detailed above, with the same force and effect as if fully set forth herein.

53.     In addition to warranting against redhibitory defects, Ford, as a seller, warrants that the Subject Vehicle is reasonably fit for its ordinary and intended use.  La. C.C. art. 2524.

54.     The Ford vehicles equipped with the 6.0L diesel Power Stroke engine are defectively designed in that they contain a design defect or flaw that causes the vehicles to be

18

unduly prone to break down, malfunction, and require costly repair. As a result, the Plaintiff's vehicle is unfit and inherently dangerous for ordinary use.

55. As a direct and proximate cause of Defendants' violation of this statutory duty, Plaintiff and the putative class members have sustained and will continue to sustain injuries and damages, including but not limited to loss of the use of their vehicles, economic losses, and other consequential damages.

## COUNT VII
## BREACH OF CONTRACT AND EXPRESS WARRANTY

56. Plaintiff and the putative class members repeat and re-allege each and every allegation of this Amended Complaint as detailed above, with the same force and effect as if fully set forth herein.

57. As alleged herein, Defendant Ford issued a written warranty for each Ford vehicle equipped with the 6.0L diesel engine. The warranty warranted against any defects in the engine and offered repair and replacement for same. The warranty was unilaterally drafted by Ford without input from Plaintiff, and was offered on a "take it or leave it" basis by Ford, who, as one of the largest automobile manufacturers with superior knowledge as to the workings of automobiles and engines, had disparately superior bargaining power with respect to the terms of the warranty coverage applicable to Plaintiff's vehicle.

58. Although Ford proposed to introduce a limitation in the warranty, setting a durational limit corresponding to the first 5 years or 100,000 miles for the warranty coverage, because Ford already knew that the vehicles and their engines were defective and unmerchantable at the time of sale, failed to disclose this to unsuspecting consumers, and, affirmatively made misrepresentations to the contrary, it would be unconscionable to honor and recognize Ford's attempted imposition of the 5 year/100,000 mile durational limit in its warranty

19

offering. Due to the unconscionability of Ford's unilateral imposition of this durational limit, when it knew but concealed and misrepresented the presence of the defects in its vehicles, Ford's reliance on that durational limit to refuse to honor payment for repairs or replacements required as a direct and foreseeable result of the very defects known to Ford at the time of sale, is unenforceable.

59. Ford's failure to repair and/or replace the defective 6.0 L engines beyond this 5 year/100,000 unconscionable durational limit, therefore, amounts to a material breach of the contract and its express warranty.

60. As a direct, foreseeable, and proximate result of Ford's material breach of its contract and express warranty, Plaintiff and the putative class have been injured by being denied repair and/or replacement coverage under the warranty Plaintiff and the putative class member were entitled to receive, and by being forced to pay for such repair and replacement work that was brought about by Defendants' conduct and the defective engine in the vehicle.

61. Plaintiff and the putative class are entitled to and do seek declaratory relief, declaring that Ford's attempted imposition of the 5 year/100,000 mile durational limit on its warranty coverage for the 6.0 L diesel engine is unconscionable and unenforceable, such that Plaintiff and the putative class have a right under the express warranty to have Ford pay for the cost of repair and/or replacement of the defective engine without regard to this unconscionable durational limit unilaterally imposed by Ford. Plaintiff and the putative class also seek injunctive relief to enjoin Ford from refusing to honor its obligation to repair and/or replace the defective engine components on the basis that the 5 year/100,000 mile purported durational limit of the express warranty has lapsed. Plaintiff and the putative class also seeks monetary relief to compensate for actual out-of-pocket expenses he incurred in having to pay for the repairs and/or

replacement of the defective engine, when such costs should have been borne by Ford under the contract and express warranty.

## COUNT VIII
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY AND FITNESS

62.     Plaintiff and the putative class members repeat and re-allege each and every allegation of this Amended Complaint as detailed above, with the same force and effect as if fully set forth herein.

63.     By operation of Louisiana law, an implied warranty of merchantability and fitness automatically attached to each and every sale made by a Ford dealer of the Ford trucks equipped with the 6.0 L diesel engine.  This implied warranty of merchantability and fitness warranted that the vehicle was and would be of merchantable quality.

64.     When selling a new Ford vehicle to a consumer, the authorized Ford dealer, including the one from whose dealership Plaintiff purchased his truck, acts as an agent of Defendant Ford.  Specifically, upon information and belief, Ford has the ability and does control, *inter alia*, the following: the array and allocation of vehicles carried and offered for sale by the dealer; the advertising and representations made by the dealer about the Ford brand; the manner in which the dealer uses the Ford trademark; the nature and scope of any warranties that are to be offered by Ford for the vehicles; and, any promotions to be offered by the dealer on Ford's behalf pertaining to the sale of Ford vehicles.

65.     Ford breached the implied warranty of merchantability and fitness because, *inter alia*, due to the defective nature of the 6.0 L diesel engine powering the Plaintiff's vehicle, the vehicle was unfit for its ordinary purpose at the time it was sold.

66.      As a direct, foreseeable, and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the putative class members have been  injured by, *inter*

*alia*, being denied the benefit of his bargain, being forced to pay for the costs of repairs and incidental expenses, such as towing, rental cars, and by being forced to absorb the diminution of value of the vehicle brought about as a result of the vehicle's unmerchantable quality.

67.     To the extent that Ford attempted or purported to limit, eliminate, or otherwise disclaim, in whole or in part, the implied warranty of merchantability, such an attempted limitation, elimination, or disclaimer is unenforceable due to its unconscionability for the reasons alleged herein.

### COUNT IX.
### VIOLATION OF LOUISIANA UNFAIR TRADE PRACTICES ACT

68.     Plaintiff hereby incorporates by reference each and every allegation of this complaint with the same force and effect as if it had been fully restated herein.

69.     As the seller of vehicles, Defendant Ford has the duty to refrain from the use of unfair methods of competition and unfair or deceptive acts or practices in the conduct of its trade and commerce.  This includes the duty to refrain from knowingly exploiting consumers in an effort to gain an unfair advantage over them.

70.     Defendant Ford's sale of the Subject Vehicle to Plaintiff was a "consumer transaction" within the scope of the Louisiana Unfair Trade Practices Act, LA R.S. 51:1401 *et seq.* ("LUTPA") as the transaction involved commerce to a natural person, the subject of which transaction is primarily intended for personal, family or household use.

71.     Defendant Ford violated LUTPA by knowingly misrepresenting and/or remaining silent as to the quality of the Subject Vehicle to Plaintiff, creating an unjust advantage for Defendant and resulting in the sale of the vehicle, which would not have occurred, but for Defendant's use of such deceptive practice.

72.   Ford's subsequent silence regarding the use of an inferior engine and parts constitutes a continuing tort, suspending and/or interrupting any applicable prescriptive period.

73.   Plaintiff and members of the class he seeks to represent reasonably relied upon representations, omissions and advertisements made by Ford in connection with the qualities, standards, characteristics, and/or attitudes of Ford vehicles equipped with the 6.0L diesel engine.

73.   Ford's violations of LUTPA have injured and damaged Plaintiff and the members of the Class he seeks to represent by leaving them with trucks that are defective, of diminished value, and causing Plaintiff and members of the class he seeks to represent to have spent significant out-of-pocket monies in repairs and associated expenses.

74.   Because of Defendant's actions, Plaintiff has and will continue to suffer a loss of money and movable property.

75.   As a direct and proximate result of Ford's violations of law, Plaintiff and the Class are entitled to declaratory and injunctive relief, including:   a declaration that Ford's practices violate LUTPA; an injunction prohibiting Ford from collecting fees for repairs or replacements to be made to class members' defective 6.0L engines; and , an injunction mandating that Ford cease any advertising that depicts the 6.0L diesel engine or the Ford vehicle it powers in a manner that leads the consumer to believe that the engine is of superior quality, design, reliability, as well as mandating that Ford issue corrective disclaimers and/or advertisements to correct the deceptive nature of its previously disseminated advertisements about its trucks equipped with the 6.0L diesel engine.

76.   As a direct and proximate result of Ford's violations of law, Plaintiff and the members of the putative class also are entitled to seek an award of money damages to compensate each of them , including compensation for:   the costs of repairs incurred by each

class member as a result of the defective engine and its non-conformance to Ford's presentations, including associated costs of towing, loss of use and rental of replacement vehicles proximately caused by the defective performance of the vehicle; costs associated with the loss of use of the vehicles brought about as a direct result of the defective malfunctions or non-performance of the vehicle; personal injury; and, the diminished value of the vehicles brought about by the defects alleged herein.

77.     Plaintiff is also entitled to and hereby seeks an order directing Defendant Ford to pay Plaintiff's reasonable attorneys' fees and costs of suit, as awarded by the Court.

78.     Because Ford's conduct that violated LUTPA was knowing and willful, Plaintiff and the putative class members are also entitled to and seek an order from this Court awarding each of them treble and/or punitive damages.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff, Carrol Duhon, on behalf of himself and the putative class members, demands judgment against Defendant on all Causes of Action herein for such damages as are reasonable in the premises, together with the maximum legal interest, and for all costs as follows:

a. Awarding actual damages to Plaintiff and the putative class members for their damages;

b. Awarding pre-judgment and post-judgment interest to the Plaintiff and the putative class members;

c. Awarding the costs and the expenses of this litigation to the Plaintiff and the putative class members;

d.  Awarding reasonable attorneys' fees and costs to the Plaintiff and the putative class members as provided by law;

e.  Awarding interest on such award of attorneys' fees and costs;

f.  All statutory damages allowed by all applicable consumer protective statutes, including but not limited to, Louisiana Unfair Trade Practices Act, LA R.S. 51:1401 *et seq.*, and Louisiana lemon law La. R.S. 51:1941 *et seq.*

g.  Granting all such relief as the Court deems necessary, just and proper.


Date:  May 20, 2011                    Respectfully submitted,

                                        BY: /s/ Richard J. Arsenault

                                        Richard J. Arsenault (LA Bar #02563)
                                        J.R. Whaley (LA Bar #25930)
                                        Mary Nell Bennett (LA Bar #32339)
                                        **NEBLETT, BEARD & ARSENAULT**
                                        2220 Bonaventure Court
                                        P.O. Box 1190
                                        Alexandria, LA 71309
                                        Telephone: (318) 487-9874
                                        Fax: (318) 561-2524
                                        Email: rarsenault@nbalawfirm.com

                                        *Attorneys for Plaintiff and the Putative Class*

25