**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **In re: NAVISTAR DIESEL ENGINE** | ) | **Case No. 11 C 2496** |
| **PRODUCTS LIABILITY** | ) | **MDL NO. 2223** |
| **LITIGATION** | ) | |

**This Document Relates to: All Cases**

---

### PLAINTIFFS' MASTER CLASS ACTION COMPLAINT

---

Pursuant to Dkt. No. 12, Plaintiffs Custom Underground, Inc., John Barrett, Scott Gray and Heather Gray, Frank Brown Towing, Inc., Cecil and Tressie Fulton, Karl Strong, Dinonno Enterprise, Inc., d/b/a Cutting Edge Concrete Cutting, Charles Clark, Georjean Vogt, John Prebish, Steve Santilli, Anthony Mawyer, Gena Boggero, Carl Atwell, Phillip Marcum, and James Hutton, on behalf of themselves and all others similarly situated, respectfully file Plaintiffs' Master Class Action Complaint against Defendant, Ford Motor Company (hereinafter, "Ford" or "Defendant"), and allege based on personal knowledge as to Plaintiffs' actions and experiences and upon information and belief as to all other matters, as follows:

### I. **PARTIES**

1. Plaintiff, Custom Underground, Inc. ("Custom Underground"), is a corporation incorporated in the state of Illinois with its principal place of business in Illinois.

2. Plaintiff, John Barrett ("Barrett"), is an individual who at all relevant times resided in Carlinville, Macoupin County, Illinois.

3. Plaintiffs, Scott and Heather Gray (collectively, "Gray"), are individuals residing in Ft. Pierce, St. Lucie County, Florida.

4.      Plaintiff, Frank Brown Towing, Inc. ("Brown"), is a corporation incorporated and with its principal place of business in Buffalo, Erie County, New York.

5.      Plaintiffs, Cecil and Tressie Fulton (collectively "Fulton"), are individuals who at all relevant times resided in Manteca, San Joaquin County, California.

6.      Plaintiff, Karl Strong ("Strong"), is an individual who at all relevant times resided in Santa Rosa, Sonoma County, California.

7.      Plaintiff, Dinonno Enterprise, Inc., d/b/a Cutting Edge Concrete Cutting ("Dinonno"), is a corporation incorporated in the state of California with its principal place of business in California.

8.      Plaintiff, Charles Clark ("Clark"), is an individual who at all relevant times resided in Brooklyn, Jackson County, Michigan.

9.      Plaintiff, Georjean Vogt ("Vogt"), is an individual who at all relevant times resided in Tucson, Pima County, Arizona.

10.      Plaintiff, John Prebish ("Prebish"), is an individual who at all relevant times resided in Loveland, Larimer County, Colorado.

11.      Plaintiff, Steve Santilli ("Santilli"), is an individual who at all relevant times resided in Newington, Hartford, Connecticut.

12.      Plaintiff, Anthony Mawyer ("Mawyer"), is an individual who at all relevant times resided in Taylorsville, Alexander County, North Carolina.

13.      Plaintiff, Gena Boggero ("Boggero"), is an individual who at all relevant times resided in Greenwood, Greenwood County, South Carolina.

14.      Plaintiff, Carl Atwell ("Atwell"), is an individual who at all relevant times resided in Mooresville, Morgan County, Indiana.

15.     Plaintiff, Phillip Marcum ("Marcum"), is an individual who at all relevant times resided in resided in Lucasville, Scioto County, Ohio.

16.     Plaintiff, James Hutton ("Hutton"), is an individual who at all relevant times resided in Flemington, Hunterdon County, New Jersey.

17.     Defendant, Ford Motor Company, is a Delaware corporation with its principal place of business in Dearborn, Michigan.  Defendant Ford is authorized to conduct business in the State of Illinois, and has made its appearance in this case.

## II.  JURISDICTION AND VENUE

18.     The Court has jurisdiction over Ford because at all relevant times Ford has regularly and systematically transacted business within the State of Illinois as a designer, manufacturer, and distributor of motor vehicles, including vehicles equipped with the 6.0-liter diesel engines at issue in this case.  Defendant Ford derives substantial revenue from Illinois residents.

19.     This Court has subject matter jurisdiction over this class action under the Class Action Fairness Act ("CAFA") because there are more than one-hundred class members, there are members of the Plaintiff class who are citizens of states different from that of Ford, and the aggregate of class members' claims is more than $5 million.  28 U.S.C. § 1332(d).

20.     Venue is proper in this Court because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.  28 U.S.C. § 1391(a)(2).  Among other things, Ford has major operations in this District, including a large manufacturing plant in Chicago.

## III.  FACTS

21.     Ford is, and has been at all relevant times, engaged in the business of developing, designing, manufacturing, testing, assembling, inspecting, marketing, distributing, and selling

Ford vehicles and/or vehicle chassis equipped with Ford's 6.0-liter diesel engines (hereinafter, "6.0L Engines" or "6.0L").

22. 











**D.    Ford Sued Navistar Concerning the Defect**

44.    Ultimately, Ford sued Navistar in Michigan state court in March 2007, seeking $493 million in damages for warranty costs, including a portion of some $84 million spent buying back vehicles specifically attributable to 6.0L issues.[16]  It was in that context that Bob Fascetti, Ford's Director of Diesel Engineering, attested to the following:

---

[14]  Barb Samardzich email to Colin Horbal, June 22, 2007.  "WFA" was Ford's "Way Forward Acceleration Plan" to improve financially in all aspects by 15% annually beginning with the 2008 model year.
[15]  Colin Horbal email to Barb Samardzich, July 9, 2007.
[16]   Ford Motor Company's Brief In Support of Its Motion For Temporary Restraining Order and Preliminary

Ford has experienced unprecedented repair rates with the 6.0L engines. The 6.0L has had the largest R/1000 (repairs per thousand) rate ever experienced by Ford for an engine in widespread production. In fact, the 6.0L, which represents only 10% of Ford's total engine volume, accounts for approximately 80% of all of Ford's warranty spending on engines. Additionally, warranty spending on the 6.0L accounts for approximately 25% of Ford's overall warranty spending.[17]

45.



47.     Similarly, Ford found problems in 86% of the 6.0L's injectors and 95% of its turbochargers returned under warranty when tested under "real world" conditions, refuting Navistar's claim that there were no problems in these same parts.

48.     The pleadings in *Navistar* demonstrate that the problems Ford's customers have experienced with the 6.0L Engines are due to a defectively designed and manufactured engine.

---

Injunction, *Ford v. Navistar*, CA07-080067-CK, Circuit Court of the County of Oakland, Michigan, at 5–6 and attached Aff. of Jim Glass, Reacquired Vehicle Operations Supervisor, Ford Motor Company, Feb. 28, 2007.
[17] Fascetti Aff., Feb. 28, 2007.
[18] John Koszewnik email to Brian Vought, Feb. 5, 2006 (emphasis added).
[19] *Id.*
[20] Koszewnik Dep., Feb. 16, 2011, at 279:21–280:25.

### E.   Ford Failed to Disclose the 6.0L Engine's Defects While Touting the Engine's Supposedly Superior Attributes

49.    As the foregoing allegations demonstrate, Ford knew from the outset that there were severe and pervasive design, manufacturing, and quality issues plaguing the Ford 6.0L Engines.  Yet, despite this knowledge, Ford never disclosed any of these issues to consumers.

50.    To the contrary, at the same time that Ford and Navistar were battling over the quality issues and defects plaguing the Ford 6.0L Engines, Ford was making precisely the opposite representations to consumers as to the quality of the engine and the vehicles it powered. For example, in its sales brochure for the 2005 Ford F-250 truck, Ford touted to consumers that:

a.    The 2005 Ford F-250 and Ford F-350 trucks had the "Best Power," explicitly referencing the "6.0L 32 Valve Power Stroke® V8 Turbo Diesel;"

b.    The Ford F-250 and F-350 were equipped with a "Best in Class" "Longest-Lasting Diesel Engine;"

c.    "Longest-Lasting Diesel: Cast-Iron Block Head—This proven architecture withstands the higher combustion pressure of peak diesel operation.  The stiff bedplate provides rigidity.   Electro-Hydraulic Direct Injection (EDHI), 4-valve induction, and electronic engine control promote efficient combustion for optimized horsepower and torque.  All-together the 6.0L Power Stroke® is the longest-lasting diesel in its class;" and

d.    "Power Stroke V8 Turbo Diesel—F-Series Super Duty outpulls the competition from a dead stop, in a 0-60 mph tow off.  It's done through careful powertrain management from engine to gearing to wheels and tire. The result is more—capable trucks."

51.    The sales brochure is but one of the many advertisements and representations that Ford disseminated about the Ford F-Super Duty truck series that were equipped with the 6.0L Engines.  Despite knowing that the engines were plagued with what Ford internally described as "unprecedented problems," Ford orchestrated and implemented a widespread advertising and marketing campaign to convince consumers that the precise opposite was true; namely, that the

engines and vehicles were of superior quality, design, manufacture, and reliability. In this regard, Mark Fields, Ford's then President of the Americas, publicly proclaimed that the Navistar 6.0L Power Stroke diesel engine—the very same engine whose design and quality issues led Ford to sue Navistar—was a "great engine." Despite its knowledge of the 6.0L Engine's many flaws and quality concerns, Ford trained its dealers throughout the country to specifically tout the supposedly superior attributes of the engine, without ever mentioning its troubled history of design, manufacturing, and reliability defects.

███ ████████████████████████████████████████████
████████████████████

52.     While Ford was pursuing its $493 million lawsuit against Navistar, ████████
████████████████████████████████████████████████████
████████████████████████████

53.     Ford's vehicles containing the 6.0L Engines were sold with Ford's Limited Warranty, including the 6.0L Powerstroke Diesel Engine warranty, which covers the "engine and engine components against defects in factory-supplied materials or workmanship for five years after the warranty start date or 100,000 miles, whichever occurs first," and provides that "[d]uring this coverage period, authorized Ford Motor Company dealers will repair, replace, or adjust all parts on your vehicle that are defective in factory-supplied materials or workmanship."

54.     ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

███ ████████████████████████████████████















██████████████████████████████████████████████████████████████

████████████████████████████████

76.     Ford unfairly benefitted by this practice because Ford knew that after the warranty expired the vehicle owner, rather than Ford, would have to pay for all future repairs. Because engine replacements cost more than ten times the cost of these lesser repairs, Ford profited enormously (at the expense of its customers) by failing to authorize necessary major engine repairs or engine replacements during the warranty period, instead only authorizing cheaper services (like injector replacements) which were not adequate repairs, and would merely serve as a temporary measure until the warranty expired. ████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████ ██████████████████████████

███████████████████████████████████ ██████████████████████████

██████████████████████████████████████████████████████████████

███ ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

───────────────────────────────

█ ██████████████████████████████████████

█ ███████████████████████████████████████████████████████████

█ ████████████████████████████



78.     Because Ford never redesigned the 6.0L diesel engine and never satisfactorily addressed the root causes of the persistent and systemic engine malfunctions being experienced at unprecedented rates by vehicle owners, and, indeed, had no plan or idea how to fix the defectively designed root-cause components, it could never provide adequate warranty service for the engine.  Ford's "warranty repair," instead, amounted to nothing more than offering consumers (without telling them as much) a band-aid fix to cover-up a symptom of the malfunctioning vehicle rather than an adequate and proper repair of the actual problem plaguing the vehicles.  This band-aid fix did not remedy the defects in the 6.0L Engines, as Ford was required to do under the terms of the warranty, but merely served to postpone the problem, virtually ensuring that aggrieved owners would continue to experience engine problems from the unremedied defective root cause engine components in the near future, and, often times, delaying these repeat problems so that they conveniently (to Ford) would reoccur shortly after the warranty period expired.  By failing to adequately repair the defective engines, Ford never lived up to its warranty obligations.

---

[45]  These documents comparing the designs of the 6.0L and the 6.4L engines detail the defects in the 6.0L engines in explaining how they were eliminated in the design of the 6.4L engine.

G.   **An Arizona Company Developed a True Root Cause Solution:  Redesigned EGR and Oil Coolers**

79.     While agreeing with many of Freeland's observations concerning "common defect," experts at Bullet Proof Diesel, a nationally renowned automotive and diesel specialist based in Mesa, Arizona, and diesel industry publications approached these problems from a different angle.   Recent articles in *Four Wheeler* (September 2010), *Diesel World* (November 2010), and *Off Road* (March 2010) summarize their testing and analysis, targeting the EGR and oil coolers:

*Four Wheeler*:

If you have owned a Ford Super Duty pickup with the 6.0L engine, chances are you have experienced an **EGR cooler** failure.   Ford released several technical bulletins to its dealer network in an attempt to resolve these problems.   However, none of them address the **root cause** of the problem, and though the dealership may replace faulty EGR coolers under warranty, the issues will continue to persist.[46]

*Diesel World*:

[O]ver time, many of the design weaknesses of the 6.0L Power Stroke began to surface. Topping the list was the repetitive failure of the **EGR cooler**.[47]

\*        \*        \*        \*

Countless owners have replaced their **EGR coolers** two, three, or more times in the first 100,000 miles, and have installed at least one **oil cooler** in the truck.[48]

*Off-Road*:

We've seen two major problems that plague most Super Dutys—both of which stem from the oiling system:   fuel injection issues (the end result of multiple oiling failure possibilities) and **EGR cooler** issues in which the cooler plugs up with carbon.[49]

---

[46]  Robin Stover, *Power Stroke Bulletproofing Tactics*, FOUR WHEELER, Sept. 2010 (emphasis added).
[47]  Kevin Wilson, *6.0L Power Stroke Problems and Solutions, Part I*, DIESEL WORLD, Nov. 2010.
[48]  *Id.*
[49]  Jerrod Jones, *Permanently Fixing a Powerstroke*, OFF-ROAD, March 2010 (emphasis added).

80.     In November 2010, *Diesel World*, in "6.0L Power Stroke Problems and Solutions: Part I: The Truth About EGR and Oil-Cooler Failures," stated:

> [T]he root of many of the 6.0L problems can be traced to a poor ***oil cooler*** design. Among the common issues on 6.0L Power Strokes are ***EGR cooler*** failures, high engine oil temperatures and overheating, injector failure, turbo failure, high-pressure oil pump failure and blown head gaskets. And, according to Bullet Proof Diesel, nearly all of these problems are related to the stock engine cooler.[50]

> *Four Wheeler* agrees:

> "In almost every case, 6.0L engine failures can be attributed to shortcomings in the ***oil cooling*** system."[51]

81.     Bullet Proof Diesel has done what Ford was unwilling to do: develop a solution for the "root causes" of the 6.0L Engine's problems: redesigned EGR and oil coolers, which can be installed in place of Ford's standard EGR and oil coolers. Bullet Proof Diesel is "so confident its street-legal EGR cooler is superior to the factory part, the company offers a lifetime warranty on it."[52] The publications referenced above specifically describe how the defects in Ford's original design manifest into engine malfunctions and how Bullet Proof's redesigned components address these root causes.[53] In fact, according to Off-Road: "The BPD [Bullet Proof Diesel] EGR cooler is a much better design, and even one that Ford dealerships recommend to modify their trucks with!"[54]

## H.     Plaintiffs and the Class experienced these same symptoms in their 6.0L Engines, and Ford failed to repair them under warranty

82.     Plaintiffs and Class members are owners, lessees and/or operators of Ford vehicles with a 6.0L Engine.

---

[50]   Wilson, *6.0L Power Stroke Problems and Solutions, Part I* (emphasis added).
[51]   Stover, *Power Stroke Bulletproofing Tactics* (emphasis added).
[52]   Wilson, *6.0L Power Stroke Problems and Solutions, Part I*; Wilson, *6.0L Power Stroke Problems and Solutions, Part II*, DIESEL WORLD, Dec. 2010.
[53]   Wilson, *6.0L Power Stroke Problems and Solutions, Part I*; Jones, *Permanently Fixing a Powerstroke*.
[54]   Jones, *Permanently Fixing a Powerstroke*.

83.     Plaintiffs and Class members have, at all times, maintained their vehicles according to Ford's Owners Guide and Owner's Guide Supplement for 6.0L Engines.

84.     Plaintiffs experienced repeated, common issues with their engines ███████

████████████████████████████████████████████████████████████████████

███████—*e.g.*, injectors, head gaskets, turbo chargers, EGR valves, and EGR coolers. Indeed, each Named Plaintiff experienced problems with at least one Root-Cause-Damaged Component.

85.     Plaintiffs and Class members have repeatedly brought their vehicles to authorized Ford dealerships for warranty repair, but Ford has failed to fulfill its obligation under Ford's Limited Warranty to adequately adjust, repair or replace the defects in the 6.0L Engines.

86.     Plaintiffs and Class members herein complain that the engines in their vehicles are defective, forcing them to repeatedly bring their vehicles to Ford dealerships for repair, only to have the vehicles break down again due to the defective nature of the engine and/or the inability of Ford, through its dealerships, to repair them properly.

87.     Moreover, when Plaintiffs and Class members brought their vehicles to authorized Ford dealerships during the warranty period and complained about problems they were having, Ford generally failed to authorize the replacement of the defective engines despite the fact that Ford knew the engines were defective, knew that the mechanics in its dealerships were not properly repairing the engines, and knew that the limited repair work Ford authorized its dealerships to perform would not properly repair the vehicles.

88.     Ford dealerships cannot provide warranted repairs (*i.e.*, repairs at no cost to the customer) beyond those authorized by Ford.  Accordingly, Ford's routine failure to authorize the work necessary to properly repair vehicles with defective 6.0L Engines resulted in a breach of Ford's warranty obligations.

89.     Ford warranted that its authorized Ford Motor Company dealers would, without charge, repair, replace, or adjust all parts that malfunctioned or failed during normal use during the applicable coverage period due to a defect in factory-supplied materials or factory workmanship.

90.     Ford's limited warranty of repairing and replacing defects failed of its essential purpose because Ford failed to give its dealerships permission to make necessary warranted repairs.  Accordingly, they failed to properly repair Plaintiffs and Class members' vehicles.

91.     Ford Motor Company, notwithstanding its knowledge of the defects, has not conducted sufficient recalls, has not notified Plaintiffs of the extent of the engines' inadequacies, has misrepresented to Plaintiffs that the 6.0L Engine problems were caused by factors other than an inherent defect (including improper maintenance and the weather), has misrepresented the supposed attributes of the 6.0L Engine, has failed to disclose known defects in the engines, and has failed to effectively repair or replace the engines and/or parts, or to reimburse Plaintiffs for their damages.

92.     The defective 6.0L Engines have caused Plaintiffs and Class members to suffer a loss of profits as a result of the inability to use the vehicles.  Plaintiffs and Class members have also suffered diminution in the value of their vehicles; out-of-pocket expenses for ongoing necessary repairs and/or services to the units; towing costs for disabled units; deductible payments to Ford dealerships for repairs under warranty; expenses associated with leasing or renting temporary vehicles while their Ford vehicles were being repaired; expenses acquiring and maintaining additional vehicles due to unreliability of the 6.0L Engines; expenses of paying wages to drivers who are unable to work due to the lack of sufficient working vehicles,

additional costs incurred from employing additional mechanics due to the problems with the 6.0L Engine, and other damages.

93.     Any limitations and exclusions in Ford's warranty are procedurally and substantively unconscionable because they are inordinately one-sided in Ford's favor in light of the fact that Ford knew of the inherent defect in the 6.0L Engines as early as 2002 and nevertheless continued to sell vehicles and vehicle chassis with defective engines without disclosing the inherent defect.

94.     The unconscionability of Ford's remedy limitations and exclusions is exacerbated by the fact that Ford knew it was selling vehicles and vehicle chassis with defective engines, and knew that its dealerships were consistently failing to repair the defects.   Accordingly, Ford attempted to limit its customers' remedies to repairs that it knew would fail to fix the engine, and thus the limited warranty failed of its essential purpose and is unenforceable.

95.     Plaintiffs and Class members notified Ford (through authorized Ford dealerships) of the multiple problems caused by the engine defects each time Plaintiffs brought their vehicles in for repair.   Plaintiffs also notified Ford directly. Plaintiffs, however, were not required to provide such notice because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile.

96.     As stated above, the Technical Service Bulletins, internal Ford memoranda and emails, and Special Service Messages describing symptoms consistent with those experienced by the Plaintiffs and Class members, demonstrate the ongoing problems with Ford's 6.0L Engine, the fact that Ford was well aware of the problems with these engines before it ever launched the 6.0L Engine, and Ford's failure to adequately address the issues by failing to properly repair or replace these defective engines.

97.     Additionally, the defective 6.0L Engines present a safety hazard and are unreasonably dangerous to consumers because the defects can cause and have caused sudden and unexpected engine stalling or complete loss of power while driving, thereby contributing to the risk of accidents, which can cause personal injury or death.

98.     Because of Ford's failure to properly repair the defective engines, Plaintiffs and Class Members have spent an unprecedented amount of time and money making repeat visits to various Ford dealership service departments attempting to resolve the engine problems to no avail.

## I.     Tolling of Limitations Periods

99.     All limitations periods were tolled from the April 21, 2006 filing date of *Cox House Moving Inc v. Ford Motor Company* (Case No. 7:06-cv-01218-HMH, D.S.C.), until November 6, 2006, the date class certification was denied, then tolled again from January 8, 2010 to the present, by the filing of *Custom Underground, Inc., et al. v. Ford Motor Company* (Case No. 1:10-cv-00127, N.D. Ill.)

100.     All limitations periods were also tolled by the doctrines of fraudulent concealment, the discovery rule and/or equitable tolling.  As alleged herein, Ford wrongfully concealed the fact (1) that it was equipping vehicles with defective engines which Ford was unable and/or unwilling to repair, and (2) that its dealerships were making inadequate repairs incapable of addressing the root cause of the vehicles' malfunctions.  Plaintiffs and Class Members did not discover the operative facts that are the basis of their claims because they were concealed in confidential and privileged documents.  No amount of diligence by Plaintiffs or Class Members could have led to discovery of these facts because they were kept secret by Ford and, therefore, Plaintiffs and Class Members were not at fault for failing to discover these facts,

nor did they have actual or presumptive knowledge of facts sufficient to put them on inquiry. No class member knew, or could have known, about Ford's inability to repair the defects in its engines because, as alleged above, Ford kept this information highly confidential, even sending internal warnings not to share this information outside of Ford.

## IV.  PLAINTIFFS' EXPERIENCE WITH THE CLASS VEHICLES

### A.  Custom Underground, Inc.

101.    Plaintiff Custom Underground is a corporation with its principal place of business in Illinois.

102.    Custom Underground purchased more than 20 Ford vehicles in Illinois with 6.0L Engines that have posed repeated problems from the start.

103.    While each of Custom Underground's engines were covered by the 5 year/100,000 mile warranty, the defective engines caused the vehicles to exhibit multiple symptoms, including among other things, exhibit poor engine acceleration, poor air conditioning performance, failure to withstand long periods of engine idle, rough idle, difficulty starting the engine, inability to start engine, engine stalling, and complete loss of power while driving. These symptoms were caused by the root cause defects in the engine and/or the consequent malfunction of the Root-Cause-Damaged Components.

104.    **Engine 142**: Custom Underground purchased Engine 142, VIN 1FDWF36P15EC46009, on March 11, 2005, from a Ford dealership in Illinois. Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to authorized Ford dealerships in Wisconsin, including John Amato Ford and Havill-Spoerl Ford, on multiple occasions including the following dates, with the indicated number of miles on the vehicle, and

the indicated component(s) repaired or replaced: July 6, 2006 (32,804 miles, EGR cooler), and January 2, 2008 (78,442 miles, injectors 1 and 7).

105. **Engine 143**: Custom Underground purchased Engine 143, VIN 1FDWF36P85EC46010, on March 11, 2005, from a Ford dealership in Illinois. Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to an authorized Ford dealership in Illinois, Uftring Ford, on June 22, 2007, and had a warranty repair performed at 72,375 miles to the EGR valve.

106. **Engine 144**: Custom Underground purchased Engine 144, VIN 1FDWF36PX5EC46011, on March 9, 2005, from a Ford dealership in Illinois. Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to authorized Ford dealerships in Illinois, including Uftring Ford, on multiple occasions including the following dates, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced: December 13, 2006 (49,776 miles, injectors 2 and 8), and January 31, 2008 (80,262 miles, injectors 1, 2, 3, and 8).

107. **Engine 146**: Custom Underground purchased Engine 146, VIN 1FDWF36P35EC46013, on March 11, 2005, from a Ford dealership in Illinois. Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to authorized Ford dealerships in Illinois, including Uftring Ford, on multiple occasions including the following dates, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced: November 21, 2006 (45,541 miles, 3 injectors), and March 19, 2007 (53,192 miles, injectors 1, 2, 3, 5, 7, and 8).

108. **Engine 147**: Custom Underground purchased Engine 147, VIN 1FDWF36P55EC46014, on March 11, 2005, from a Ford dealership in Illinois. Pursuant to the

Ford warranty, Custom Underground brought the malfunctioning vehicle to an authorized Ford dealership in Wisconsin, Havill-Spoerl Ford, on March 29, 2007, and had a warranty repair performed at 42,820 miles on injectors 2, 4, 6, and 8.

109. **Engine 148**: Custom Underground purchased Engine 148, VIN 1FDWF36P75EC46015, on March 11, 2005, from a Ford dealership in Illinois. Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to an authorized Ford dealership in Wisconsin, Grinwald Ford, on November 26, 2008, and had a warranty repair performed at 95,360 miles to injectors 3 and 8.

110. **Engine 149**: Custom Underground purchased Engine 149, VIN 1FDWF36P95EC46016, on March 11, 2005, from a Ford dealership in Illinois. Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to authorized Ford dealerships in Illinois, including, Uftring Ford and Woodrum Ford, on multiple occasions including the following dates, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced: March 14, 2006 (23,078 miles, injectors 1, 2, and 3), April 4, 2006 (23,315 miles, injectors 4, 5, 6, 7, and 8), and on March 27, 2006 (23,991 miles, injector leaking).

111. **Engine 150**: Custom Underground purchased Engine 150, VIN 1FDWF36P05EC46017, on March 9, 2005, from a Ford dealership in Illinois. Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to an authorized Ford dealership in Wisconsin, Porcaro Ford, on July 7, 2008, and had a warranty repair performed at 93,253 miles on the EGR cooler.

112. **Engine 151**: Custom Underground purchased Engine 151, VIN 1FDWF36P25EC46018, on March 11, 2005, from a Ford dealership in Illinois. Pursuant to the

Ford warranty, Custom Underground brought the malfunctioning vehicle to an authorized Ford dealership in Indiana, Southworth Ford, on February 15, 2007, and had a warranty repair performed at 36,985 miles to injectors 1, 2, 3, 5, 7, and 8.

113. **Engine 152**: Custom Underground purchased Engine 152, VIN 1FDWF36P45EC46019, on March 11, 2005, from a Ford dealership in Illinois. Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to authorized Ford dealerships in Wisconsin, including Tom Peck Ford, on multiple occasions including the following dates, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced: April 18, 2007 (61,353 miles, EGR valve), March 26, 2008 (79,122 miles, injectors), May 22, 2008 (81,333 miles, injectors), and October 28, 2008 (96,597 miles, turbo charger).

114. **Engine 154**: Custom Underground purchased Engine 154, VIN 1FDWF36P46EA02291, on June 3, 2005, from a Ford dealership in Illinois. Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to an authorized Ford dealership in Illinois, Uftring Ford, on June 3, 2007, and had a warranty repair performed at 62,970 miles to multiple injectors and the turbo charger.

115. **Engine 155**: Custom Underground purchased Engine 155, VIN 1FDWF36P86EA02293, on June 3, 2005, from a Ford dealership in Illinois. Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to an authorized Ford dealership in Illinois, Sterlins Ford, on May 6, 2008, and had a warranty repair performed at 86,888 miles to the EGR valve.

116. **Engine 156**: Custom Underground purchased Engine 156, VIN 1FDWF36PX6EA02294, on June 3, 2005, from a Ford dealership in Illinois. Pursuant to the

Ford warranty, Custom Underground brought the malfunctioning vehicle to authorized Ford dealerships in Illinois, including Ford of Champaign, Uftring Ford, and Demison Ford, on multiple occasions including the following dates, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced:   April 26, 2006 (37,199 miles, injector 7), May 16, 2006  (38,649 miles, injectors 1, 3, and 8),  June 7, 2006 (39,481 miles, injector 5), July 25, 2006 (44,827 miles, injector), November 15, 2006 (57,336 miles, EGR valve), January 18, 2007 (64,003 miles, injectors 1, 3, 5, and 7), and May 18, 2007 (73,183 miles, turbo charger).

117.   **Engine 157**:  Custom    Underground    purchased    Engine    157,    VIN 1FDWF36PX6EA02292, on June 3, 2005, from a Ford dealership in Illinois.  Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to authorized Ford dealerships in Illinois, including Uftring Ford, on multiple occasions including the following dates, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced:   January 4, 2007 (54,261 miles, injector 7), February 26, 2007  (56,768 miles, injectors 1, 3, and 5),  March 10, 2008 (91,318 miles, EGR valve), and April 21, 2008  (94,895 miles, EGR cooler).

118.   **Engine 159**:  Custom    Underground    purchased    Engine    159,    VIN 1FDWF36P96EA02299, on June 3, 2005, from a Ford dealership in Illinois.  Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to authorized Ford dealerships in Illinois, including Uftring Ford, on multiple occasions including the following dates, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced:   June 5, 2007 (44,894 miles, turbo charger), and February 5, 2008 (63,785 miles, injectors).

119. **Engine 160**: Custom Underground purchased Engine 160, VIN 1FDWF36P96EA02298, on June 3, 2005, from a Ford dealership in Illinois. Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to an authorized Ford dealership in Illinois, Uftring Ford, on December 29, 2006, and had a warranty repair performed at 73,548 miles to injectors 1 and 8.

120. **Engine 161**: Custom Underground purchased Engine 161, VIN 1FDWF36P36EA02296, on June 3, 2005, from a Ford dealership in Illinois. Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to authorized Ford dealerships in Illinois, including Uftring Ford, on multiple occasions including the following dates, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced: December 13, 2006 (49,292 miles, injector 5), February 22, 2008 (89,596 miles, injectors), and April 10, 2008 (95,966 miles, injector 8).

121. **Engine 162**: Custom Underground purchased Engine 162, VIN 1FDWF36P16EA02295, on June 3, 2005, from a Ford dealership in Illinois. Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to authorized Ford dealerships in Illinois, including Uftring Ford, on multiple occasions including the following dates, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced: November 16, 2005 (20,010 miles, injector 4), January 23, 2006 (21,903 miles, injector 6), February 14, 2006 (22,058 miles, injectors 1 and 7), March 3, 2006 (23,339 miles, injectors 4 and 6), July 11, 2006 (36,027 miles, injectors 2 and 6), and August 1, 2006 (38,065 miles, injectors 2, 4, and 8).

122. Each time Custom Underground complained of the aforementioned engine symptoms and requested that the vehicle be repaired.

123.    Each time, the Ford dealership did not repair the engines or performed an inadequate repair of the engines.  Thus, Ford failed to provide appropriate warranty benefits for Custom Underground's vehicles despite the fact that the vehicles fell within the warranty's eligible time and mileage periods.

124.    As a result, the engines continued to malfunction and Custom Underground was forced to repeatedly bring the malfunctioning vehicles to an authorized Ford dealership for additional repairs, as indicated above.  Each time Ford either failed to perform an adequate repair or failed to provide any repair at all.

125.    Despite knowing that the engines had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engines.

126.    As a result of Ford's failure to properly repair the engines during the warranty, after the expiration of the warranty, Custom Underground was required to incur repair expenses to address these issues, lost income due to the vehicles being unavailable, and/or suffered other direct and consequential damages.

127.    For example, regarding **Unit 144**,  in addition to being damaged more than $4000 in out-of-pocket repair expenses, Custom Underground was damaged by the extensive periods, totaling more than 50 days, it was without the use of the vehicle due to Ford's inability to repair it.

128.    Regarding **Unit 146**, after the warranty expired, Custom Underground was forced to spend more than $1200 on engine repairs, including a November 13, 2008 replacement of an oil pump assembly and injector pressure regulator, and a December 17, 2009 replacement of an EGR valve.

129.    Regarding **Unit 148**, the warranty repairs did not repair the vehicle, which broke down again on November 6, 2009 when the vehicle had 104,692 miles and was out of warranty. At that point Custom Underground took the vehicle out of service and has been unable to use the vehicle since that time as a result of Ford's refusal to authorize a proper repair when the vehicle was brought in for repairs before the expiration of the warranty.

130.    Regarding **Unit 149**, in February 2010, at 112,027 miles and out of warranty, Custom Underground took the vehicle out of service and has been unable to use the vehicle since that point as a result of Ford's refusal to authorize a proper repair when the vehicle was brought in for repairs before the expiration of the warranty.

131.    Regarding **Unit 156**, on December 14, 2007, at 105,266 miles and when the vehicle was out of warranty, the engine died. From that point forward, Custom Underground spent over $5000 trying to repair the engine, which would not have been necessary had Ford authorized an engine replacement or an adequate repair of the engine on any of the multiple occasions the vehicle was brought into a Ford dealership for service when the engine was still under warranty.  Additionally, Ford's refusal to authorize an adequate repair when the engine first began exhibiting signs of its defects caused the vehicle to be out of service for more than 100 days, thus damaging Custom Underground by depriving it of the use of this vehicle.

132.    Regarding **Unit 147**, because of Ford's refusal to authorize an adequate repair, the engine did not perform properly and Custom Underground was forced to take the vehicle out of service when the warranty expired. Had Ford properly repaired the vehicle when it was brought in for service during the warranty period, Custom Underground would still have use of the vehicle today.

133.    Regarding **Unit 151**, on August 12, 2009, the vehicle continued having injector problems.  Finally, on October 6, 2009, at 108,913 miles, when the engine warranty had expired and the engine was still experiencing problems, Custom Underground had to take the vehicle out of service. Had Ford properly repaired the vehicle when it was brought in for service during the warranty period, Custom Underground would still have use of the vehicle today.

134.    Regarding **Unit 157**, on October 16, 2009, at 108,226 miles, when the engine warranty had expired and the engine was still experiencing problems (making noise, not running, running rough, exhibiting a lack of power), Custom Underground had to pay for repairs itself, spending more than $3800 at Dennison Ford, an authorized Ford dealership, on engine repairs on November 4 and December 2, 2009.

135.    Regarding **Unit 161**, after the warranty expired, on August 26, 2008 at 113,879 miles, the engine was still not operating correctly.   From that point forward, Custom Underground spent about $7000 at Marion Ford and Uftring in 2008 and 2009 attempting to repair the engine. Had Ford properly repaired the vehicle when it was brought in for service during the warranty period, Custom Underground would not have had to incur these repair expenses.

136.    Regarding **Unit 162**, after the warranty expired, on February 26, 2009 at 112,016 miles, the engine was still not operating correctly, malfunctioning in the same manner as previously.  Custom Underground was forced to spend more than $2400 at Uftring for additional post-warranty engine repairs. Had Ford properly repaired the vehicle when it was brought in for service during the warranty period, Custom Underground would not have had to incur these repair expenses.

137.    Various employees of the Ford dealerships admitted to Custom Underground that Ford knew that the engines were defective when the dealerships sold the vehicles to Custom Underground.

138.    Diesel technicians working on Custom Underground's units at the dealerships have acknowledged, in the presence of representatives of Custom Underground, the high volume of problems the Ford 6.0L Engines have experienced.

139.    Ford has actual knowledge of the details of the defects in Custom Underground's vehicles, as well as the claims and demands Custom Underground made to Ford for repair of the defects.  Custom Underground has notified Ford, either directly or through Ford's dealerships, of the issues, describing the defects and the problems caused by the defects, and giving Ford multiple opportunities to properly repair or replace the defective engine.

**B.    John Barrett**

140.    Plaintiff John Barrett ("Barrett") is an individual who at all relevant times resided in Carlinville, Macoupin County, Illinois.

141.    Barrett, purchased a new Ford vehicle with a 6.0L Engine, VIN 1FDWE35P44HA86337, in 2004.

142.    While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms, such as exhibiting poor engine acceleration, failure to withstand long periods of engine idle, rough idle, difficulty starting the engine, inability to start engine, engine stalling and complete loss of power while driving.  These symptoms were caused by the root cause defects in the engine and/or the consequent malfunction of the Root-Cause-Damaged Components.

143.     Pursuant to the Ford warranty, Barrett brought the malfunctioning vehicle to authorized Ford dealerships on multiple occasions, including on August 29, 2007 when the Ford dealership only authorized an injector and EGR valve repair.

144.     This was an inadequate repair which did not adequately repair the engine.  Thus, Ford failed to provide appropriate warranty benefits for Barrett's vehicle despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

145.     As a result, the engine continued to malfunction and Barrett was forced to bring the malfunctioning vehicle to an authorized Ford dealership for additional repairs.  Each time Ford either failed to perform an adequate repair or failed to provide any repair at all.

146.     Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

147.     As a result of Ford's failure to properly repair the engine during the warranty, on July 3, 2009, when the vehicle had approximately 108,000 miles and was no longer under warranty, it again experienced engine problems.  Barrett brought the vehicle to a Ford dealer who initially told him that the engine needed two injectors replaced, but eventually admitted that the engine could not be repaired, and that Barrett needed a complete engine replacement, at a cost of approximately $16,000.

148.     Barrett spoke with the Ford Service Manager and his top diesel mechanic who admitted that Ford knew at the time it performed the repair in 2007 that the repair was not an adequate repair of the engine.  The Ford mechanic also admitted that the 6.0L Engines had a very high failure rate.

149. Ford has actual knowledge of the details of the defects in Barrett's vehicle, as well as the claims and demands Barrett made to Ford for repair of the defects. Barrett has notified Ford, either directly or through Ford's dealerships, of the issue, describing the defects and the problems caused by the defects, and giving Ford the opportunity to properly repair or replace the defective engine.

## C.   Scott and Heather Gray

150. Plaintiff Heather and Scott Gray ("Gray") are individuals who at all relevant times resided in St. Lucie County, Florida.

151. Gray, purchased a new Ford F-350 Super Duty vehicle with a 6.0L Engine, VIN 1FTWW33P15ED38133, on May 25, 2005 at Bartow Ford in Bartow, Florida.

152. While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms, including starting rough, not accelerating properly, and making a knocking noise in the engine. These symptoms were caused by the root cause defects in the engine and/or the consequent malfunction of the Root-Cause-Damaged Components.

153. Pursuant to the Ford warranty, Gray brought the malfunctioning vehicle to authorized Ford dealerships in Florida, including Sunrise Ford and Velde Ford, on multiple occasions including on June 9, 2008 when the EGR and Oil Cooler were repaired or replaced. Each time Gray complained of the aforementioned engine symptoms and requested that the vehicle be repaired.

154. Each time, the Ford dealership did not repair the engine or performed an inadequate repair of the engine. Thus, Ford failed to provide appropriate warranty benefits for

Gray's vehicle despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

155.    As a result, the engine continued to malfunction and Gray was forced to repeatedly bring the malfunctioning vehicle to an authorized Ford dealership for additional repairs, as indicated above.  Each time Ford either failed to perform an adequate repair or failed to provide any repair at all.

156.    Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

157.    As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Gray was required to incur repair expenses to address these issues, lost income due to the vehicle being unavailable, and/or suffered other direct and consequential damages.

158.    For example, Gray incurred $2189.12 in repair expenses in January 2009, as well as significant expenses to rent a replacement vehicle while the Ford vehicle was inoperable.  In February 2009, Gray incurred additional expenses in an attempt to repair the turbo.  In April 2009, the vehicle broke down again, leading to the replacement of injectors.  In April 2010, Gray was forced to spend over $3500 to replace 8 injectors.  In June 2010, Gray was forced to spend over $2400 to repair the injectors and fuel modulator.

159.    Ford has actual knowledge of the details of the defects in Gray's vehicle, as well as the claims and demands Gray made to Ford for repair of the defects.  Gray has notified Ford, either directly or through Ford's dealerships, of the issue, describing the defects and the problems caused by the defects, and giving Ford the opportunity to properly repair or replace the

defective engine. For example, Gray wrote letters to Ford dealerships and Ford Motor Company complaining of the defects and Ford's inability to properly repair them.

**D.    Gena Boggero**

160.    Plaintiff Gena Boggero ("Boggero") is an individual who at all relevant times resided in Greenwood County, South Carolina.

161.    Boggero purchased a 2006 Ford F550 truck with a 6.0L Engine, VIN 1FDAF56P66ED52236, from Ford.

162.    Beginning at about 10 days after Boggero purchased her vehicle, the engine constantly malfunctioned.

163.    While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms, such as poor engine acceleration, rough idle, difficulty starting the engine, inability to start engine, engine stalling, and complete loss of power while driving. These symptoms were caused by the root cause defects in the engine and/or the consequent malfunction of the Root-Cause-Damaged Components.

164.    Pursuant to the Ford warranty, Boggero brought the malfunctioning vehicle to an authorized Ford dealership in South Carolina, including George Ballentine Ford Lincoln Mercury, multiple times, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced: December 17, 2007 (58,776 miles, EGR valve), January 7,2008 (59,724 miles, injector pump and injectors), March 24, 2008 (64,222 miles, EGR valve), April 10, 2008 (65,082 miles, EGR valve), July 30, 2008 (72,194 miles, EGR valve), November 26, 2008 (79,742 miles, EGR cooler and EGR valve), and July 22, 2009 (98,874 miles, EGR cooler, EGR valve, and turbo).

165.    Each time, Boggero complained of the aforementioned engine symptoms, and requested that the vehicle be repaired.

166.    Each time, the Ford dealership did not repair the engine or performed an inadequate repair of the engine. Thus, Ford failed to provide appropriate warranty benefits for Boggero's vehicle despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

167.    As a result, the engine continued to malfunction.

168.    Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

169.    As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Boggero was required to incur repair expenses to address these issues, lost income due to the vehicle being unavailable, and/or suffered other direct and consequential damages.

170.    Boggero's repair expenses include replacing the turbocharger, injectors, multiple EGR coolers, the head gaskets, and the oil cooler, at the cost of more than $10,000.

171.    Ford has actual knowledge of the details of the defects in Boggero's vehicle, as well as the claims and demands Boggero made to Ford for repair of the defects.  Boggero has notified Ford, either directly or through Ford's dealerships, described the defects, the problems caused by the defects, and has repeatedly given Ford the opportunity to repair or replace the defective engine.  Specifically, Boggero has notified Ford, either directly or through Ford's dealerships, by describing the defects, the problems caused by the defects, and has repeatedly given Ford the opportunity to repair or replace the defective engine.

**E.**    **Charles Clark**

172.    Plaintiff Charles Clark ("Clark") is an individual who at all relevant times resided in Brooklyn, Jackson County, Michigan.

173.    On August 3, 2006, Clark purchased a 2004 Ford F350 with a 6.0L Engine, VIN 1FTSW31P04ED20285.

174.    While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms, including blowing white smoke. These symptoms were caused by the root cause defects in the engine and/or the consequent malfunction of the Root-Cause-Damaged Components.

175.    Pursuant to the Ford warranty, Clark's malfunctioning vehicle was brought to authorized Ford dealerships on multiple occasions, including on April 13, 2004 where the Ford dealership repaired or replaced the turbo charger vanes and EGR valve sensor.

176.    The Ford dealership did not repair the engine or performed an inadequate repair of the engine. Thus, Ford failed to provide appropriate warranty benefits for Clark's vehicle despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

177.    As a result, the engine continued to malfunction, including leaking coolant so excessively that it can no longer be driven and Clark cannot afford to pay for additional repairs. Each time in the past Ford either failed to perform an adequate repair or failed to provide any repair at all.

178.    Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

179.    As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Clark is no longer able to use the vehicle, resulting in loss-of-use damages, and/or other direct and consequential damages.

180.    Ford has actual knowledge of the details of the defects in Clark's vehicle, as well as the claims and demands Clark made to Ford for repair of the defects. Clark has notified Ford, either directly or through Ford's dealerships, of the issue, describing the defects and the problems caused by the defects, and giving Ford the opportunity to properly repair or replace the defective engine. Ford gave Clark a "complaint number" but refused to take any action.

## F.     Dinonno Enterprise, Inc.

181.    Plaintiff Dinonno Enterprise, Inc., d/b/a Cutting Edge Concrete Cutting ("Dinonno") is a corporation incorporated in the state of California with its principal place of business in Simi Valley, Ventura County, California.

182.    Dinonno purchased two new Ford vehicles with 6.0L Engines, a model year 2006 F550 purchased in Indiana, VIN 1FTAF56P46EA73870, on September 30, 2005, and a 2006 F550 purchased in Illinois, VIN 1FDAF56P56EA25665, on August 5, 2005. He also received a 2005 F550 in California, VIN 1FDAF56P35EB87390, on March 27, 2005 as a trade-in for a 2003 vehicle that Ford acknowledged was defective and could not be repaired.

183.    While the engines were covered by the 5 year/100,000 mile warranty, the defective engines caused the vehicles to exhibit multiple symptoms, such as poor engine acceleration, rough idle, difficulty and/or inability to start, engine stalling, and loss of power while driving. These symptoms were caused by the root cause defects in the engine and/or the consequent malfunction of the Root-Cause-Damaged Components.

184. Pursuant to the Ford warranty, Dinonno brought the malfunctioning vehicles on multiple occasions to authorized Ford dealerships including Sunrise Ford in N. Hollywood, California, and Carmenita Truck Center Ford in Santa Fe Springs, California.

185. Dinonno brought malfunctioning vehicle, VIN 1FTAF56P46EA73870, to authorized Ford dealerships on multiple occasions, including on March 13, 2007 for injector replacement.

186. Dinonno brought malfunctioning vehicle, VIN 1FDAF56P56EA2566, to authorized Ford dealerships on multiple occasions including the following dates, each time for injector repair or replacement: December 28, 2007, January 15, 2007, January 19, 2007, March 25, 2007.

187. Dinonno brought malfunctioning vehicle, VIN 1FDAF56P35EB87390, to authorized Ford dealerships in California on multiple occasions including the following dates, with the indicated component(s) repaired or replaced: March 1, 2006 (EGR cooler and EGR valve); October 2, 2006 (EGR valve, injectors, and turbo); September 24, 2008 (heads and EGR cooler) and November 7, 2008 (turbo).

188. Each time Dinonno complained of the aforementioned engine symptoms and requested that the vehicle be repaired.

189. Each time, the Ford dealership did not repair the engine or performed an inadequate repair of the engine. Thus, Ford failed to provide appropriate warranty benefits for Dinonno's vehicles despite the fact that the vehicles fell within the warranty's eligible time and mileage periods.

190. As a result, the engine continued to malfunction and Dinonno was forced to repeatedly bring the malfunctioning vehicles to authorized Ford dealerships for additional

repairs, as indicated above. Each time, Ford either failed to perform an adequate repair or failed to provide any repair at all.

191. Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

192. As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Dinonno was required to incur repair expenses to address these issues, lost income due to the vehicle being unavailable, and/or suffered other direct and consequential damages.

193. Ford has actual knowledge of the details of the defects in Dinonno's vehicle, as well as the claims and demands Dinonno made to Ford for repair of the defects. Dinonno has notified Ford, either directly or through Ford's dealerships, of the issue, describing the defects and the problems caused by the defects, and giving Ford the opportunity to properly repair or replace the defective engine.

**G.     Karl Strong**

194. Plaintiff Karl Strong ("Strong") is an individual who at all relevant times resided in Santa Rosa, Sonoma County, California.

195. Strong purchased a 2004 Ford F250 truck with a 6.0-liter diesel engine, VIN 1FTNX21P64ED41727, from Sebastopol Ford in Sebastopol, California on August 21, 2004.

196. While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms, such as poor engine acceleration, poor air conditioning performance, failure to withstand long periods of engine idle, rough idle,

difficulty and/or inability to start, engine stalling, and complete loss of power while driving. These symptoms were caused by the root cause defects in the engine and/or the consequent malfunction of the Root-Cause-Damaged Components.

197.    Pursuant to the Ford warranty, Strong brought the malfunctioning vehicle to an authorized Ford dealership, Hansel Ford in Santa Rosa, California, for repair, complaining of the aforementioned engine symptoms, and requesting that the vehicle be repaired.

198.    The Ford dealership did not repair the engine and/or performed an inadequate repair of the engine, for example, the dealership only replaced the EGR cooler and oil cooler, which did not repair the engine.  Thus, Ford failed to provide appropriate warranty benefits for Strong's vehicle despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

199.    As a result, the engine continued to malfunction.

200.    Strong was again forced to bring the malfunctioning vehicle to an authorized Ford dealership, including on February 6, 2009 to Hansel Ford.  Each time Ford either failed to perform an adequate repair or failed to provide any repair at all.

201.    Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

202.    As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Strong was required to incur repair expenses to address these issues, lost income due to the vehicle being unavailable, and/or suffered other direct and consequential damages.

203.    For example, Strong had to pay to have the EGR cooler and oil cooler replaced again, and pay for repairs to the head gaskets and EGR valve, after the warranty expired, costing Strong more than $5,900.

204.    Ford has actual knowledge of the details of the defects in Strong's vehicle, as well as the claims and demands Strong made to Ford for repair of the defects. Strong has notified Ford, either directly or through Ford's dealerships, described the defects, the problems caused by the defects, and has repeatedly given Ford the opportunity to repair or replace the defective engine.

**H.    Frank Brown Towing, Inc.**

205.    Plaintiff Frank Brown Towing, Inc. ("Brown") is a corporation incorporated and with its principal place of business in Buffalo, Erie County, New York.

206.    On November 30, 2005, Brown purchased a 2006 Ford F450 truck equipped with the 6.0L Engine, VIN 1FDXX46P36EB47314, in New York.

207.    While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms, such as poor engine acceleration, rough idle, difficulty and/or inability to start, engine stalling, and complete loss of power while driving. The symptoms were caused by the root cause defects in the engine and/or the consequent malfunction of the Root-Cause-Damaged Components.

208.    Pursuant to the Ford warranty, Brown brought the malfunctioning vehicle to authorized Ford dealerships in New York, including Steve Baldo Ford and West-Herr Ford of Amherst, for repair on multiple occasions, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced: January 2, 2008 (47,021 miles, EGR valve), April, 11 2008 (54,320 miles, EGR valve), May 23, 2008 (57,240 miles, EGR cooler), August 6,

2008 (61,174 miles, EGR valve), December 21, 2009 (89,851 miles, EGR valve), January 6, 2010 (90,489 miles, injector), February 10, 2010 (91,763 miles, EGR cooler and oil cooler), June 29, 2010 (99,635 miles, injector), and July 15, 2010 (100,064 miles, turbo).

209.    Each time, Brown complained of the aforementioned engine symptoms, and requested that the vehicle be repaired.

210.    Each time, the Ford dealership performed inadequate repairs of the engine, none of which repaired the engine.

211.    Ford's mechanic even suggested that Brown carry a spare EGR valve onboard the truck to make repairs "on the road" should the part fail again.

212.    Thus, Ford failed to provide appropriate warranty benefits for Brown's vehicle, despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

213.    As a result, the engine continued to malfunction.

214.    Brown was forced to bring the malfunctioning vehicle to an authorized Ford dealership on multiple occasions as listed above.  Each time Ford either failed to perform an adequate repair or failed to provide any repair at all.

215.    Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

216.    Ford has now told Brown that the truck needs an entire engine replacement, which will cost around $18,000.

217.    As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Brown was required to incur repair expenses to address these

issues, lost income due to the vehicle being unavailable, and/or suffered other direct and consequential damages.

218.     Ford has actual knowledge of the details of the defects in Brown's vehicle, as well as the claims and demands Brown made to Ford for repair of the defects.   Brown has notified Ford, either directly or through Ford's dealerships, described the defects, the problems caused by the defects, and has repeatedly given Ford the opportunity to repair or replace the defective engine.

**I.      Steve Santilli**

219.     Plaintiff Steve Santilli ("Santilli") is an individual who at all relevant times resided in Newington, New Haven County, Connecticut.

220.     Santilli purchased a 2005 Ford F250 truck with a 6.0-liter diesel engine, VIN 1FT5X21P95EC54862, on March 25, 2005, from Family Ford in Waterbury, Connecticut.

221.     While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms, such as poor engine acceleration, rough idle, difficulty starting the engine, inability to start engine, engine stalling, and complete loss of power while driving.   These symptoms were caused by the root cause defects in the engine and/or the consequent malfunction of the Root-Cause-Damaged Components.

222.     In approximately November 2008, Santilli experienced problems with the truck running rough, stalling, and failing to start.   Pursuant to the Ford warranty, Santilli brought the malfunctioning vehicle to Interstate Ford, an authorized Ford dealership in Connecticut, complaining of the aforementioned engine symptoms, and requesting that the vehicle be repaired.

223. The Ford dealership did not repair the engine or performed an inadequate repair of the engine. Thus, Ford failed to provide appropriate warranty benefits for Santilli's vehicle despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

224. As a result, the engine continued to malfunction.

225. Santilli was again forced to bring the malfunctioning vehicle to an authorized Ford dealership due to the improper repair. Each time Ford either failed to perform an adequate repair or failed to provide any repair at all.

226. Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

227. As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Santilli was required to incur repair expenses to address these issues, lost income due to the vehicle being unavailable, and/or suffered other direct and consequential damages.

228. In particular, since his warranty expired, Santilli's vehicle has broken down, and Ford claims that the vehicle will require a new FICM, a new turbocharger, and a new EGR valve.

229. Ford has actual knowledge of the details of the defects in Santilli's vehicle, as well as the claims and demands Santilli made to Ford for repair of the defects. Santilli has notified Ford, either directly or through Ford's dealerships, described the defects, the problems caused by the defects, and has repeatedly given Ford the opportunity to repair or replace the defective engine.

**J.**     **John Prebish**

230.     Plaintiff John Prebish ("Prebish") is an individual who at all relevant times resided in Loveland, Larimer County, Colorado.

231.     Prebish purchased a 2004 Ford F350 truck with a 6.0-liter diesel engine, VIN 1FTWW33P74ED15146, on December 1, 2004, with 4,951 miles on it.

232.     While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms, such as poor engine acceleration, rough idle, difficulty starting the engine, inability to start engine, engine stalling and/or complete loss of power while driving.  These symptoms were caused by the root cause defects in the engine and/or the consequent malfunction of the Root-Cause-Damaged Components.

233.     Pursuant to the Ford warranty, Prebish brought the malfunctioning vehicle to an authorized Ford dealership (Heritage Ford-Lincoln-Mercury, Inc.) multiple times, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced: July 8, 2005 (12,911 miles, EGR valve), October 10, 2006 (31.945 miles, clean and test EGR valve), January 24, 2008 (51,750 miles, EGR valve), and September 29, 2009 (EGR valve and cooler), complaining of the aforementioned engine symptoms, and requesting that the vehicle be repaired.

234.     The Ford dealership did not repair the engine or performed an inadequate repair of the engine.  Thus, Ford failed to provide appropriate warranty benefits for Prebish's vehicle despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

235.     As a result, the engine continued to malfunction and Prebish was forced to bring the malfunctioning vehicle back for additional repairs as stated above.  Each time Ford either failed to perform an adequate repair or failed to provide any repair at all.

236.     Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

237.     As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Prebish was required to incur repair expenses to address these issues, lost income due to the vehicle being unavailable, and/or suffered other direct and consequential damages.

238.     Ford has actual knowledge of the details of the defects in Prebish's vehicle, as well as the claims and demands Prebish made to Ford for repair of the defects.  Prebish has notified Ford, either directly or through Ford's dealerships, described the defects, the problems caused by the defects, and has repeatedly given Ford the opportunity to repair or replace the defective engine.

**K.     Anthony Mawyer**

239.     Plaintiff Anthony Mawyer ("Mawyer") is an individual who at all relevant times resided in Alexander County, North Carolina.

240.     On September 19, 2004, Mawyer purchased a new 2004 Ford F250 truck with a 6.0L Engine, VIN 1FTNW21P64EA09712, from Larry Schronce Ford in North Carolina.

241.     While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms, such as poor engine acceleration, poor air conditioning performance, failure to withstand long periods of engine idle, rough idle, difficulty and/or inability to start, engine stalling, and complete loss of power while driving. These symptoms were caused by the root cause defects in the engine and/or the consequent malfunction of the Root-Cause-Damaged Components.

242.     Pursuant to the Ford warranty, Mawyer brought the malfunctioning vehicle to authorized Ford dealerships in North Carolina, including Larry Schronce Ford, for repair on multiple occasions, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced: January 11, 2005 (6289 miles, injector), July 25, 2005 (12,590, injector), August 8, 2007 (33,123 miles, injector replaced and turbo cleaned), and September 15, 2009 (55,325 miles, EGR valve).

243.     Each time, Mawyer complained of the aforementioned engine symptoms, and requested that the vehicle be repaired.

244.     Each time, the Ford dealership performed inadequate repairs of the engine, none of which repaired the engine.

245.     Thus, Ford failed to provide appropriate warranty benefits for Mawyer's vehicle despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

246.     As a result, the engine continued to malfunction.

247.     A Ford service technician admitted to Mawyer that 9 out of 10 trucks equipped with the 6.0L Engine presented for repair exhibit the same problems as Mawyer's vehicle.

248.     Mawyer was forced to return the malfunctioning vehicle to an authorized Ford dealership.  Each time Ford either failed to perform an adequate repair or failed to provide any repair at all.

249.     Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

250.     As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Mawyer was required to incur repair expenses to address

these issues, lost income due to the vehicle being unavailable, and/or suffered other direct and consequential damages.

251.    Ford has actual knowledge of the details of the defects in Mawyer's vehicle, as well as the claims and demands Mawyer made to Ford for repair of the defects.  Mawyer has notified Ford, either directly or through Ford's dealerships, described the defects, the problems caused by the defects, and has repeatedly given Ford the opportunity to repair or replace the defective engine.

**L.    Georjean Vogt**

252.    Plaintiff Georjean Vogt ("Vogt") is an individual who at all relevant times resided in Tucson, Arizona.

253.    Vogt, through a family trust, purchased a new 2003 Ford F350 truck with a 6.0-liter diesel engine, VIN 1FTSW31P83ED32943, on August 10, 2003, in Arizona.

254.    While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms, including running rough, blowing black smoke, turbo whine.  These symptoms were caused by the root cause defects in the engine and/or the consequent malfunction of the Root-Cause-Damaged Components.

255.    Pursuant to the Ford warranty, Vogt brought the malfunctioning vehicle to authorized Ford dealerships in Arizona, including Oracle Ford and Holmes Tuttle Ford, on multiple occasions including the following dates, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced:  October 26, 2005, (17,573 miles, turbo and EGR valve), August 22, 2006 (22,901 miles, EGR valve), September 20, 2007 (31,081 miles, EGR valve), July 31, 2008 (39,382 miles, turbo charger), and August 21, 2008 (39,641

miles, turbo charger). Each time Vogt complained of the aforementioned engine symptoms and requested that the vehicle be repaired.

256. Each time, the Ford dealership did not repair the engine or performed an inadequate repair of the engine. Thus, Ford failed to provide appropriate warranty benefits for Vogt's vehicle despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

257. As a result, the engine continued to malfunction and Vogt was forced to repeatedly bring the malfunctioning vehicle to an authorized Ford dealership for additional repairs. Each time Ford either failed to perform an adequate repair or failed to provide any repair at all.

258. Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components that Ford knew would not, and in fact did not, adequately repair the engine.

259. As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Vogt was required to incur repair expenses to address these issues, lost income due to the vehicle being unavailable, and/or suffered other direct and consequential damages.

260. For example, on July 31, 2008, Vogt was billed $1,992.68 by Oracle Ford for turbocharger work and on August 22, 2008 Vogt was billed $1,127.13 by Oracle Ford for additional engine work.

261. Ford has actual knowledge of the details of the defects in Vogt's vehicle, as well as the claims and demands Vogt made to Ford for repair of the defects. Vogt has notified Ford, either directly or through Ford's dealerships, of the issue, describing the defects and the

problems caused by the defects, and giving Ford the opportunity to properly repair or replace the defective engine.

## M.     Cecil and Tressie Fulton

262.     Plaintiff Cecil and Tressie Fulton ("Fulton") are individuals who at all relevant times resided in Manteca, San Joaquin County, California.

263.     Fulton purchased a new 2004 Ford F250 truck with a 6.0-liter diesel engine, VIN 1FTNW21P14EB66788, in Livermore, California on December 14, 2004.

264.     While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms, including excessive engine noise and other symptoms.  The symptoms were caused by the root cause defects in the engine and/or the consequent malfunction of the Root-Cause-Damaged Components.

265.     Pursuant to the Ford warranty, Fulton brought the malfunctioning vehicle to an authorized Ford dealership, including Codiroli Ford in Livermore, California, on dates including November 15, 2005, December 5, 2005, January 29, 2007, September 10, 2007, March 25, 2008, April 30, 2008, May 12, 2008, April 27, 2011, and May 23, 2011, complaining of the aforementioned engine symptoms, and requesting that the vehicle be repaired.

266.     The Ford dealership performed inadequate repairs of the engine including repairs or replacements of the turbo (four times), the EGR throttle body, EGR cooler and EGR valve, EGR cooler, and head gaskets, none of which repaired the engine adequately.  Thus, Ford failed to provide appropriate warranty benefits for Fulton's vehicle despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

267.     As a result, the engine continued to malfunction.

268.    Fulton was forced to bring the malfunctioning vehicle to an authorized Ford dealership, on multiple occasions as listed above.  Each time Ford either failed to perform an adequate repair or failed to provide any repair at all.

269.    Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

270.    As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Fulton was required to incur repair expenses to address these issues, lost income due to the vehicle being unavailable, and/or suffered other direct and consequential damages.

271.    Ford has actual knowledge of the details of the defects in Fulton's vehicle, as well as the claims and demands Fulton made to Ford for repair of the defects.  Fulton has notified Ford, either directly or through Ford's dealerships, described the defects, the problems caused by the defects, and has repeatedly given Ford the opportunity to repair or replace the defective engine.

## N.    Carl Atwell

272.    Plaintiff Carl Atwell ("Atwell") is an individual who at all relevant times resided in Mooresville, Morgan County, Indiana.

273.    On December 27, 2007, Atwell purchased a pre-owned 2005 Ford F350 truck with a 6.0L Engine, VIN 1FTWW31P85ED18948, from Ray Skillman Ford in Greenwood, Indiana.

274.    While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms including poor engine acceleration,

rough idle, difficulty and/or inability to start, engine stalling, and complete loss of power while driving. These symptoms were caused by the root cause defects in the engine and/or the consequent malfunction of the Root-Cause-Damaged Components.

275. Pursuant to the Ford warranty, Atwell brought the malfunctioning vehicle to authorized Ford dealerships on multiple occasions including the following dates, with the indicated component(s) repaired or replaced: December 17, 2008 (EGR and oil cooler), August 17, 2009 (Injectors 2 and 4), and December 1, 2009 (Injectors 1, 5 and 6).

276. Each time Atwell complained of the aforementioned engine symptoms and requested that the vehicle be repaired.

277. Each time, the Ford dealership did not repair the engine or performed an inadequate repair of the engine. Thus, Ford failed to provide appropriate warranty benefits for Atwell's vehicle despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

278. As a result, the engine continued to malfunction and Atwell was forced to repeatedly bring the malfunctioning vehicle to an authorized Ford dealership for additional repairs, as indicated above. Each time, Ford either failed to perform an adequate repair or failed to provide any repair at all.

279. Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

280. As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Atwell was required to incur repair expenses to address these

issues, lost income due to the vehicle being unavailable, and/or suffered other direct and consequential damages.

281. For example, Atwell was forced to pay for the replacement of the EGR cooler and oil cooler.

282. Ford has actual knowledge of the details of the defects in Atwell's vehicle, as well as the claims and demands Atwell made to Ford for repair of the defects. Atwell has notified Ford, either directly or through Ford's dealerships, of the issue, describing the defects and the problems caused by the defects, and giving Ford the opportunity to properly repair or replace the defective engine.

## O. Phillip Marcum

283. Plaintiff Phillip Marcum ("Marcum") is an individual who at all relevant times resided in Lucasville, Ohio.

284. On September 28, 2007, Marcum purchased a pre-owned 2005 Ford F350 truck with a 6.0L Engine, VIN 1FTWW33P45EB17075, from Donnie Smith Auto Sales in Ohio.

285. The vehicle had 32,100 at the time Marcum purchased the vehicle.

286. While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms, such as poor engine acceleration, rough idle, difficulty starting the engine, inability to start engine, engine stalling and/or complete loss of power while driving. These symptoms were caused by the root cause defects in the engine and/or the consequent malfunction of the Root-Cause-Damaged Components.

287. Pursuant to the Ford warranty, Marcum brought the malfunctioning vehicle to an authorized Ford dealership in Ohio, including Barnett Ford, for repair on multiple occasions, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or

replaced: August 7, 2009 (60,242 miles, EGR valve), and January 26, 2010 (66,326 miles, turbo and two injectors).

288.     Each time, Marcum complained of the aforementioned engine symptoms, and requested that the vehicle be repaired.

289.     Each time, the Ford dealership did not repair the engine or performed an inadequate repair of the engine.  Thus, Ford failed to provide appropriate warranty benefits for Marcum's vehicle despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

290.     As a result, the engine continued to malfunction and Marcum was forced to bring the malfunctioning vehicle back for additional repairs.  Each time, Ford either failed to perform an adequate repair or failed to provide any repair at all.

291.     For example, in September 2010, after his vehicle's warranty had expired, Marcum returned the vehicle to an authorized dealership when the engine again malfunctioned.  Upon discovering that multiple injectors needed replacement, Marcum complained to Ford directly.  Despite the expiration of the vehicle's warranty, Ford agreed to split the repair costs of replacing injectors.

292.     Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

293.     As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Marcum was required to incur repair expenses to address these issues, lost income due to the vehicle being unavailable, and/or suffered other direct and consequential damages.

294. Ford has actual knowledge of the details of the defects in Marcum's vehicle, as well as the claims and demands Marcum made to Ford for repair of the defects. Marcum has notified Ford, either directly or through Ford's dealerships, described the defects, the problems caused by the defects, and has repeatedly given Ford the opportunity to repair or replace the defective engine.

295. In particular, Marcum authored a letter to Ohio Attorney General Richard Cordray detailing Marcum's complaints regarding his vehicle and requesting that Ford replace his defective engine. This letter was provided to Ford as part of the Ohio Attorney general's dispute resolution program.

296. Ford responded that it was not responsible for further repairs to the vehicle after the expiration of the warranty, and that it would not comply with the Marcum's request for engine replacement.

297. Accordingly, Marcum notified Ford of the breach within a reasonable time, and/or was not required to do so because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile.

**P.  James Hutton**

298. Plaintiff James Hutton ("Hutton") is an individual who at all relevant times resided in Flemington, New Jersey.

299. On September 8, 2004, Hutton purchased a new 2005 Ford F350 truck with a 6.0L Engine, VIN 1FTWW33P75EA46406, from Ditschman Flemington Ford in Flemington, New Jersey.

300. While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms, including poor engine acceleration,

rough idle, difficulty and/or inability to start, engine stalling, and/or complete loss of power while driving. These symptoms were caused by the root cause defects in the engine and/or the consequent malfunction of the Root-Cause-Damaged Components.

301. Pursuant to the Ford warranty, Hutton brought the malfunctioning vehicle to Flemington Ford, an authorized Ford dealership in New Jersey, on June 22, 2007. The vehicle had 70,357 miles, and Flemington Ford replaced the EGR valve and turbo charger.

302. Hutton complained of the aforementioned engine symptoms, and requested that the vehicle be repaired.

303. The Ford dealership did not repair the engine or performed an inadequate repair of the engine. Thus, Ford failed to provide appropriate warranty benefits for Hutton's vehicle despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

304. As a result, the engine continued to malfunction and Hutton was forced to repeatedly bring the malfunctioning vehicle to an authorized Ford dealership for additional repairs. Each time, Ford either failed to perform an adequate repair or failed to provide any repair at all.

305. Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

306. As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Hutton was required to incur repair expenses to address these issues, and/or suffered other direct and consequential damages.

307. Ford has actual knowledge of the details of the defects in Hutton's vehicle, as well as the claims and demands Hutton made to Ford for repair of the defects. Hutton has

notified Ford, either directly or through Ford's dealerships, of the issue, describing the defects and the problems caused by the defects, and has given Ford the opportunity to properly repair or replace the defective engine.

## V.  **CLASS ACTION ALLEGATIONS**

308.    Pursuant to FED. R. CIV. P. 23, Plaintiffs Gray, Custom Underground, Brown, Fulton, Strong, Dinnono, Clark, Marcum, Vogt, Prebish, Santilli, Boggero, Hutton, and Mawyer bring this action for themselves and on behalf of the following class ("**the Inadequate Warranty Repair Class"**), which excludes states requiring pre-litigation notice or reliance and is defined as:

> 1.      All entities and natural persons in the United States (including its Territories and the District of Columbia) who (a) currently own or lease (or who in the past owned or leased) vehicles with a Ford 6.0-liter diesel engine, referred to herein (and in all Class definitions) as the "Class Vehicles"; and (b) had a warranty repair by a Ford dealership to any of the following "Root-Cause-Damaged Components": injector, EGR valve, EGR cooler, turbo charger, oil cooler, head gasket, or rear seal.

> 2.      Excepted from the Class Vehicles in this class definition are all vehicles that were only serviced at Ford Dealerships in states requiring reliance or pre-litigation notice as an element of a breach of express warranty claim. Accordingly, the Class will be limited to those who presented a Class Vehicle for service at a Ford Dealership in (1) Alaska, (2) Arizona, (3) California, (4) Colorado, (5) Connecticut, (6) Delaware, (7) Florida, (8) Hawaii, (9) Idaho, (10) Kansas, (11) Louisiana, (12) Maryland, (13) Massachusetts, (14) Michigan, (15) Minnesota, (16) Missouri, (17) Nevada, (18) New Jersey, (19) New York, (20) North Carolina,  (21) District of Columbia, (22) Oklahoma, (23) Pennsylvania, (24) South Carolina, (25) Vermont, (26) Virginia, (27) Washington, (28) West Virginia, (29) Wisconsin, or (30) Puerto Rico.

309.    Pursuant to FED. R. CIV. P. 23, Plaintiffs Custom Underground and Barrett bring this action for themselves and on behalf of the following class ("**the Illinois Inadequate Warranty Repair Class"**):

> All entities and natural persons in the United States (including its Territories and the District of Columbia) who (a) currently own or lease a Class Vehicle; and

(b) had a warranty repair by a Ford dealership **in Illinois** to any of the following "Root-Cause-Damaged Components": injector, EGR valve, EGR cooler, turbo charger, oil cooler, head gasket, or rear seal.

310.     Pursuant to FED. R. CIV. P. 23, Plaintiff Marcum brings this action for himself and

on behalf of the following class ("**the Ohio Inadequate Warranty Repair Class"**):

All entities and natural persons in the United States (including its Territories and the District of Columbia) who (a) currently own or lease (or who in the past owned or leased) a Class Vehicle; and (b) had a warranty repair by a Ford dealership **in Ohio** to any of the following "Root-Cause-Damaged Components": injector, EGR valve, EGR cooler, turbo charger, oil cooler, head gasket, or rear seal.

311.     Pursuant to FED. R. CIV. P. 23, Plaintiffs Atwell and Custom Underground bring

this action for themselves and on behalf of the following class ("**the Indiana Inadequate**

**Warranty Repair Class"**):

All entities and natural persons in the United States (including its Territories and the District of Columbia) who (a) currently own or lease (or who in the past owned or leased) a Class Vehicle; and (b) had a warranty repair by a Ford dealership **in Indiana** to any of the following "Root-Cause-Damaged Components": injector, EGR valve, EGR cooler, turbo charger, oil cooler, head gasket, or rear seal.

312.     Pursuant to FED. R. CIV. P. 23, Plaintiffs Hutton, Prebish, and Boggero bring this

action for themselves and on behalf of the following class ("**the Implied Warranty Class"**)

defined as:

All entities and natural persons in the United States (including its Territories and the District of Columbia) who purchased or leased a Class Vehicle in the States of Alaska, Delaware, Washington, D.C., Hawaii, Louisiana, Nebraska, Nevada, New Jersey, Pennsylvania, West Virginia, Colorado, Oklahoma, or South Carolina.

313.     Pursuant to FED. R. CIV. P. 23(b)(2) all named Plaintiffs bring this action for

declaratory and injunctive relief on behalf of the following  nationwide class ("**the Declaratory**

**Relief Class"**) defined as :

All entities and natural persons in the United States (including its Territories and the District of Columbia) who are current owners or lessees of a Class

Vehicle. This class seeks a declaration by this Court that Ford's unilaterally imposed durational limits of the lesser of 5 years or 100,000 miles to its express warranty is unconscionable and unenforceable, and seeks to enjoin Ford from enforcing these durational limits as a basis to deny warranty coverage to any member of the Declaratory Relief Class.

314.     Pursuant to FED. R. CIV. P. 23, Plaintiffs Custom Underground, Barrett, Gray, Brown, Fulton, Strong, Dinnono, Clark, Marcum, Vogt, Santilli, Mawyer, Hutton, and Boggero bring this action for themselves and on behalf of the following class ("**the Consumer Fraud Class**") defined as:

All entities and natural persons in the United States (including its Territories and the District of Columbia) who purchased or leased a Class Vehicle in the States of California, Florida, Illinois, Michigan, New Jersey, New York, Arizona, Connecticut, North Carolina, South Carolina, or Ohio.

315.     Pursuant to FED. R. CIV. P. 23, as an alternative to the Consumer Fraud Class, Plaintiffs Custom Underground (on behalf of the Illinois Consumer Fraud Sub-Class), Barrett (on behalf of the Illinois Consumer Fraud Sub-Class), Gray (on behalf of the Florida Consumer Fraud Sub-Class), Brown (on behalf of the New York Consumer Fraud Sub-Class), Fulton (on behalf of the California Consumer Fraud Sub-Class), Strong (on behalf of the California Consumer Fraud Sub-Class), Dinnono (on behalf of the California Consumer Fraud Sub-Class), Clark (on behalf of the Michigan Consumer Fraud Sub-Class), Marcum (on behalf of the Ohio Consumer Fraud Sub-Class), Vogt (on behalf of the Arizona Consumer Fraud Sub-Class), Santilli (on behalf of the Connecticut Consumer Fraud Sub-Class), Mawyer (on behalf of the North Carolina Consumer Fraud Sub-Class), Hutton (on behalf of the New Jersey Consumer Fraud Sub-Class), and Boggero (on behalf of the South Carolina Consumer Fraud Sub-Class) bring this action for themselves and on behalf of the following consumer fraud sub-classes:

**California Consumer Fraud Sub-Class**: All entities and natural persons in the United States (including its Territories and the District of Columbia) who purchased or leased a Class Vehicle in the State of California.

**Florida Consumer Fraud Sub-Class**: All entities and natural persons in the United States (including its Territories and the District of Columbia) who purchased or leased a Class Vehicle in the State of Florida.

**Illinois Consumer Fraud Sub-Class**: All entities and natural persons in the United States (including its Territories and the District of Columbia) who purchased or leased a Class Vehicle in the State of Illinois.

**Michigan Consumer Fraud Sub-Class**: All entities and natural persons in the United States (including its Territories and the District of Columbia) who purchased or leased a Class Vehicle in the State of Michigan.

**New Jersey Consumer Fraud Sub-Class**: All entities and natural persons in the United States (including its Territories and the District of Columbia) who purchased or leased a Class Vehicle in the State of New Jersey.

**New York Consumer Fraud Sub-Class**: All entities and natural persons in the United States (including its Territories and the District of Columbia) who purchased or leased a Class Vehicle in the State of New York.

**Arizona Consumer Fraud Sub-Class**: All entities and natural persons in the United States (including its Territories and the District of Columbia) who purchased or leased a Class Vehicle in the State of Arizona.

**Connecticut Consumer Fraud Sub-Class**: All entities and natural persons in the United States (including its Territories and the District of Columbia) who purchased or leased a Class Vehicle in the State of Connecticut.

**North Carolina Consumer Fraud Sub-Class**: All entities and natural persons in the United States (including its Territories and the District of Columbia) who purchased or leased a Class Vehicle in the State of North Carolina.

**South Carolina Consumer Fraud Sub-Class**: All entities and natural persons in the United States (including its Territories and the District of Columbia) persons who purchased or leased a Class Vehicle in the State of South Carolina.

**Ohio Consumer Fraud Sub-Class**: All entities and natural persons in the United States (including its Territories and the District of Columbia) who purchased or leased a Class Vehicle in the State of Ohio.

316.    Excepted from the definition of Class Vehicles in all class definitions above are all "Settled Ambulances," which are defined as vehicles built on an ambulance prep package 47A chassis containing a model year 2003-2007 Ford F-Series or E-Series chassis equipped with

a 6.0-liter diesel engine, which were the subject of a prior class action settlement in the Eastern District of Texas. Specifically excluded from all Classes above are: (a) all federal court judges who preside over this case and their spouses; (b) all persons who elect to exclude themselves from the Class; (c) all persons who have previously executed and delivered to Ford Motor Company releases of all their claims for all of their Class Vehicles; and (d) Defendant's employees, officers, directors, agents, and representatives and their family members.

## A.     <u>Fᴇᴅ. R. Cɪᴠ. P. 23(a) Prerequisites</u>

317.     The classes are so numerous that joinder of all members is impracticable. At this time, Plaintiffs do not know the exact size of the Class. Based on information and belief, the Class is comprised of at least hundreds of thousands of members and is geographically dispersed throughout the country as to render joinder of all Class members impracticable.

318.     The claims of Plaintiffs and the Class Members involve common questions of fact and law which will predominate over any individual issues. These common issues, include, but are not limited to:

    a.     Whether the subject 6.0L Engines are defective, thereby making the vehicles unable to withstand reasonably anticipated use;

    b.     Whether the implied warranty of merchantability applied to the subject 6.0L Engines;

    c.     Whether Defendant breached the implied warranty of merchantability with respect to the subject 6.0L Engines;

    d.     Whether Defendant made express warranties regarding the subject 6.0L Engines, including the warranty that Defendant, through its authorized dealerships, would, without charge, repair, replace, or adjust all parts that malfunctioned or failed during normal use during the applicable coverage period due to a defect in factory-supplied materials or factory workmanship;

    e.     Whether Defendant breached its express warranty regarding the subject 6.0L Engines when it failed to adequately repair the defects;

      f.        Whether Defendant knew about the 6.0L Engine defects;

      g.        When Defendant knew about the 6.0L Engine defects;

      h.        Whether Defendant failed to disclose the 6.0L Engine defects;

      i.        Whether Defendant concealed the 6.0L Engine defects;

      j.        Whether Defendant had and/or has a duty to disclose the 6.0L Engine defects;

      k.        Whether the defective nature of the 6.0L Engines constitutes a material fact; and

      l.        Whether Defendant violated consumer protection statues under Illinois law, California law, Florida law, Michigan law, New Jersey law, and New York law, Arizona law, Connecticut law, North Carolina law, and/or South Carolina law.

319.    The claims of Plaintiffs are typical of the other Class Members' claims.  As described above, Defendant expressly warranted to all Class Members that it would, without charge, repair, replace, or adjust all parts that malfunctioned or failed during normal use during the applicable coverage period due to a defect in factory-supplied materials or factory workmanship.

320.    Defendant uniformly breached its express warranty to Plaintiffs and Class Members by failing to repair, replace, or adjust defective parts.

321.    Defendant uniformly breached the implied warranty of merchantability to Plaintiffs and all Class Members because the 6.0L Engines are inadequate and incapable of performing the very tasks they were designed to carry out.

322.    Plaintiffs, like all Class Members, used their vehicles in the normal manner for which the 6.0L Engines were designed.  Despite Plaintiffs' proper use of the engines, they malfunctioned in a manner which Defendant failed to fix by repairing, replacing or adjusting.

323.     Because of the well-known defects, which have been admitted by Ford, it is clear that the Class Members' engines are malfunctioning during normal use due to defects in factory-supplied materials and/or factory workmanship.

324.     Plaintiffs, like all Class Members, purchased and leased Ford vehicles designed, manufactured, and distributed by Ford in which the 6.0L Engine was defective.  Plaintiffs, like all Class Members, have been damaged by Ford's misconduct. Further, the factual bases of Ford's misconduct are common to all class members, as—regarding the defective nature of the 6.0L Engines—Ford made uniform misrepresentations to and uniformly withhold material information from Plaintiffs and all class members.

325.     Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs are members of the subject Classes.  Plaintiffs' interests coincide with, and are not antagonistic to, other Class Members' interests.  Additionally, Plaintiffs have retained counsel experienced and competent in complex, commercial, multi-party, mass tort, consumer, and class action litigation.  Plaintiffs' counsel has prosecuted complex class actions in state and federal courts across the country.  Plaintiffs' counsel has also prosecuted successfully a class action involving the defective 6.0L Engine.

## B.     FED. R. CIV. P. 23(b) Prerequisites

326.     Questions of law and fact common to the Class predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy.  Individual damages on the matter can be readily calculated by documented income loss and expenses caused by the defects at issue.  Thus, the question of individual damages will not predominate over legal and factual questions common to the class.  Additionally, Ford has acted or refused to act on grounds that apply

generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## VI. CAUSES OF ACTION

### Count 1: Breach of Implied Warranty of Merchantability
### (Asserted on Behalf of Plaintiffs Hutton, Prebish, Boggero, and the Implied Warranty Class)

327.    Plaintiffs and Class Members incorporate by reference those paragraphs set out above as though fully set forth herein.

328.    Plaintiffs and Class Members purchased or leased vehicles equipped with 6.0L Engines supplied by Defendant Ford.

329.    When the subject 6.0L Engines left Defendant Ford's possession, they were unmerchantable. Plaintiffs and Class Members used their vehicles in the normal manner for which the 6.0L Engines were designed. Despite Plaintiffs' proper use of the engines, they malfunctioned in a manner that Defendant failed to fix by repairing, replacing or adjusting.

330.    The vehicles equipped with 6.0L Engines supplied by Ford are inadequate and incapable of performing the very tasks they were designed to carry out. The inadequacies of the engines include but are not limited to:

    a.    The 6.0L Engines are not equipped to withstand extended periods of engine idle;

    b.    The 6.0L Engines have poor acceleration;

    c.    The 6.0L Engines repeatedly stall;

    d.    The 6.0L Engines are frequently incapable of starting;

    e.    The 6.0L Engines are difficult to start and run rough; and

    f.    The 6.0L Engines require prolonged periods of warm up time before acceleration is possible.

331.     After having the subject vehicles repaired repeatedly, Plaintiffs notified Ford of the breach of warranty claims when they brought their vehicles to a Ford dealership, and/or contacted Ford directly, as described above.  Plaintiffs contacted their local Ford dealerships and/or informed a Ford representative of the continuous mechanical malfunctions of the 6.0L Engine design and suffered repeated unsuccessful attempts by Ford dealerships to repair the problems.

332.     Accordingly, Ford has actual knowledge of the specific defects associated with defective 6.0L Engines and the problems resulting therefrom.

333.     To date, Ford has neither adequately cured the actual engine defects nor replaced the defective engines.

334.     As a result of Ford's breach of implied warranty of merchantability, Plaintiffs suffered damages in the amount of the difference between the value of the vehicles equipped with the defective engines and the value of the vehicles if they had been equipped as warranted.

335.     Plaintiffs also suffered diminution in the value of their vehicles, out-of-pocket expenditures related to the cost to repair/service the engines (including deductibles paid when repairs were covered by warranty, and the full cost of repair when they were not covered), lost profits from the inability to utilize the vehicles equipped with the defective engine (caused by the long delays as Ford dealership mechanics repeatedly and unsuccessfully attempted to diagnose and/or repair the defects), towing charges incurred due to the repeated break-downs of the vehicles, the cost of purchasing additional vehicles necessitated by the repeated problems with the 6.0L Engines, and other damages as described herein.

336.     Defendant Ford's defective 6.0L Engine was the direct and proximate cause of Plaintiffs' injuries.

**Count 2:  Breach of Express Warranty**
**(Asserted on Behalf of Plaintiffs Gray, Custom Underground, Brown,**
**Fulton, Strong, Dinnono, Clark, Marcum, Vogt, Prebish, Santilli,**
**Boggero, Hutton, Mawyer, and the Inadequate Warranty Repair Classes)**

337.    Plaintiffs incorporate by reference those paragraphs set out above as though fully set forth herein.

338.    Ford provided all Plaintiffs with the express 6.0L Powerstroke Diesel Engine warranty, which covers the engine and engine components against defects in factory-supplied materials or workmanship for five years after the warranty start date or 100,000 miles, whichever occurs first, and provides that during this coverage period, authorized Ford Motor Company dealers will repair, replace, or adjust all parts on the vehicle that are defective in factory-supplied materials or workmanship.

339.    This warranty became part of the basis of the bargain.

340.    Ford manufactured and sold vehicles equipped with the 6.0L Engine that are covered by the express warranty.

341.    Ford breached this express warranty (1) each time its dealerships failed to properly repair, replace, or adjust the malfunctioning engine and thus failed to return the vehicle to proper working condition, and (2) each time Defendant failed to authorize a Ford dealer to perform an adequate repair of a vehicle, instead only authorizing an inadequate repair which resulted in additional engine repair or replacement expenses after the expiration of the warranty period.

342.    Ford has actual knowledge of the specific defects associated with defective 6.0L Engines and the problems resulting therefrom.

343.    Plaintiffs (or the prior owners of their Ford vehicles) notified Ford of the breach within a reasonable time and/or were not required to do so because affording Ford a reasonable

opportunity to cure its breach of written warranty would have been futile. After having the subject vehicles repaired repeatedly, Plaintiffs notified Defendant of the breach of warranty claims when they brought their vehicles into a Ford dealership, and/or contacted Ford directly, as described above. Plaintiffs contacted their local Ford dealerships and/or informed a Ford representative of the continuous mechanical malfunctions of the 6.0L Engine design and suffered repeated unsuccessful attempts by Ford Dealerships to repair the problems. To date, Defendant has neither adequately cured the actual engine defects nor replaced the defective engines.

344. Ford was also on notice of the engine defects from the complaints and service requests it received from class members, from repairs of the 6.0L Engines or components thereof, through its own maintenance records, and through its own employees' communications as evidenced in numerous memoranda and email communications.

345. As a result of Defendant Ford's breach, Plaintiffs suffered damages in the amount of the difference between the value of the vehicles equipped with the defective engines and the value of the vehicles if they had been equipped as warranted.

346. Plaintiffs also suffered diminution in the value of their vehicles, out-of-pocket expenditures related to the cost to repair/service the engines (including deductibles paid when repairs were covered by warranty, and the full cost of repair when they were not covered), lost profits from the inability to utilize the vehicles equipped with the defective engine (caused by the long delays as Ford dealership mechanics repeatedly and unsuccessfully attempted to diagnose and/or repair the defects), towing charges incurred due to the repeated break-downs of the vehicles, the cost of purchasing additional vehicles necessitated by the repeated problems with the 6.0L Engines, and other damages as described herein.

347.    Defendant Ford's defective 6.0L Engine is the direct and proximate cause of Plaintiffs' injuries.

348.    Plaintiffs and the other class members are entitled to legal and equitable relief against Ford, including damages, consequential damages, specific performance, rescission, attorneys' fees, costs of suit, and other relief as appropriate.

### Count 3:  Declaratory Relief Regarding Unconscionability and Unenforceability of Unilaterally Imposed Durational Limits to Ford's Express Warranty
### (Asserted on Behalf of all Plaintiffs and the Declaratory Relief Class)

349.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

350.    The express 6.0L Powerstroke Diesel Engine warranty was unilaterally and solely drafted by Ford without any negotiation or opportunity for input from any Plaintiffs or members of the Declaratory Relief Class.  All terms of the express warranty, including the unilaterally imposed durational limits of 5 years or 100,000 miles were offered by Ford on a "take it or leave it basis," and without affording members of the Declaratory Relief Class any meaningful choice in bargaining for the terms of warranty coverage.

351.    Ford, as the manufacturer of the Class Vehicles and contractee of Navistar, knew, at the time that it unilaterally imposed the terms of its express warranty (including the warranty's durational limits), that the 6.0L Engine was defective and would fail repeatedly beyond the warranty repair period.  Ford also knew, at the time that it unilaterally imposed the durational limits on its express warranty, that Ford was unqualified and unable to perform properly the warranty service that it had contracted to offer as part of the 6.0L Powerstroke Diesel Engine warranty, thereby leaving the Class Vehicles defective both within and outside the warranty durational limits unilaterally imposed by Ford.  Ford failed to disclose this knowledge to any

member of the Declaratory Relief Class, and took affirmative steps to conceal it by continuing to tout the supposed superior attributes and qualities of the 6.0L Engine.

352.    As a result of Ford's knowledge and concealment from consumers of the defects inherent in the 6.0L Engine, its propensity to fail shortly after the warranty durational limits would expire, and Ford's inability to offer appropriate warranty repair service as was called for under the terms of the express warranty, Ford was the party with superior bargaining power.

353.    Ford has and continues to adhere to the durational limits of its express warranty and relies upon these unilaterally imposed durational limits to deny warranty coverage to any Class Vehicle that is presented for warranty repair service either more than 5 years since its in-service date or having more than 100,000 miles.  All Plaintiffs have either had Ford deny warranty service to their vehicles as a result of these unilaterally imposed durational limits, or face the certain prospect of Ford denying warranty coverage to their vehicles once these durational limits have been reached.

354.    Given that (1) there was no opportunity for bargaining the terms of the warranty (including its durational limits); (2) Ford concealed, during the transactions giving rise to the offering of the express warranty, Ford's unique and superior knowledge as to the defective nature of the Class Vehicles, their propensity to fail shortly after the durational limits, and Ford's inability to offer adequate warranty repair service; and (3) consumers and members of the Declaratory Relief Class had no meaningful choice but to accept Ford's unilaterally imposed warranty terms, the durational limits imposed unilaterally by Ford as part of its warranty contract are procedurally unconscionable, and hence unenforceable.

355.    Given the inherently defective nature of the Class Vehicles, and their propensity to malfunction (or continue to malfunction) and require inordinately expensive repairs shortly

after the expiration of the warranty durational limits unilaterally imposed by Ford, and given Ford's non-disclosure and affirmative concealment of these facts, enforcement of the unilaterally imposed durational limits of the 6.0L Powerstroke Diesel Engine express warranty would so oppress and surprise the innocent end-user members of the Declaratory Relief Class as to render these durational limits substantively unconscionable, and hence unenforceable.

356.    Because all members of the Declaratory Relief Class are subject to these same unilaterally imposed durational limits, and all either have been denied warranty coverage by Ford as a result of these durational limits or face the certain prospect of such denial, a real controversy exists between all members of the Declaratory Relief Class and Ford.  As such, Plaintiffs and the Declaratory Relief Class may and do seek a declaration of their rights and Ford's obligations regarding the express warranty.  Specifically, all Plaintiffs and members of the Declaratory Relief Class seek a declaration by this Court that Ford's unilaterally imposed durational limits on its 6.0L Powerstroke Diesel Engine express warranty are unconscionable and, hence, unenforceable, such that Ford may not enforce or rely on these durational limits as a basis to deny warranty coverage to members of the Declaratory Relief Class or their successors or assignees in the future.

357.    Because Ford's continued enforcement of these unconscionable durational limits to the 6.0L Powerstroke Diesel Engine warranty would cause members of the Declaratory Relief Class to sustain irreparable harm, all Plaintiffs and the members of the Declaratory Relief Class have standing to and do seek an injunction barring Ford from continuing to enforce the durational limits and relying on these unconscionable limits to deny warranty coverage.

**Count 4: Violation of Similar State Consumer Protection Laws**
**(Asserted on Behalf of Plaintiffs Custom Underground, Barrett, Gray, Brown, Fulton,**
**Strong, Dinnono, Clark, Marcum, Mawyer, Boggero,**
**Santilli, Vogt, Hutton, and the Consumer Fraud Class)**

358.    Plaintiffs and the Consumer Fraud Class incorporate the allegations set forth above as if fully set forth herein.

359.    Plaintiffs and the Consumer Fraud Class are "consumers," as defined by the Consumer Fraud Acts under the law of Illinois, California, Florida, Michigan, New Jersey, New York, Arizona, Connecticut, North Carolina, South Carolina, and Ohio who purchased or leased one or more Ford vehicles equipped with a defective 6.0L Engine.

360.    Ford is a "person" within the meaning of Consumer Fraud Acts.

361.    Ford's conduct, as set forth herein, occurred in the conduct of "trade or commerce" within the meaning of the Consumer Fraud Acts.

362.    At all relevant times, as described above, the Ford vehicles equipped with the defective 6.0L Engines that Ford sold to Plaintiffs and the Consumer Fraud Class Members were not of the particular sponsorship, approval, or certification because the Ford vehicles contained defective 6.0L Engines, causing the likelihood of confusion and misunderstanding.

363.    By failing to disclose the defects inherent to the 6.0L Engine and failing to properly repair the defective engines, Ford engaged in unfair or deceptive acts or practices prohibited by the Consumer Fraud Acts, including (1) representing that the Ford vehicles equipped with defective 6.0L Engines have characteristics, use benefits, and qualities which they do not have; (2) representing that the Ford vehicles equipped with the defective 6.0L Engines are of a particular standard, quality, and grade when they are not; (3) advertising the Ford vehicles equipped with the defective 6.0L Engines with the intent not to sell them as advertised; (4) representing that a transaction involving Ford vehicles equipped with the defective 6.0L

Engines confers or involves rights, remedies, and obligations which it does not; (5) representing that the subject of a transaction involving the Ford vehicles equipped with the defective 6.0L Engines has been supplied in accordance with a previous representation when it has not; and (6) representing that the Ford vehicles equipped with the defective 6.0L Engines had sponsorship, approval, characteristics, ingredients, uses, and benefits that they do not have.

364.    Ford sold the vehicles equipped with the defective 6.0L Engines to Plaintiffs and the Consumer Fraud Class Members with full knowledge that the Ford vehicles contained the defective 6.0L Engines at issue in the litigation.

365.    Ford intended that Plaintiffs and the other members of the Consumer Fraud Class rely on its misrepresentations and omissions, so that Plaintiffs and other Consumer Fraud Sub-Class Members would purchase Ford vehicles equipped with the defective 6.0L Engines.

366.    Ford owed Plaintiffs and the Consumer Fraud Class members a duty to disclose the defects in the Ford vehicles equipped with the defective 6.0L Engines, because it possessed exclusive and superior knowledge of the defects and did not disclose these defects.

367.    Information regarding these defects, which result in substantial additional repair costs, decreased vehicle performance, and/or vehicle failure, is material to a reasonable consumer in deciding to purchase a vehicle and considering how much to pay for a vehicle.

368.    A reasonable consumer who had known of the defective nature of the 6.0L Engines would not have purchased Ford vehicles equipped with the engine or would have paid less for them.

369.    Ford's unfair or deceptive acts or practices were therefore likely to or had a tendency or capacity to deceive reasonable consumers about the true nature of the Ford vehicles equipped with the defective 6.0L Engines.

370.    Ford's actions impact the public interest because Plaintiffs and members of the Consumer Fraud Class were injured in exactly the same way as thousands of others who purchased and/or leased Ford vehicles equipped with the defective 6.0L Engines as a result of and pursuant to Ford's generalized course of deception.

371.    Ford's conduct was knowing, intentional, and with malice, and demonstrated complete carelessness and recklessness and was in conscious disregard for the rights of Plaintiffs and the Consumer Fraud Class.

372.    As a result of the foregoing acts, omissions, Plaintiffs and the Consumer Fraud Class suffered actual damages as described herein, and these class members are entitled to recover such damages, together with punitive damages, equitable relief, injunctive relief, diminution of value, reasonable attorneys' fees, costs of suit, and such other relief set forth below.

**Count 5:  Violation of California's Consumer Legal Remedies Act**
**(Asserted on Behalf of Plaintiffs Fulton, Strong, Dinnono,**
**and the California Consumer Fraud Sub-Class)**
**(CAL. CIV. CODE § 1750, *et seq.*)**

373.    Plaintiffs Fulton, Strong, and Dinonno ("California Plaintiffs") and the California Consumer Fraud Sub-Class incorporate the allegations set forth above as if fully set forth herein.

374.    Ford is a "person" under CAL. CIV. CODE § 1761(c).

375.    California Plaintiffs and the California Consumer Fraud Sub-Class are "consumers," as defined by CAL. CIV. CODE § 1761(d), who purchased or leased one or more Ford vehicles equipped with a defective 6.0L Engine.

376.    By failing to disclose the defects inherent to the 6.0L Engine and failing to properly repair the defective engines, Ford engaged in unfair or deceptive acts or practices prohibited by the CLRA, CAL. CIV. CODE § 1770, including (1) representing that the Ford

vehicles equipped with defective 6.0L Engines have characteristics, use benefits, and qualities which they do not have; (2) representing that Ford vehicles equipped with the defective 6.0L Engines are of a particular standard, quality, and grade when they are not; (3) advertising the Ford vehicles equipped with the defective 6.0L Engines with the intent not to sell them as advertised; (4) representing that a transaction involving Ford vehicles equipped with the defective 6.0L Engines confers or involves rights, remedies, and obligations which it does not; and (5) representing that the subject of a transaction involving the Ford vehicles equipped with the defective 6.0L Engines has been supplied in accordance with a previous representation when it has not.

377.    Ford owed California Plaintiffs and the California Consumer Fraud Sub-Class a duty to disclose the defects in the Ford vehicles equipped with the defective 6.0L Engines, because it possessed exclusive and superior knowledge of the defects and did not disclose these defects.

378.    Information regarding these defects, which result in substantial additional repair costs, decreased vehicle performance, and/or vehicle failure, is material to a reasonable consumer in deciding to purchase a vehicle and considering how much to pay for a vehicle.

379.    A reasonable consumer with knowledge of the defective nature of the 6.0L Engines would not have purchased Ford vehicles equipped with the defective 6.0L Engine or would have paid less for them.

380.    Ford's unfair or deceptive acts or practices were therefore likely to or had a tendency or capacity to deceive reasonable consumers about the true nature of the Ford vehicles equipped with the defective 6.0L Engines.

381.    As a result of its violations of the CLRA, Ford caused actual damage to California Plaintiffs and the California Consumer Fraud Sub-Class including, inter alia, substantial time and money dedicated to repeat visits to various Ford dealership service departments attempting to resolve the engine problems to no avail.

382.    In accordance with CIVIL CODE § 1780 (a), California Plaintiffs and the California Consumer Fraud Sub-Class seek injunctive and equitable relief for Ford's violations of the CLRA.   However, in accordance with CIVIL CODE § 1782(d), California Plaintiffs and the California Consumer Fraud Sub-Class will provide notice of the violations described herein and demand that they be rectified by certified mail to the principal place of Ford's business in California and then amend this Complaint to include a request for damages, including actual and punitive damages pursuant to § 1780.   California Plaintiffs and the California Consumer Fraud Sub-Class request that this Court enter such orders or judgments as may be necessary to restore to any person-in-interest any money which may have been acquired by means of such unfair business practices, and for such other relief, including attorneys' fees and costs, as provided in CIVIL CODE § 1780, and for such other relief set forth below.

### Count 6:  Violation of California's Unfair Competition Law
**(Asserted on Behalf of Fulton, Strong, Dinnono, and the**
**California Consumer Fraud Sub-Class)**
**(CAL. BUS. & PROF. CODE § 17200, *et seq.*)**

383.    California Plaintiffs and the California Consumer Fraud Sub-Class incorporate the allegations set forth above as if fully get forth herein.

384.    California Business and Professions Code section 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices."   Ford has engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

385.    Ford has violated the unlawful prong of section 17200 by its violations of the Consumer Legal Remedies Act, CAL CIV. CODE § 1750, *et seq.* and various warranty statutes, as set forth above.

386.    Ford has violated the fraudulent prong of section 17200 because the material misrepresentations and omissions regarding the Ford vehicles equipped with the defective 6.0L Engines were both likely to or had a tendency or capacity to deceive a reasonable consumer.

387.    Ford has violated the unfair prong of section 17200 because the acts and practices set forth in the Complaint, including the manufacture and sale of the Ford vehicles equipped with the defective 6.0L Engines, Ford's failure to adequately investigate, disclose or remedy the defective 6.0L Engines, and Ford's misrepresentations concerning the Ford vehicles equipped with the defective 6.0L Engines, offend established public policy; and because the harm Ford caused to consumers greatly outweighs any benefits associated with those practices. Ford's conduct has also impaired competition within the automotive vehicles market and has prevented California Plaintiffs and the California Consumer Fraud Sub-Class from making fully informed decisions about whether to purchase or lease the Ford vehicles equipped with the defective 6.0L Engines and/or how much they should pay to purchase or lease the Ford vehicles equipped with the defective 6.0L Engines.

388.    California Plaintiffs have standing to pursue this claim on behalf of the California Consumer Fraud Sub-Class because they have suffered an injury in fact, including the loss of money or property, as a result of Ford's unfair unlawful and/or deceptive practices. As set forth above, had Ford disclosed the known defect inherent to the 6.0L Engines, a reasonable consumer would not have purchased Ford vehicles equipped with defective 6.0L Engines or leased and/or paid as much for them. In addition, California Plaintiffs and the California Consumer Fraud

Sub-Class have suffered actual damages because their Ford vehicles contained the defective 6.0L Engines.

389.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business.  Ford's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated in the State of California.

390.    California Plaintiffs and the California Consumer Fraud Sub-Class request that this Court enter such orders or judgments as may be necessary to enjoin Ford from continuing its unfair, unlawful, and/or deceptive practices and to restore to California Plaintiffs and the California Consumer Fraud Sub-Class any money Ford acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in CAL. BUS. & PROF. CODE § 17203 and CAL. CIV. CODE § 3345, and for such other relief set forth below.

### Count 7:  Violation of Florida's Unfair and Deceptive Trade Practices Act
**(Asserted on Behalf Plaintiff Gray and the Florida Consumer Fraud Sub-Class)**
**(FLA. STAT. § 501.201 *et seq.*)**

391.    Plaintiffs Gray ("Florida Plaintiffs") incorporate the allegations set forth above as if fully set forth herein.

392.    Ford's business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the Florida Unfair and Deceptive Trade Practices Act, FLA. STAT. § 501.201, *et seq.* ("FUDTPA").

393.    At all relative times, Florida Plaintiffs and all members of the Florida Consumer Fraud Sub-Class were "consumers" within the meaning of the FUDTPA, FLA. STAT. § 501.203(7).

394.    Ford's conduct, as set forth herein, occurred in the conduct of "trade or commerce" within the meaning of the FUDTPA, FLA. STAT. § 501.203(8).

395.    Ford's practices, described above, violate the FUDTPA for one or more of the following reasons:

a.    Ford represented that goods or services have sponsorship, approval, characteristics, uses, and benefits that they do not have;

b.    Ford provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements technical data and other information to consumers regarding the performance, reliability, quality and nature of the Ford vehicles equipped with the defective 6.0L Engines;

c.    Ford represented that goods or services were of a particular standard, quality, or grade when they were of another;

d.    Ford engaged in unconscionable commercial practices in failing to reveal material facts and information about the Ford vehicles equipped with the defective 6.0L Engines, which did (or tended to) mislead Florida Plaintiffs and the Florida Consumer Fraud Sub-Class about facts that could not reasonably be known by the consumer;

e.    Ford failed to reveal facts that were material to the transactions in light of representations of fact made in a positive manner;

f.    Ford caused Florida Plaintiffs and the Florida Consumer Fraud Sub-Class to suffer a probability of confusion and a misunderstanding of legal rights, obligations, and/or remedies by and through its conduct; and

g.    Ford made material representations and statements of fact to Florida Plaintiffs and the Florida Consumer Fraud Sub-Class that represented or suggested a state of affairs to be other than what they actually were.

396.    Ford owed Florida Plaintiffs and the Florida Consumer Fraud Sub-Class a duty to disclose the defects in the Ford vehicles equipped with the defective 6.0L Engines, because Ford possessed exclusive and superior knowledge of the defects and did not disclose the defects.

397.    Information regarding the defects, which result in substantial additional repair costs, decreased vehicle performance, and/or vehicle failure, is material to a reasonable consumer in deciding to purchase a vehicle and considering how much to pay for a vehicle.

398. A reasonable consumer with knowledge of the defective nature of the 6.0L Engines would not have purchased Ford vehicles equipped with the defective 6.0L Engine or would have paid less for them.

399. Ford's conduct in employing these unfair and deceptive trade practices was malicious, willful, wanton, and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

400. Ford's actions impact the public interest because Florida Plaintiffs and members of the Florida Consumer Fraud Sub-Class were injured in exactly the same way as thousands of others who purchased and/or leased Ford vehicles equipped with the defective 6.0L Engines as a result of and pursuant to Ford's generalized course of deception.

401. As a result of the foregoing acts, omissions, and practices Florida Plaintiffs and other members of the Florida Consumer Fraud Sub-Class suffered actual damages as described herein, and these class members are entitled to recover such damages, together with punitive damages, equitable relief, injunctive relief, diminution of value, reasonable attorneys' fees, costs of suit, and such other relief set forth below.

## Count 8: Violation of Illinois Consumer Fraud and Deceptive Business Practices Act
### (Asserted on Behalf of Plaintiffs Custom Underground, Barrett, and the Illinois Consumer Fraud Sub-Class)
### (815 ILL. COMP. STAT. 505/1 *et seq.*)

402. Illinois Plaintiffs and the Illinois Consumer Fraud Sub-Class incorporate the allegations set forth above as if fully set forth herein.

403. Illinois Plaintiff and the Illinois Consumer Fraud Sub-Class are "consumers" within the meaning of 815 ILL. COMP. STAT. 505/1(e).

404. Ford is a "person" within the meaning of 815 ILL. COMP. STAT. 505/1(c).

405. At all relevant times material hereto, Ford conducted trade and commerce in Illinois and elsewhere within the meaning of 815 ILL. COMP. STAT. 505/1(f).

406. 815 ILL. COMP. STAT. 505/2 provides in relevant part as follows:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

407. By misrepresenting the characteristics of the 6.0L Engine, failing to disclose the defects inherent to the 6.0L Engine, and failing to properly repair the defective engines, as fully set forth above, Ford engaged in unfair or deceptive acts or practices prohibited by 815 ILL. COMP. STAT. 505/2.

408. Ford owed Illinois Plaintiffs and the Illinois Consumer Fraud Sub-Class a duty to disclose the defects in the Ford vehicles equipped with the defective 6.0L Engines because it possessed exclusive and superior knowledge of the defects and did not disclose the defects.

409. Information regarding the defects, which result in substantial additional repair costs, decreased vehicle performance, and/or vehicle failure, is material to a reasonable consumer in deciding to purchase a vehicle and considering how much to pay for a vehicle.

410. A reasonable consumer with knowledge of the defective nature of the 6.0L Engines would not have purchased Ford vehicles equipped with the defective 6.0L Engine or would have paid less for them.

411.    Ford's unfair or deceptive acts or practices were therefore likely to or had a tendency or capacity to deceive reasonable consumers about the true nature of the Ford vehicles equipped with the defective 6.0L Engines.

412.    Ford intended that Illinois Plaintiffs and the other members of the Illinois Consumer Fraud Sub-Class rely on their misrepresentations and omissions, so that Illinois Plaintiffs and other Illinois Consumer Fraud Sub-Class Members would purchase Ford vehicles equipped with the defective 6.0L Engines.

413.    Ford's conduct was knowing and intentional and with malice, and demonstrated a complete lack of care and recklessness and was in conscious disregard for the rights of Illinois Plaintiffs and the Illinois Consumer Fraud Sub-Class.

414.    As a result of the foregoing acts, omissions, and practices, Illinois Plaintiffs and other members of the Illinois Consumer Fraud Sub-Class have suffered actual damages as described herein, and these class members are entitled to recover such damages, together with punitive damages, equitable relief, injunctive relief, diminution of value, reasonable attorneys' fees, costs of suit, and such other relief set forth below.

### Count 9:  Violation of Illinois Uniform Deceptive Trade Practices Act
**(Asserted on Behalf of Plaintiffs Custom Underground, Barrett,
and the Illinois Consumer Fraud Sub-Class)
(815 ILL. COMP. STAT. 510/1 *et seq.*)**

415.    Illinois Plaintiffs and the Illinois Consumer Fraud Sub-Class incorporate the allegations set forth above as if fully set forth herein.

416.    Ford is a "person" within the meaning of 815 ILL. COMP. STAT. 510/1(5).

417.    815 ILL. COMP. STAT. 510/2 provides that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person does any of the following: (2) causes likelihood of confusion or of misunderstanding as to the source,

sponsorship, approval, or certification of goods or services; . . . (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have. . . ; (7) represents that goods or services are of a particular standard, quality, or grade . . . if they are not; . . . [and] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

418.    By misrepresenting the characteristics of the 6.0L Engine, failing to disclose the defects inherent to the 6.0L Engine, and failing to properly repair the defective engines, as fully set forth above, Ford engaged in deceptive acts or practices prohibited by 815 ILL. COMP. STAT. 510/2.

419.    At all relevant times, as described above, the Ford vehicles equipped with the defective 6.0L Engines Ford sold to Illinois Plaintiffs and the Illinois Consumer Fraud Class Sub-Class Members were not of the particular sponsorship, approval, or certification because Ford vehicles contained defective 6.0L Engines, causing the likelihood of confusion and misunderstanding.

420.    Further, Ford represented that the Ford vehicles equipped with the defective 6.0L Engines had sponsorship, approval, characteristics, ingredients, uses, and benefits that they do not have.  For example, Ford sold the Ford vehicles equipped with the defective 6.0L Engines to Plaintiffs and the Illinois Consumer Fraud Sub-Class Members with full knowledge that Ford vehicles contained the defective 6.0L Engines defects at issue in the litigation.

421.    Ford's conduct was knowing and intentional and with malice, and demonstrated a complete lack of care and recklessness and was in conscious disregard for the rights of Illinois Plaintiffs and the Illinois Consumer Fraud Sub-Class.

422.     As a result of the foregoing acts, omissions, and practices Illinois Plaintiffs and other members of the Illinois Consumer Fraud Sub-Class have suffered actual damages as described herein, and these class members are entitled to recover such damages, together with punitive damages, equitable relief, injunctive relief, diminution of value, reasonable attorneys' fees, costs of suit, and such other relief set forth below.

**Count 10:  Violations of New Jersey Consumer Fraud Act**
**(Asserted on Behalf Plaintiff Hutton and the New Jersey Consumer Fraud Sub-Class)**
**(N.J. STAT. ANN. § 56:8-1 *et seq.*)**

423.     Plaintiff Marcum ("New Jersey Plaintiff") and the New Jersey Consumer Fraud Sub-Class incorporate the allegations set forth above as if fully set forth herein.

424.     New Jersey Plaintiff, the New Jersey Consumer Fraud Sub-Class, and Ford are "persons" with the meaning of the New Jersey Consumer Fraud Act ("NJCFA"), N.J. STAT. ANN.§ 56:8-1 (d)

425.     The NJCFA provides in relevant part as follows:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

N.J. STAT. ANN. § 56:8-2.

426.     By misrepresenting the characteristics of the 6.0L Engine, failing to disclose the defects inherent to the 6.0L Engine, and failing to properly repair the defective engines, as fully set forth above, Ford engaged in unfair or deceptive acts or practices prohibited by the NJCFA.

427.     Ford's unconscionable conduct described herein included the knowing omission and concealment of material facts concerning the defective 6.0L Engines as set forth above.

428.     Ford owed New Jersey Plaintiff and the New Jersey Consumer Fraud Sub-Class a duty to disclose the defects in the Ford vehicles equipped with the defective 6.0L Engines because it possessed exclusive and superior knowledge of the defects and did not disclose these defects.

429.     Information regarding these defects, which result in substantial additional repair costs, decreased vehicle performance, and/or vehicle failure, is material to a reasonable consumer in deciding to purchase a vehicle and considering how much to pay for a vehicle.

430.     A reasonable consumer with knowledge of the defective nature of the 6.0L Engines would not have purchased Ford vehicles equipped with the defective 6.0L Engine or would have paid less for them.

431.     Ford knew or should have known that reasonable consumers would likely regard information regarding these defects as material to deciding to purchase a vehicle and considering how much to pay for a vehicle.

432.     Ford's unfair or deceptive acts or practices were therefore likely to or had a tendency or capacity to deceive reasonable consumers about the true nature of the Ford vehicles equipped with the defective 6.0L Engines.

433.     Ford intended that New Jersey Plaintiff and the other members of the New Jersey Sub-Class rely on their misrepresentations and omissions, so that New Jersey Plaintiff and other New Jersey Consumer Fraud Sub-Class Members would purchase Ford vehicles equipped with the defective 6.0L Engines.

434.     As a result of the foregoing acts, omissions, and practices New Jersey Plaintiff and the New Jersey Consumer Fraud Sub-Class have suffered an ascertainable loss as set forth above, and these class members are entitled to recover such actual damages, together with

appropriate penalties, including treble damages, equitable relief, injunctive relief, diminution of value, reasonable attorneys' fees, costs of suit, and such other relief set forth below.

435.     Pursuant to N.J. STAT. ANN. § 56:8-20, New Jersey Plaintiff will serve the New Jersey Attorney General a copy of this complaint.

<u>**Count 11:  Violation of New York General Business Law**</u>
**(Asserted on Behalf of Plaintiff Brown and the New York Consumer Fraud Sub-Class)**
**(Deceptive Acts and Practices, N.Y. GEN. BUS. LAW § 349)**

436.     Plaintiff Brown ("New York Plaintiff") and the New York Consumer Fraud Sub-Class incorporate the allegations set forth above as if fully set forth herein.

437.     Ford's business acts and practices alleged herein constitute deceptive acts or practices under the New York General Business Law, Deceptive Acts and Practices, N.Y. GEN. BUS. LAW § 349 ("NYGBL").

438.     Ford's practices, as set forth above, violate the NYGBL for one or more of the following reasons:

    a.     Ford engaged in deceptive, unfair, and unconscionable commercial practices in failing to reveal material facts and information regarding the defective 6.0L Engines which did, or tended to, mislead New York Plaintiff and the New York Consumer Fraud Sub-Class about facts that could not reasonably be known by the consumers;

    b.     Ford failed to reveal facts that were material to the transactions in light of representations of fact made in a positive manner;

    c.     Ford caused New York Plaintiff and New York Consumer Fraud Sub-Class to suffer a probability of confusion and a misunderstanding of legal rights, obligations and/or remedies by and through its conduct;

    d.     Ford made material representations and statements of fact to New York Plaintiff and the New York Consumer Fraud Sub-Class that represented or suggested state of affairs to be other than what they actually were;

439.     Ford's actions impact the public interest because New York Plaintiff and members of the New York Consumer Fraud Sub-Class were injured in exactly the same way as

thousands of others purchasing and/or leasing Ford vehicles equipped with the defective 6.0L Engines as a result of and pursuant to Ford's generalized course of deception.

440.     Ford owed New York Plaintiff and the New York Consumer Fraud Sub-Class a duty to disclose the defects in the Ford vehicles equipped with the defective 6.0L Engines because it possessed exclusive and superior knowledge of the defects and did not disclose these defects.

441.     Information regarding these defects, which result in substantial additional repair costs, decreased vehicle performance, and/or vehicle failure, is material to a reasonable consumer in deciding to purchase a vehicle and considering how much to pay for a vehicle.

442.     A reasonable consumer with knowledge of the defective nature of the 6.0L Engines would not have purchased Ford vehicles equipped with the defective 6.0L Engine or would have paid less for them.

443.     Ford's unfair or deceptive acts or practices were therefore likely to or had a tendency or capacity to deceive reasonable consumers about the true nature of the Ford vehicles equipped with the defective 6.0L Engines.

444.     Under all of the circumstances, Ford's conduct in employing these unfair and deceptive trade practices was malicious, willful, wanton and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

445.     As a result of the foregoing acts, omissions and practices, New York Plaintiff and other members of the New York Consumer Fraud Sub-Class have suffered actual damages as set forth above, and the New York Consumer Fraud Sub-Class members are entitled to recover such damages, together with punitive damages, equitable relief, injunctive relief, diminution of value, reasonable attorneys' fees, costs of suit, and such other relief set forth below.

**Count 12:  Violation of the Michigan Consumer Protection Act**
**(Asserted on Behalf of Plaintiff Clark and the Michigan Consumer Fraud Sub-Class)**
**(MICH. COMP. LAWS § 445.901 *et seq.*)**

446.    Michigan Plaintiff and the Michigan Consumer Fraud Sub-Class incorporate the allegations set forth above as if fully set forth herein.

447.    Ford's business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the Michigan Consumer Protection Act ("MCPA").

448.    Michigan Plaintiff and all members of the Michigan Consumer Fraud Sub-Class are "persons' within the meaning of the MCPA.  MICH. COMP. LAWS § 445.902(1)(d).

449.    Ford is a "person" engaged in "trade or commerce" within the meaning of the MCPA.  MICH. COMP. LAWS § 445.902(1)(d) and (g).

450.    Ford's practices, as described throughout this complaint, violate the MCPA for one of more of the following reasons:

   a. Ford represented that goods or services have sponsorship, approval, characteristics, uses, and benefits that they do not have;

   b. Ford provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements; technical data and other information to consumers regarding the performance, reliability, quality and nature of the Ford vehicles equipped with the defective 6.0L Engines;

   c. Ford represented that goods or services were of a particular standard, quality, or grade when they were of another;

   d. Ford engaged in unconscionable commercial practices in failing to reveal material facts and information about the Ford vehicles equipped with the defective 6.0L Engines, which did (or tended to) mislead Michigan Plaintiff and the Michigan Consumer Fraud Sub-Class about facts that could not reasonably be known by the consumer;

   e. Ford failed to reveal facts that were material to the transactions in light of representations of fact made in a positive manner;

    f.   Ford caused Michigan Plaintiff and the Michigan Consumer Fraud Sub-Class to suffer a probability of confusion and a misunderstanding of legal rights, obligations, and/or remedies by and through its conduct;

    g.   Ford failed to reveal material facts to Michigan Plaintiff and the Michigan Consumer Fraud Sub-Class;

    h.   Ford made material representations and statements of fact to Michigan Plaintiff and the Michigan Consumer Fraud Sub-Class or suggested a state of affairs to be other than what they actually were.

451.   Ford owed Michigan Plaintiff and the Michigan Consumer Fraud Sub-Class a duty to disclose the defects in the Ford vehicles equipped with the defective 6.0L Engines because it possessed exclusive and superior knowledge of the defects and did not disclose the defects.

452.   Information regarding the defects, which result in substantial additional repair costs, decreased vehicle performance, and/or vehicle failure, is material to a reasonable consumer in deciding to purchase a vehicle and considering how much to pay for a vehicle.

453.   A reasonable consumer with knowledge of the defective nature of the 6.0L Engines would not have purchased Ford vehicles equipped with the defective 6.0L Engine or would have paid less for them.

454.   Ford's unfair or deceptive acts or practices were therefore likely to or had a tendency or capacity to deceive reasonable consumers about the true nature of the Ford vehicles equipped with the defective 6.0L Engines.

455.   Ford intended that Michigan Plaintiff and the other members of the Michigan Consumer Fraud Sub-Class rely on their misrepresentations and omissions, so that Michigan Plaintiff and other Michigan Consumer Fraud Sub-Class Members would purchase Ford vehicles equipped with the defective 6.0L Engines.

456. Under all of the circumstances, Ford's conduct in employing these unfair and deceptive trade practices was malicious, willful, wanton, and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

457. Ford's actions impact the public interest because Michigan Plaintiff and members of the Michigan Consumer Fraud Sub-Class were injured in exactly the same way as thousands of others who purchased and/or leased Ford vehicles equipped with the defective 6.0L Engines as a result of and pursuant to Ford's generalized course of deception.

458. As a result of the foregoing acts, omissions and practices Michigan Plaintiff and other members of the Michigan Consumer Fraud Sub-Class suffered actual damages as described herein, and these class members are entitled to recover such damages, together with punitive damages, equitable relief, injunctive relief, diminution of value, reasonable attorneys' fees, costs of suit, and such other relief set forth below.

459. Pursuant to MICH. COMP. LAWS § 445.905 subd. 3, Michigan Plaintiff will serve the Michigan Attorney General a copy of this complaint.

**Count 13: Violation of the South Carolina Unfair Trade Practices Act**
**(Asserted on Behalf of Plaintiff Boggero and the**
**South Carolina Consumer Fraud Sub-Class)**
**(S.C. CODE ANN. § 39-5-10 *et seq.*)**

460. South Carolina Plaintiff and the South Carolina Consumer Fraud Sub-Class incorporate the allegations set forth above as if fully set forth herein.

461. Ford is a "person" engaged in "trade" and "commerce" within the meaning of S.C. CODE. ANN. § 39-5-10.

462. The South Carolina Unfair Trade Practices Act ("SCUTPA") declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. CODE. ANN. § 39-5-20.

463. By misrepresenting the characteristics of the 6.0L Engine, failing to disclose the defects inherent to the 6.0L Engine, and failing to properly repair the defective engines, as fully set forth above, Ford engaged in unlawful, unfair, or deceptive acts or practices prohibited by the SCUTPA.

464. Ford owed South Carolina Plaintiff and the South Carolina Consumer Fraud Sub-Class a duty to disclose the defects in the Ford vehicles equipped with the defective 6.0L Engines because it possessed exclusive and superior knowledge of the defects and did not disclose the defects.

465. Information regarding the defects, which result in substantial additional repair costs, decreased vehicle performance, and/or vehicle failure, is material to a reasonable consumer in deciding to purchase a vehicle and considering how much to pay for a vehicle.

466. A reasonable consumer with knowledge of the defective nature of the 6.0L Engines would not have purchased Ford vehicles equipped with the defective 6.0L Engine or would have paid less for them.

467. Ford's unfair or deceptive acts or practices were therefore likely to or had a tendency or capacity to deceive reasonable consumers about the true nature of the Ford vehicles equipped with the defective 6.0L Engines.

468. Ford's actions impact the public interest because Plaintiff and members of the Consumer Fraud Class were injured in exactly the same way as thousands of others who purchased and/or leased Ford vehicles equipped with the defective 6.0L Engines as a result of and pursuant to Ford's generalized course of deception.

469. As result of its violations of the SCUTPA, Ford caused actual damage to South Carolina Plaintiff and the South Carolina Consumer Fraud Sub-Class including, inter alia,

substantial time and money dedicated to repeat visits to various Ford dealership service departments attempting to resolve the engine problems to no avail.

470.    Ford's conduct in employing these unfair and deceptive trade practices was malicious, willful, wanton, and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

471.    As a result of the foregoing acts, omissions, and practices South Carolina Plaintiff and other members of the South Carolina Consumer Fraud Sub-Class suffered actual damages as described herein, and these class members are entitled to recover such damages, together with punitive damages, equitable relief, injunctive relief, diminution of value, reasonable attorneys' fees, costs of suit, and such other relief set forth below.

**Count 14:  Violation of  Arizona Consumer Fraud Act**
**(Asserted on Behalf of Plaintiff Vogt and the Arizona Consumer Fraud Sub-Class)**
**(ARIZ. REV. STAT. ANN. § 44-1521 *et seq.*)**

472.    Arizona Plaintiff and the Arizona Consumer Fraud Sub-Class incorporate the allegations set forth above as if fully set forth herein.

473.    Arizona Plaintiff, the Arizona Consumer Fraud Sub-Class, and Ford are "persons" with the meaning of the Arizona's Consumer Fraud Act ("ACFA").  A.R.S. § 44-1521.

474.    The ACFA prohibits the "act, use or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby."  A.R.S. § 44-1522.

475.    By misrepresenting the characteristics of the 6.0L Engine, failing to disclose the defects inherent to the 6.0L Engine, and failing to properly repair the defective engines, as fully set forth above, Ford engaged in unfair or deceptive acts or practices prohibited by Arizona's CFA.

476.    Ford owed Arizona Plaintiff and the Arizona Consumer Fraud Sub-Class a duty to disclose the defects in the Ford vehicles equipped with the defective 6.0L Engines because it possessed exclusive and superior knowledge of the defects and did not disclose the defects.

477.    Information regarding the defects, which result in substantial additional repair costs, decreased vehicle performance, and/or vehicle failure, is material to a reasonable consumer in deciding to purchase a vehicle and considering how much to pay for a vehicle.

478.    A reasonable consumer with knowledge of the defective nature of the 6.0L Engines would not have purchased Ford vehicles equipped with the defective 6.0L Engine or would have paid less for them.

479.    Ford's unfair or deceptive acts or practices were therefore likely to or had a tendency or capacity to deceive reasonable consumers about the true nature of the Ford vehicles equipped with the defective 6.0L Engines.

480.    Ford intended that Arizona Plaintiff and the other members of the Arizona Consumer Fraud Sub-Class rely on Ford's misrepresentations and omissions, so that Arizona Plaintiff and other Arizona Consumer Fraud Sub-Class Members would purchase Ford vehicles equipped with the defective 6.0L Engines.

481.    As result of its violations of the ACFA, Ford caused actual damage to Arizona Plaintiff and the Arizona Consumer Fraud Sub-Class including, inter alia, substantial time and

money dedicated to repeat visits to various Ford dealership service departments attempting to resolve the engine problems to no avail.

482.    Ford's conduct in employing these unfair and deceptive trade practices was malicious, willful, wanton, and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

483.    As a result of the foregoing acts, omissions, and practices Arizona Plaintiff and other members of the Arizona Consumer Fraud Sub-Class suffered actual damages as described herein, and these class members are entitled to recover such damages, together with punitive damages, equitable relief, injunctive relief, diminution of value, reasonable attorneys' fees, costs of suit, and such other relief set forth below.

### Count 15:  Violation of Connecticut Unfair Trade Practices Act
**(Asserted on Behalf of Plaintiff Santilli and the Connecticut Consumer Fraud Sub-Class)**
**(CONN. GEN. STAT. §§ 42-110a *et seq.*)**

484.    Connecticut Plaintiff and the Connecticut Consumer Fraud Sub-Class incorporate the allegations set forth above as if fully set forth herein.

485.    Ford is a "person" engaged in "trade" and "commerce" within the meaning of CONN. GEN. STAT. §42-110a(3), (4).

486.    Ford's business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the Connecticut Unfair Trade Practices Act ("CUTPA").  CONN. GEN. STAT. 42-110b.

487.    By misrepresenting the characteristics of the 6.0L Engine, failing to disclose the defects inherent to the 6.0L Engine, and failing to properly repair the defective engines, as fully set forth above, Ford engaged in immoral, unethical, oppressive, and unscrupulous acts that offend public policy.

488. Ford owed Connecticut Plaintiff and the Connecticut Consumer Fraud Sub-Class a duty to disclose the defects in the Ford vehicles equipped with the defective 6.0L Engines because it possessed exclusive and superior knowledge of the defects and did not disclose the defects.

489. Information regarding the defects, which result in substantial additional repair costs, decreased vehicle performance, and/or vehicle failure, is material to a reasonable consumer in deciding to purchase a vehicle and considering how much to pay for a vehicle.

490. A reasonable consumer with knowledge of the defective nature of the 6.0L Engines would not have purchased Ford vehicles equipped with the defective 6.0L Engine or would have paid less for them.

491. Ford's unfair or deceptive acts or practices were therefore likely to or had a tendency or capacity to deceive reasonable consumers about the true nature of the Ford vehicles equipped with the defective 6.0L Engines.

492. Ford's conduct was knowing and intentional and with malice, and demonstrated a complete lack of care and recklessness and was in conscious disregard for the rights of Connecticut Plaintiff and the Connecticut Consumer Fraud Sub-Class.

493. As a result of the foregoing acts, omissions, and practices Connecticut Plaintiff and other members of the Connecticut Consumer Fraud Sub-Class suffered an ascertainable loss of money or property as described herein, and these class members are entitled to recover such actual damages, together with punitive damages, equitable relief, injunctive relief, diminution of value, reasonable attorneys' fees, costs of suit, and such other relief set forth below.

494. Pursuant to CONN. GEN. STAT. § 42-110(g)(c), Connecticut Plaintiff will serve the Connecticut Attorney General and Commissioner of Consumer Protect a copy of this complaint.

104

**Count 16:  Violation of North Carolina Consumer Fraud Act**
**(Asserted on Behalf of Plaintiff Mawyer and the North Carolina**
**Consumer Fraud Sub-Class)**
**(N.C. GEN. STAT. § 75-1.1 *et seq.*)**

495.    North Carolina Plaintiff and the North Carolina Consumer Fraud Sub-Class incorporate the allegations set forth above as if fully set forth herein.

496.    Ford is engaged in "commerce" within the meaning of N.C. GEN. STAT. § 75-1.1(b).

497.    By misrepresenting the characteristics of the 6.0L Engine, failing to disclose the defects inherent to the 6.0L Engine, and failing to properly repair the defective engines, as fully set forth above, Ford engaged in unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices affecting commerce under the North Carolina Consumer Fraud Act ("NCCFA").

498.    Ford owed North Carolina Plaintiff and the North Carolina Consumer Fraud Sub-Class a duty to disclose the defects in the Ford vehicles equipped with the defective 6.0L Engines because it possessed exclusive and superior knowledge of the defects and did not disclose the defects.

499.    Information regarding the defects, which result in substantial additional repair costs, decreased vehicle performance, and/or vehicle failure, is material to a reasonable consumer in deciding to purchase a vehicle and considering how much to pay for a vehicle.

500.    A reasonable consumer with knowledge of the defective nature of the 6.0L Engines would not have purchased Ford vehicles equipped with the defective 6.0L Engine or would have paid less for them.

501.    Ford's unfair or deceptive acts or practices were therefore likely to or had a tendency or capacity to deceive reasonable consumers about the true nature of the Ford vehicles equipped with the defective 6.0L Engines.

502.    Ford's conduct was knowing and intentional and with malice, and demonstrated a complete lack of care and recklessness and was in conscious disregard for the rights of North Carolina Plaintiff and the North Carolina Consumer Fraud Sub-Class.

503.    As a result of the foregoing acts, omissions, and practices, North Carolina Plaintiff and other members of the North Carolina Consumer Fraud Sub-Class have suffer an ascertainable loss of money or property as described herein, and these class members are entitled to recover such actual damages, together with punitive damages, equitable relief, injunctive relief, diminution of value, reasonable attorneys' fees, costs of suit, and such other relief set forth below.

### Count 17:  Violation of Ohio's Consumer Sales Practices Act
**(Asserted on Behalf Plaintiff Marcum and the Ohio Consumer Fraud Sub-Class)**
**(OHIO REV. CODE. ANN. § 1345.01 *et seq.*)**

504.    Ohio Plaintiff and the Ohio Consumer Fraud Sub-Class incorporate the allegations set forth above as if fully set forth herein.

505.    Ford's business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts, or practices under the Ohio Consumer Sales Practices Act ("OCSPA"), OHIO REV. CODE ANN. § 1305.01, *et seq.*

506.    At all relative times, Ohio Plaintiff and all members of the Ohio Consumer Fraud Sub-Class were "consumers" within the meaning of the OCSPA, OHIO REV. CODE ANN. § 1305.01(D).

507. Ford is a "person" within the meaning of the OCSPA, OHIO REV. CODE ANN. § 1305.01(B).

508. Ford's practices, described above, violate the OCSPA for one or more of the following reasons:

a. Ford represented that goods or services have sponsorship, approval, performance characteristics, uses, and benefits that they do not have;

b. Ford provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements technical data and other information to consumers regarding the performance, reliability, quality and nature of the Ford vehicles equipped with the defective 6.0L Engines;

c. Ford represented that goods or services were of a particular standard, quality, or grade when they were of another;

d. Ford engaged in unconscionable commercial practices in failing to reveal material facts and information about the Ford vehicles equipped with the defective 6.0L Engines, which did (or tended to) mislead Ohio Plaintiff and the Ohio Consumer Fraud Sub-Class about facts that could not reasonably be known by the consumer;

e. Ford failed to reveal facts that were material to the transactions in light of representations of fact made in a positive manner;

f. Ford caused Ohio Plaintiff and the Ohio Consumer Fraud Sub-Class to suffer a probability of confusion and a misunderstanding of legal rights, obligations, and/or remedies by and through its conduct;

g. Ford made material representations and statements of fact to Ohio Plaintiff and the Ohio Consumer Fraud Sub-Class that represented or suggested a state of affairs to be other than what they actually were.

509. Ford owed Ohio Plaintiff and the Ohio Consumer Fraud Sub-Class a duty to disclose the defects in the Ford vehicles equipped with the defective 6.0L Engines, because Ford possessed exclusive and superior knowledge of the defects and did not disclose the defects.

510.    Information regarding the defects, which result in substantial additional repair costs, decreased vehicle performance, and/or vehicle failure, is material to a reasonable consumer in deciding to purchase a vehicle and considering how much to pay for a vehicle.

511.    A reasonable consumer with knowledge of the defective nature of the 6.0L Engines would not have purchased Ford vehicles equipped with the defective 6.0L Engine or would have paid less for them.

512.    Under all of the circumstances, Ford's conduct in employing these unfair and deceptive trade practices was malicious, willful, wanton, and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

513.    Ford's actions impact the public interest because Ohio Plaintiff and members of the Ohio Consumer Fraud Sub-Class were injured in exactly the same way as thousands of others who purchased and/or leased Ford vehicles equipped with the defective 6.0L Engines as a result of and pursuant to Ford's generalized course of deception.

514.    As a result of the foregoing acts, omissions, and practices Ohio Plaintiff and other members of the Ohio Consumer Fraud Sub-Class suffered actual damages as described herein, and these class members are entitled to recover such damages, together with punitive damages, equitable relief, injunctive relief, diminution of value, reasonable attorneys' fees, costs of suit, and such other relief set forth below.

## VII.  DAMAGES

515.    Plaintiffs incorporate the allegations set out above as though fully set forth herein.

516.    Plaintiffs would further show that as a result of the acts and/or omissions of Ford, Plaintiffs have suffered and continue to suffer at least the following damages for which Plaintiffs now sue:

      a.     Out of pocket damages for expenditures related to the cost to repair/service the engines;

      b.     deductibles paid when repairs were covered by warranty;

      c.     towing charges incurred from having incapacitated vehicles towed in for repair;

      d.     lost profits from the inability to utilize vehicles equipped with said engine, due to the engine being inoperable, the vehicle being stored at a Ford dealership awaiting a Ford mechanic to repair it, or the vehicle being insufficiently reliable to be put into service;

      e.     cost to overhaul and/or replace the engine in all vehicles equipped with 6.0L Engines;

      f.     diminution in value of the vehicles attributable to the defect;

      g.     decreased value received for vehicles, as a result of the defect, when trading in or selling the vehicle;

      h.     increased equipment expenses caused by the need to purchase additional vehicles to keep in reserve (due to the unreliability of the 6.0L Engine and the fact that units spend a large amount of time incapacitated awaiting repair at Ford dealerships);

      i.     increased salary expenses caused by the need to hire additional mechanics to deal with the repeated problems with the 6.0L Engine; and

      j.     increased expenses caused by the need to keep additional tools and parts on hand to deal with the repeated problems with the 6.0L Engine.

517.    The damages set forth above are sought by Plaintiffs and Class members from and against Defendant.

518.    WHEREFORE, Plaintiffs pray for judgment against Defendant, Ford Motor Company, for past and future economic losses, declaratory and injunctive relief, reasonable attorneys' fees, prejudgment and post-judgment interest, costs, equitable relief, and such other relief the Court may deem proper.

Dated:          July 29, 2011

By:     /s/ Michael A. Caddell
        Michael A. Caddell
        Cynthia B. Chapman
        Cory S. Fein
        Caddell & Chapman
        1331 Lamar, Suite 1070
        Houston TX 77010-3027
        Telephone:  (713) 751-0400
        Facsimile:  (713) 751-0906
        mac@caddellchapman.com
        cbc@caddellchapman.com
        csf@caddellchapman.com

By:     /s/ Roy A. Katriel
        Roy A. Katriel
        The Katriel Law Firm
        12707 High Bluff Dr., # 200
        San Diego CA 92130
        Telephone:  (858) 350-4342
        Facsimile:  (858) 430-3719
        rak@katriellaw.com

By:     /s/ William E. Hopkins, Jr.
        William E. Hopkins, Jr.
        Beasley, Allen, Crow, Methvin,
          Portis & Miles, P.C.
        Post Office Box 4160
        Montgomery AL 36103-4160
        Toll Free:  (800) 898-2034
        Telephone:  (334) 269-2343
        Facsimile:  (334) 954-7555
        bill.hopkins@beasleyallen.com

By:     /s/ Patrick E. Knie
        Patrick E. Knie
        Patrick E. Knie, PA
        Post Office Box 5159
        Spartanburg SC 29304-5159
        Telephone:  (864)582-5118
        Facsimile:  (864)585-1615
        pknie@knielaw.com

By:     /s/ John R. Climaco
        John R. Climaco
        John A. Peca
        Patrick G. Warner
        Climaco Wilcox, Peca, Tarantino &
          Garofoli Co.
        55 Public Square #1950
        Cleveland OH  44113
        Telephone:  (216) 621-8484
        Facsimile:  (216) 771-1632
        jrclim@climacolaw.com
        japeca@climacolaw.com
        pgwarn@climacolaw.com

By:     /s/ Joseph J. Rego
        Joseph J. Rego
        Law Office of Joseph Rego, APC,
          Inc.
        8765 Aero Dr., Suite 306
        San Diego CA 92123
        Telephone:  (858) 598-6628
        Facsimile:  (858) 598-6631
        joerego@regolaw.com

By:     /s/ Daniel E. Becnel, Jr.
        Daniel E. Becnel, Jr.
        Law Offices of Daniel E. Becnel, Jr.
        P.O. Drawer H
        106 W. 7th St.
        Reserve LA 70084
        Telephone:  (985) 536-1186
        Facsimile:  (985) 536-6445
        dbecnel@becnellaw.com

By:     /s/ Camilo K. Salas, III
        Camilo K. Salas, III
        SALAS & Co., L.C.
        650 Poydras, Suite 1650
        New Orleans LA 70130
        Telephone:  (504) 799-3080
        Direct Line: (504) 799-3081
        Facsimile:  (504) 799-3085
        csalas@salaslaw.com

By:   /s/ John F. Nevares
John F. Nevares
John F. Nevares & Assoc., PSC
P.O.Box 13667
San Juan P.R. 00908-3667
Telephone: (787) 722-9333
Facsimile: (787) 721-8820
jfnevares@nevareslaw.com

By:   /s/ Eric D. Holland
Eric D. Holland
300 North Tucker Blvd., Suite 801
St. Louis MO 63101
Telephone: (314) 241-8111
Facsimile: (314) 241-5554
eholland@hgsslaw.com

By:   /s/ Charles Schaffer
Charles Schaffer
Levin, Fishbein, Sedran & Berman
510 Walnut St., Suite 500
Philadelphia PA 19106-3697
Telephone: (215) 592-1500
Facsimile: (215) 592-4663
alevin@lfsblaw.com
cschaffer@lfsblaw.com

By:   /s/ Bruce C. Betzer
Bruce C. Betzer
Law Office of Bruce C. Betzer, LLC
1420 Veterans Blvd.
Metairie LA 70005
Telephone: (504) 264-9523
Toll Free: (866) 603-3792
Facsimile: (504) 304-9964
bruce@brucebetzer.com

By:   /s/ Daniel Edelman
James Latturner
Daniel Edelman
Francis R. Greene
Edelman, Combs, Latturner
  & Goodwin, LLC
120 S. LaSalle St. # 1800
Chicago IL 60603
Telephone: (312) 739-4200
Facsimile: (312) 419-0379
jlatturner@edcombs.com
dedelman@edcombs.com
fgreene@edcombs.com

By:   /s/ Rebecca Cameron Bount
Rebecca Cameron Blount
Blount & Blount, P.C.
Post Office Drawer 58
Greenville NC 27835
Toll Free: (800) 851-1818
Facsimile: (252) 752-2174
Rebecca@blountlegal.com

By:   /s/ Tim Edwards
Tim Edwards
Edwin E. Wallis, III
Todd B. Murrah
Glassman, Edwards, Wyatt, Tuttle &
  Cox, P.C.
26 N. Second St.
Memphis TN 38103
Telephone: (901) 527-4673
Facsimile: (901) 521-0940
tedwards@gewwlaw.com
EWallis@gewwlaw.com
tmurrah@gewwlaw.com

By:   /s/ Sach D. Oliver
Sach D. Oliver
Bailey Oliver Law Firm
2000 SE 14th St.
Bentonville AR 72712
Telephone: (479) 273-1445
soliver@baileyoliverlawfirm.com

By:    /s/ Erik A. Christiansen
       Erik A. Christiansen
       Parsons Behle & Latimer
       201 S. Main St. # 1800
       Salt Lake City UT 84145-0898
       Telephone:  (801) 532-1234
       Facsimile:  (801) 536-6111
       echristiansen@parsonsbehle.com

By:    /s/ Jeffrey A. Long
       Jeffrey A. Long
       Bray & Long, PLLC
       2820 Selwyn Ave. # 400
       Charlotte NC 28209
       Telephone:  (704) 523-7777
       Facsimile:  (704) 523-7780
       jlong@braylong.com

By:    /s/ Frank E. Piscitelli, Jr.
       Frank E. Piscitelli, Jr.
       Piscitelli Law Firm
       55 Public Square, #1950
       Cleveland OH  44113
       Telephone:  (216) 931-7000
       Facsimile:  (216) 931-9925
       frank@feplaw.com

By:    /s/ D. Scott Kalish
       D. Scott Kalish
       James L. Deese
       Scott Klaish Co., L.L.C.
       1468 W. 9th St., # 405
       Cleveland OH 44113
       Telephone: (216) 502-0570
       Facsimile:  (216) 502-0569
       scottkalishcollc@cs.com

By:    /s/ Mitchell A. Toups
       Mitchell A. Toups
       Weller, Green, Toups
        & Terrell, L.L.P.
       Post Office Box 350
       Beaumont TX 77704-0350
       Telephone:  (409) 838-0101
       Facsimile:  (409) 832-8577
       matoups@wgttlaw.com

By:    /s/ Patrick W. Pendley
       Nicholas R. Rockforte
       Patrick W. Pendley
       Stan Baudin
       Christopher L. Coffin
       Pendley, Baudin & Coffin, L.L.P.
       24110 Eden St.
       Post Office Drawer 71
       Plaquemine LA 70765
       Telephone:  (225) 687-6396
       Facsimile:  (225) 687-6398
       nrockforte@pbc1awfirm.com
       pwpendley@pbclawfirm.com

By:    /s/ Charles J. LaDuca
       Charles J. LaDuca
       Victoria Romanenko
       Cuneo Gilbert & Laduca, LLP
       507 C St. NE
       Washington DC 20002
       Telephone:  (202) 789-3960
       Facsimile:  (202) 789-1813
       charlesl@cuneolaw.com
       vicky@cuneolaw.com

By:    /s/ J. Barton Goplerud
       J. Barton Goplerud
       Hudson, Mallaney & Shindler, P.C.
       5015 Grand Ridge Dr., Suite 100
       West Des Moines IA 50265
       Phone: 515-223-4567
       Toll Free:  (866) 916-9127
       Facsimile:  (515) 223-8887
       jbgoplerud@hudsonlaw.net

By:    /s/ Timothy P. Mitchell
       Timothy P. Mitchell
       Themis Law Group
       2000 Marengo St., Suite G
       Los Angeles CA 90033
       Telephone:  (310) 295-4748
       Facsimile:  (310) 492-5982
       timmitchellesq@hotmail.com

By:    /s/ Michael R. Imprevento
        Michael R. Imprevento
        Breit Drescher Imprevento &
          Walker, P.C.
        1000 Dominion Tower
        999 Waterside Dr.
        Norfolk VA 23510
        Telephone:  (757) 670-3884
        Facsimile:  (757) 299-8035
        mimprevento@breitdrescher.com

By:    /s/ Dana F. Strout
        Dana F. Strout
        Rubin & Strout, P.A.
        480 West St.
        Rockport ME 04856
        Telephone:  (207) 236-0200
        Facsimile:  (207) 236-4981
        dfspc@free.midcoast.com

By:    /s/ Peter J. Cambs, Sr.
        Peter J. Cambs, Sr.
        Senior Litigation Counsel
        Parker Waichman Alonso, LLP
        3301 Bonita Beach Rd.
        Bonita Springs FL. 34134
        Telephone: (239) 390-1000
        Facsimile (239) 390-0055
        pcambs@yourlawyer.com

By:    /s/ Richard R. Barrett
        Richard R. Barrett
        Don Barrett
        Barrett Law Group, P.A.
        1223 Jackson Ave. East, Suite 203
        Oxford MS 38655
        Telephone:  (601) 259-2117
        Facsimile:  (662) 834-2628
        rrb@rrblawfirm.net
        dbarrett@barrettlawgroup.com

By:    /s/ Robert K. Shelquist
        Robert K. Shelquist
        Lockridge Grindal Nauen P.L.L.P.
        100 Washington Ave., S., Suite 2200
        Minneapolis MN 55401-2179
        Telephone:  (612) 339-6900
        Facsimile:  (612) 339-0981
        rkshelquist@locklaw.com

By:    /s/ Mark P. Chalos
        Mark P. Chalos
        Lieff Cabraser Heimann &
          Bernstein, LLP
        150 Fourth Ave. North, Suite 1650
        Nashville TN 37219-2417
        Telephone:  (615) 313-9000
        Facsimile:  (615) 313-9965
        mchalos@lchb.com

By:    /s/ Richard J. Arsenault
        Richard J. Arsenault
        Neblett, Beard & Arsenault
        2220 Bonaventure Court
        Alexandria LA 71309
        Telephone:  (800) 256-1050
        Facsimile:  (318) 561-2591
        rarsenault@nbalawfirm.com

By:    /s/ Thomas P. Thrash
        Thomas P. Thrash
        Cydni Thrasher, Legal Assistant
        Thrash Law Firm, P.A.
        1101 Garland St.
        Little Rock AR 72201
        Telephone:  (501) 374-1058
        Facsimile:  (501) 374-2222
        tomthrash@sbcglobal.net