FILED
10/25/2012
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: NAVISTAR DIESEL ENGINE | ) | Case No. 11 C 2496 |
| PRODUCTS LIABILITY | ) | MDL NO. 2223 |
| LITIGATION | ) | |

### This Document Relates to: All Cases

---

## PLAINTIFFS' AMENDED MASTER CLASS ACTION COMPLAINT

---

Plaintiffs Custom Underground, Inc., John Barrett, Scott Gray and Heather Gray, Frank Brown Towing, Inc., Cecil and Tressie Fulton, Karl Strong, Dinonno Enterprises, Inc., d/b/a Cutting Edge Concrete Cutting, Charles Clark, Georjean Vogt, John Prebish, Steve Santilli, Anthony Mawyer, Gena Boggero, Carl Atwell, Phillip Marcum, and James Hutton, on behalf of themselves and all others similarly situated, respectfully file Plaintiffs' Master Class Action Complaint against Defendant, Ford Motor Company (hereinafter, "Ford" or "Defendant"), and allege based on personal knowledge as to Plaintiffs' actions and experiences and upon information and belief as to all other matters, as follows:

## I. PARTIES

1. Plaintiff, Custom Underground, Inc. ("Custom Underground"), is a corporation incorporated in the state of Illinois with its principal place of business in Illinois.

2. Plaintiff, John Barrett ("Barrett"), is an individual who at all relevant times resided in Carlinville, Macoupin County, Illinois.

3. Plaintiffs, Scott and Heather Gray (collectively, "Gray"), are individuals residing in Ft. Pierce, St. Lucie County, Florida.

4.      Plaintiff, Frank Brown Towing, Inc. ("Brown"), is a corporation incorporated and with its principal place of business in Buffalo, Erie County, New York.

5.      Plaintiffs, Cecil and Tressie Fulton (collectively "Fulton"), are individuals who at all relevant times resided in Manteca, San Joaquin County, California.

6.      Plaintiff, Karl Strong ("Strong"), is an individual who at all relevant times resided in Santa Rosa, Sonoma County, California.

7.      Plaintiff, Dinonno Enterprises, Inc., d/b/a Cutting Edge Concrete Cutting ("Dinonno"), is a corporation incorporated in the state of California with its principal place of business in California.

8.      Plaintiff, Charles Clark ("Clark"), is an individual who at all relevant times resided in Brooklyn, Jackson County, Michigan.

9.      Plaintiff, Georjean Vogt ("Vogt"), is an individual who at all relevant times resided in Tucson, Pima County, Arizona.

10.     Plaintiff, John Prebish ("Prebish"), is an individual who at all relevant times resided in Loveland, Larimer County, Colorado.

11.     Plaintiff, Steve Santilli ("Santilli"), is an individual who at all relevant times resided in Newington, Hartford, Connecticut.

12.     Plaintiff, Anthony Mawyer ("Mawyer"), is an individual who at all relevant times resided in Taylorsville, Alexander County, North Carolina.

13.     Plaintiff, Gena Boggero ("Boggero"), is an individual who at all relevant times resided in Greenwood, Greenwood County, South Carolina.

14.     Plaintiff, Carl Atwell ("Atwell"), is an individual who at all relevant times resided in Mooresville, Morgan County, Indiana.

2

15.     Plaintiff, Phillip Marcum ("Marcum"), is an individual who at all relevant times resided in resided in Lucasville, Scioto County, Ohio.

16.     Plaintiff, James Hutton ("Hutton"), is an individual who at all relevant times resided in Flemington, Hunterdon County, New Jersey.

17.     Defendant, Ford Motor Company, is a Delaware corporation with its principal place of business in Dearborn, Michigan.  Defendant Ford is authorized to conduct business in the State of Illinois, and has made its appearance in this case.

## II.  JURISDICTION AND VENUE

18.     The Court has jurisdiction over Ford because at all relevant times Ford has regularly and systematically transacted business within the State of Illinois as a designer, manufacturer, and distributor of motor vehicles, including vehicles equipped with the 6.0-liter diesel engines at issue in this case.  Defendant Ford derives substantial revenue from Illinois residents.

19.     This Court has subject matter jurisdiction over this class action under the Class Action Fairness Act ("CAFA") because there are more than one-hundred class members, there are members of the Plaintiff class who are citizens of states different from that of Ford, and the aggregate of class members' claims is more than $5 million.  28 U.S.C. § 1332(d).

20.     Venue is proper in this Court because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.  28 U.S.C. § 1391(a)(2).  Among other things, Ford has major operations in this District, including a large manufacturing plant in Chicago.

## III.  FACTS

21.     Ford is, and has been at all relevant times, engaged in the business of developing, designing, manufacturing, testing, assembling, inspecting, marketing, distributing, and selling

Ford vehicles and/or vehicle chassis equipped with Ford's 6.0-liter diesel engines (hereinafter, "6.0L Engines" or "6.0L").

22.     Launched with great fanfare in 2002,[1] by the end of its short production life,[2] Ford's 6.0L Engines had "unprecedented repair rates," accounted for "approximately 80% of all of Ford's warranty spending on engines," and forced Ford to assemble a "team of approximately 70 engineers" to assist Ford's supplier "full time in identifying and resolving problems."[3] Ultimately, Ford sued its engine supplier, Navistar,[4] for $493 million for what it termed "exceptionally high repair rates and warranty costs due to quality problems attributable to Navistar," including "design flaws."[5]

23.     While Ford's Super Duty truck with the 6.0L Diesel Power Stroke Engine provided Ford the "best [gross profit] margin of any vehicle" Ford sold during the 6.0L's sales history, as early as 2002 numerous issues were identified with the 6.0L Engine, specifically including turbo charger systems, fuel injection systems, head gasket, EGR valves, and coolers plugging.  Ford documents reflect that (1) Ford knew about issues regarding the 6.0L Engine even before the engine's launch, (2) the same core concerns persisted throughout Ford's production and sale of the 6.0L Engine, (3) Ford never had a "definitive repair action" for these issues, (4) most, if not all, of these concerns had a "common cause," and (4) Ford ultimately adopted a band-aid approach to reduce its "warranty spend," without addressing the "common causes" of these problems.

---

[1]  Named to *Ward's AutoWorld* "10 Best Engines" list in 2003.
[2]  2002-06, except for a very limited production post-2006 for Ford's "E Series."  The engine was used in Ford truck model years 2003-2007, and a relatively small number of 2008 vehicles.
[3]  Robert Fascetti, Director of V-Engine and Diesel Engineering for the North American Engine Organization of Ford Motor Company, Feb. 28, 2007.
[4]  Navistar International Transportation Corporation and International Truck and Engine Corporation, hereinafter "Navistar."
[5]  Confidential Portions of Ford Motor Company's Answers and Objections to Defendants' Court-Ordered Set of Interrogatories, Response to Interrogatory No. 3, filed May 23, 2007; *Ford Motor Company v. Navistar*, C.A. 07-080067-CK, Circuit Court for the County of Oakland, Michigan (hereinafter "*Ford v. Navistar*").

**A.** **Ford Identified Critical Defects Prior to Selling Vehicles Equipped with the 6.0L Engine, Failed to Resolve the Defects, and Sold the Vehicles with Known Defects**

24.     Ford knew about the 6.0L Engine's critical defects in the months leading up to the engine's launch, and delayed the launch in an effort to understand and correct the engine's multiple design flaws.  Ultimately unwilling to further postpone the launch, Ford decided to launch the engine, despite the fact that the engine contained known defects which Ford did not know how to repair, and thus could not instruct its dealers how to repair.

25.     For a significant period of time, Ford scheduled August 1, 2002, as the date of first production (*i.e.*, "Job #1") of vehicles with the newly designed 6.0L diesel engine. However, Navistar's plan was to get the base engine reliability up to only 84% by the time of Job #1.  Throughout 2002, it was clear that the engine had serious problems.

26.     For example, the Injection Control Pressure Sensor (ICP) continually failed due to excessive heat, and other engine parts were similarly being exposed to excessive heat far beyond the allowable temperature limit of 135 degrees Celsius. In September 2001, underhood temperatures near the ICP were exceeding 180 degrees Celsius. Ford implemented changes to lower underhood temperatures and make components more robust to endure excessive heat, but the ICP continued to fail.  Ford and Navistar eventually revised the specifications due to these failures, causing Texas Instruments (the manufacturer of the ICP component) to (1) lose confidence in the ability of the ICP to operate, and (2) require indemnification for product failures.

27.     As of May 2002, Navistar still contended that the cooling system was inadequate and threatened a launch delay if the ICP change was not implemented.  Ford finally realized that the Flourosilicone material was not suitable for the ICP given its inability to handle heat and

scrapped it in favor of Viton. Nonetheless, in June 2002, the engine was still exhibiting a "hung idle" malfunction during testing.

28. On May 15, 2002, Charlie Freese, Ford's Chief Engineer of Diesel Engines, wrote: "We face multiple high risk items, which will influence a decision to delay J#1" [*i.e.*, Job #1, the beginning of production for the first 2003 6.0-liter diesel engine]. Freese mentioned open issues that were "of particularly great concern," including ICP failures, piston failures, and injector failures. The issue was considered so serious that Ford considered extending its production of the predecessor 7.3-liter engine due to concern that the 6.0L Engine would not be ready for production. Freese wanted an answer on May 17, 2002 in order to make the decision on the last possible day, Saturday, May 18, 2002.

29. On May 29, 2002, Freese emailed a large team of Ford and Navistar personnel regarding protecting the planned timing of Job #1. The launch team had given up the plan for an August 1, 2002 launch and assessed the risk as "manageable" for a November 4, 2002 launch. Freese's email noted that the team "must still address a significant number of details" and also noted that "[s]everal recent failures surfaced new concerns, which also require immediate attention." Freese cautioned, "[w]e must continue working together w/ a continued sense of urgency, to address the remaining open issues," and further set forth some "key near term concerns," many of which "require[ed] closure over the next few days." The email informed the team that only four days remained to close out nine separate "key open issues" in order to meet the June 3, 2002 delayed engine build kick-off. Some of the nine key open issues listed were: No. 2, "Injector Failures Persist"; No. 4, dealing with the design of the ICP sensor which still needed durability validated; No. 5, dealing with testing of head gaskets; No. 7, dealing with a new turbocharger which Ford and Navistar had not even begun to analyze; No. 8, a new rough

engine idle problem; and No. 9, a failure of the IDM (injector driver module) during cold operation experienced by multiple vehicles, with no root cause identified.

30.     Ford held a New Model Launch Meeting on July 30, 2002.  At that meeting, Job #1 was still slated for the Kentucky Plant on November 4, 2002.  The 6.0L engine was still considered to have "Major Issues" that Ford did not understand.  The problem of injector plunger scoring (which causes fuel leakage, incomplete combustion and excess soot) was still listed as "Root cause undetermined."  Intermittent engine stall was likewise characterized as a "Major Issue."  There was discussion that some problems would have to be resolved after Job #1, on March 3, 2003, when the vehicles were already being produced and sold.

31.     In reviewing the readiness of suppliers, 21 suppliers of 29 parts were selected as High Impact.  Fifteen suppliers with 23 parts were rated Green, but 4 suppliers with 4 parts were rated red, and Ford knew that 2 suppliers with 2 parts had no chance of being ready and were "moved to post Job #1 running changes" meaning that these updates would not be included in the first engines sold. Significantly, Navistar was specifically singled out and rated "High Risk" due to lack of durability testing and late design changes.  The recommendation was to "Proceed with International [*i.e.*, Navistar] deep-dive review to confirm root cause and containment of critical issues."

32.     Pursuant to Charlie Freese's email, as of August 23, 2002, Ford was still addressing injector defects causing idle problems, cold start problems, engine stall problems, and injector failures.  Navistar began a new process for injectors and planned to ship the first three engines with these new process injectors to Ford on August 28–30, with additional injectors supplied the week of September 2.  Ford's durability tests for these engines were scheduled for completion the week of October 9, 2002, less than a month before Job #1.

33.    Finally, Ford decided it could not continue delaying the launch, and instead began producing and selling a vehicle with a known defective engine.  On November 12, 2002, Steven Henderson wrote:

> As you noted, **we're in the middle of 6.0L launch, and as you may have heard, things are not going well**.  J1 [Job #1] for the 6.0L was delayed a full week for International to work on these issues, but **they are not fully resolved yet.**  The entire International team is either down at the plant or working full time on this issue.

## B.    The 6.0L Engine's Defects Caused the Same Primary Components to Malfunction: Injectors, EGR Valves, EGR Coolers, Turbochargers, Oil Coolers, and Rear Seals

34.    Ford's inability to resolve the multiple major defects in the engine pre-launch had the expected result.  That is, with defective engines being put in vehicles despite the inability to repair the defects, an unprecedented number of malfunctions began to occur.  Moreover, the consistency with which the same components on the 6.0L failed was striking.  John Koszewnik, Ford's Director, North American Diesel, identified the primary components that were having problems in 2003 as the "injectors, turbo chargers, EGR valves, [and] EGR coolers."

35.    Bob Fascetti, Mr. Koszewnik's successor, similarly explained that the "early '03, '04 issues with the 6.0L were the turbo charger systems, fuel injection systems, head gasket, EGR valves, coolers plugging."  Despite the fact that—according to Mr. Fascetti—"Ford assigned 70 engineers to assist Navistar on a full-time basis in identifying and resolving problems with the 6.0-liter engine," in January 2007, after the 6.0L was no longer in widespread production, a joint Ford-Navistar meeting involving the 6.0L Engine included an "update" on the same issues that had plagued the engine since its introduction:  "Injector Induction Heat, Turbo, EGR Valve, Rear Seal, and EGR Cooler."[6]  Ford's Quarterback Department Manager, Colin Horbal, present at the meeting, admitted that Ford was still having "quality issues" with these

---

[6]  International Truck & Engine IDA CTW Commodity Review, Jan. 26, 2007.

Case: 1:11-cv-02496 Document #: 23-1 Filed: 10/23/12 Page 10 of 82 PageID #:5596

items. Similarly, in July 2007 a Ford Product Development Quality Review ("PDQR") meeting discussed "diesel warranty spend" and noted that: "Causal parts were the usual suspects: Cylinder Head/Head Gasket, Engine Assembly, EGR Cooler, EGR Valve."[7]

36.     Not only were these defects consistent throughout time (from the beginning to the end of the production of the 6.0L Engine), they were consistent throughout geography.  For example, on April 18, 2005, Don Kaercher from Ford's Customer Service Division wrote that Ford's warranty analysis people, as well as Navistar, confirmed that they were seeing no difference in failure rates for EGR coking on Edmonton (Canada) vehicles versus Texas vehicles, and that ambient temperature and climate had no impact.

37.     A Ford engineer acknowledged that the problems with the 6.0L Engine—at least the "usual suspects":  injectors, turbo charger, EGR components, fuel system components, and engine components—had the same root causes.   In January 2006 (the last year of mass production of the 6.0L and after more than 75% of the 6.0L Engines had been placed in service), Mark Freeland, a Ford engineer under the direction of John Koszewnik, Director, North American Diesel, conducted an analysis of 6.0L warranty claims to determine the root causes of the problems that continued to plague the engine.  He made the following observations:

- "It is likely that these symptoms are all the result of the same root causes."

- "Further I would hypothesize . . . that the same root cause or causes are responsible for the majority of all claims."

- "There had been many changes made to 'fix the Injector' warranty issue, but none seem to be effective at reducing the base level of the warranty [spend]."

- "The probability of multiple injectors failing simultaneously on the same engine is quite remote, unless the failure is the result of another system issue."

---

[7]  Colin Horbal email to Barb Samardzich, July 9, 2007.

- "THE LIST GOES ON, MANY OTHER SEEMING UNRELATED FAILURES ARE CAUSED BY THE INJECTOR SEALING ISSUES."[8]

Based on his testing, observations, and analysis, Mr. Freeland concluded the following:

CONCLUSIONS:

A very large portion, if not most of, the common cause of the Injector, Turbo Charger, EGR Components, Fuel System Components and Engine Components warranty [repairs/spend] is being caused by leaks between the Fuel Rail, the combustion chamber and the coolant jacket.[9]

38. Ford likewise recognized some of these defects in Technical Service Bulletins (TSB) and Special Service Messages (SSM) issued pertinent to the 6.0L Engines. TSBs are documents Ford issues to its dealers to aid them in locating and repairing certain problems or defects. TSBs describe the symptoms of the problem or defect and either detail a method of diagnosing, mitigating or repairing it, or refer the technician to another Ford document which describes a repair procedure. Ford issued numerous TSBs related to the Root Cause Components of the 6.0L diesel engine system. Ford's TSBs demonstrate the ongoing problems with Ford's 6.0L Engine, the fact that Ford was aware of the problems with these engines, and Ford's failure to adequately address the issues by failing to properly repair or replace these defective engines.

## C.    **Ford Admitted to Having No Definitive Repair Action**

39. Ford's inability to repair the 6.0L Engine and its core problems is exemplified by a September 7, 2004 memo from Frank Ligon, Ford's Director of Service Engineering Operations, addressing 6.0L "Buy-Backs":

This is very confidential!!!

. . . Bottom line is we are not "out of the woods" on this 6.0 . . . . **At this point we do not have a definitive repair action or production parts to properly address the concern universe.** The best course of action is to have the dealer

---

[8] John Koszewnik email to Frank Abkenar, Mina Shams, et al., Feb. 6, 2006.
[9] *Id.*

contact the hotline. **I strongly urge that this information NOT be shared at this time until the "official" action is announced.**

Ford's CBG Manager for 2005-2007, Michael Berardi, admitted that—in the context of Ligon's September 2004 admission that Ford lacked a "definitive repair action or production parts to properly address the concern universe"—the same situation continued in 2005 and 2006.[10]

40.     As evidence of that, in June 2006—after the 6.0L had been in production for over four years (and only six months before the end of widespread production)—Ford engineer Mike Frommann emailed regarding one of the "usual suspects," the head gasket:

> We unfortunately **exceeded our own** cylinder pressure **specs** in **normally** performing engines. We don't want to have our cylinder pressure specs published or documented by having them subpoenaed or we might face a **class action**. When we have a **defect**, we have to honor our warranty. . . . **I recommend we all delete these emails**.[11]

41.     Not surprisingly, one of the key recipients of Frommann's email, Mina Shams, 6.0L Diesel Pride Campaign leader and Systems Diagnostics Supervisor, did not respond substantively to Frommann's email, but instead—only 16 minutes later—requested his phone number.[12] Also regarding the head gasket, John Koszewnik wrote, on July 8, 2005 that the head gasket was failing due to factors including: (1) a less than robust engine design; (2) poor manufacturing, with a "waviness" in the cylinder head deck that prevented it from sealing properly; and (3) cooling systems that did not sufficiently cool the engine.[13]

42.     On July 22, 2005, Chris Bolen, Ford's Director of North America Powertrain Manufacturing, wrote, "in my 32 years at Ford I have not experienced such [negative] feedback regarding one of our products. It's clear that we still have a lot of work to do to improve Diesel

---

[10]  Berardi could not remember whether the same situation continued in 2007.
[11]  Mike Frommann email to Mina Shams, et al., June 13, 2006 (emphasis added).
[12]  *See id.* Ford's admission that 6.0L engines performing "normally" exceed Ford's own cylinder pressure specifications causing gasket leaks confirms that blown head gaskets are caused by a defective design.
[13]  John Koszewnik email to Dave Szczupak, et. al. July 8, 2005.

quality levels, and that our current warranty performance is having disastrous effects on this customer and segment." Bob Fascetti, Director of V-Engine and Diesel Engineering for Ford, explained in 2008 that the core problems with the 6.0L "only got fixed to a certain point." Specifically, Mr. Fascetti stated that as to head gasket leaks, it "only got fixed to a certain point" and had "not been solved." As to the EGR valve, it was fixed only "to a degree" and Ford "still fail[s] EGR systems." Similarly, when asked if the EGR cooler was "fixed or not fixed," Mr. Fascetti responded "no," and testified that "neither the [Navistar] engineers nor the Ford engineers made it go to zero."

43.     As late as June 22, 2007—six months after Ford stopped mass production of the 6.0L—Ford's Vice President for Powertrain Product Development, Barb Samardzich, referred to the "continued poor performance of the 6.0L (*i.e.*, worse than our WFA assumptions)."[14] Colin Horbal, Manager of the North American Diesel Quarterback Department, reported to Ms. Samardzich at the July 2007 PDQR that the "warranty spend" on the 6.0L was $11 million greater than anticipated for the most recent four-month tracking period, despite the fact that "no new failure modes had been identified through claims analysis." Rather, Mr. Horbal reported that the "increased spend is driven by more claims, not an increase in cost per claim."[15]

**D.     Ford Sued Navistar Concerning the Defect**

44.     Ultimately, Ford sued Navistar in Michigan state court in March 2007, seeking $493 million in damages for warranty costs, including a portion of some $84 million spent buying back vehicles specifically attributable to 6.0L issues.[16] It was in that context that Bob Fascetti, Ford's Director of Diesel Engineering, attested to the following:

---

[14]  Barb Samardzich email to Colin Horbal, June 22, 2007.  "WFA" was Ford's "Way Forward Acceleration Plan" to improve financially in all aspects by 15% annually beginning with the 2008 model year.
[15]  Colin Horbal email to Barb Samardzich, July 9, 2007.
[16]   Ford Motor Company's Brief In Support of Its Motion for Temporary Restraining Order and Preliminary

Ford has experienced unprecedented repair rates with the 6.0L engines. The 6.0L has had the largest R/1000 (repairs per thousand) rate ever experienced by Ford for an engine in widespread production. In fact, the 6.0L, which represents only 10% of Ford's total engine volume, accounts for approximately 80% of all of Ford's warranty spending on engines. Additionally, warranty spending on the 6.0L accounts for approximately 25% of Ford's overall warranty spending.[17]

45.     Ford's documents, testimony, and judicial admissions make it clear that the problems with the 6.0L Engine were the result of defects in the engine design. Yet, in the words of Bob Fascetti, as the Navistar "engine was falling apart," Navistar contended that "most of the failures weren't their problem."

46.     Ford's customers were caught in the crossfire between Ford and Navistar. For example, John Koszewnik, Ford's Director, North American Diesel, in February 2006—the last year of mass production of the 6.0L—complained that he "considered an EGR valve upgrade to be a 'no brainer'," but the Ford Program Team "would always fall back on the argument that they didn't pay originally for a **deficient design**, therefore, they weren't going to pay for an upgrade."[18] Of course, Navistar's "position was simple: no added pricing, no added content."[19] Koszewnik could not get Ford Motor Company to approve an upgraded EGR valve for the 6.0L, "because there was no agreement with [Navistar] on pricing and content."[20]

47.     Similarly, Ford found problems in 86% of the 6.0L's injectors and 95% of its turbochargers returned under warranty when tested under "real world" conditions, refuting Navistar's claim that there were no problems in these same parts.

48.     The pleadings in *Navistar* demonstrate that the problems Ford's customers have experienced with the 6.0L Engines are due to a defectively designed and manufactured engine.

---

Injunction, *Ford v. Navistar*, CA07-080067-CK, Circuit Court of the County of Oakland, Michigan, at 5–6 and attached Aff. of Jim Glass, Reacquired Vehicle Operations Supervisor, Ford Motor Company, Feb. 28, 2007.
[17] Fascetti Aff., Feb. 28, 2007.
[18] John Koszewnik email to Brian Vought, Feb. 5, 2006 (emphasis added).
[19] *Id.*
[20] Koszewnik Dep., Feb. 16, 2011, at 279:21–280:25.

**E.      Ford Failed to Disclose the 6.0L Engine's Defects While Touting the Engine's Supposedly Superior Attributes**

49.      As the foregoing allegations demonstrate, Ford knew from the outset that there were severe and pervasive design, manufacturing, and quality issues plaguing the Ford 6.0L Engines.  Yet, despite this knowledge, Ford never disclosed any of these issues to consumers.

50.      To the contrary, at the same time that Ford and Navistar were battling over the quality issues and defects plaguing the Ford 6.0L Engines, Ford was making precisely the opposite representations to consumers as to the quality of the engine and the vehicles it powered.  For example, in its sales brochure for the 2005 Ford F-250 truck, Ford touted to consumers that:

    a.      The 2005 Ford F-250 and Ford F-350 trucks had the "Best Power," explicitly referencing the "6.0L 32 Valve Power Stroke® V8 Turbo Diesel;"

    b.      The Ford F-250 and F-350 were equipped with a "Best in Class" "Longest-Lasting Diesel Engine;"

    c.      "Longest-Lasting Diesel: Cast-Iron Block Head—This proven architecture withstands the higher combustion pressure of peak diesel operation.  The stiff bedplate provides rigidity.   Electro-Hydraulic Direct Injection (EDHI), 4-valve induction, and electronic engine control promote efficient combustion for optimized horsepower and torque.  All-together the 6.0L Power Stroke® is the longest-lasting diesel in its class;" and

    d.      "Power Stroke V8 Turbo Diesel—F-Series Super Duty outpulls the competition from a dead stop, in a 0–60 mph tow off.  It's done through careful powertrain management from engine to gearing to wheels and tire.  The result is more—capable trucks."

51.      The sales brochure is but one of the many advertisements and representations that Ford disseminated about the Ford F-Super Duty truck series that were equipped with the 6.0L Engines.  Despite knowing that the engines were plagued with what Ford internally described as "unprecedented problems," Ford orchestrated and implemented a widespread advertising and marketing campaign to convince consumers that the precise opposite was true; namely, that the

14

engines and vehicles were of superior quality, design, manufacture, and reliability. In this regard, Mark Fields, Ford's then President of the Americas, publicly proclaimed that the Navistar 6.0L Power Stroke diesel engine—the very same engine whose design and quality issues led Ford to sue Navistar—was a "great engine." Despite its knowledge of the 6.0L Engine's many flaws and quality concerns, Ford trained its dealers throughout the country to specifically tout the supposedly superior attributes of the engine, without ever mentioning its troubled history of design, manufacturing, and reliability defects.

**F.    Ford Opted to Reduce Warranty Spend Instead of Fixing the Defect and Complying with its Warranty Obligations**

52.    While Ford was pursuing its $493 million lawsuit against Navistar, Ford shifted its efforts from trying to repair issues with the 6.0L—which was near the end of its production life—to simply reducing Ford's warranty spend.

53.    Ford's vehicles containing the 6.0L Engines were sold with Ford's New Vehicle Limited Warranty, including the 6.0L Powerstroke Diesel Engine warranty, which covers the "engine and engine components against defects in factory-supplied materials or workmanship for five years after the warranty start date or 100,000 miles, whichever occurs first," and provides that "[d]uring this coverage period, authorized Ford Motor Company dealers will repair, replace, or adjust all parts on your vehicle that are defective in factory-supplied materials or workmanship."

54.    In 2006, for example, among Ford's "6.0L Top Parts Warranty Actions" were new procedures adopted to address "turbo coking" and "EGR coking," issues that had plagued the engine since its inception. Rather than replace the coked turbo charger or EGR valve, Ford commenced a program in mid-2006 of simply "cleaning" the parts in question, thus saving Ford

a projected $9 million and $2.5 million in warranty spend, respectively, on those two items.[21] Mr. Horbal, Ford's Quarterback Department Manager, later admitted that "simply cleaning the coking off the turbo" would "not address the root cause of what created the coking to begin with," and that—if only cleaning was done—Ford would save millions in projected warranty spending on that item, but simply postpone the problem for the customer. Similarly, in the previously-referenced email from Mr. Horbal to Barb Samardzich in July 2007, Mr. Horbal characterized his "assignments" from a prior PDQR as "Continue to Look for More Service Cost Reductions" with respect to the 6.0L engine.[22]

55.     Early in the life of the 6.0L, Ford began discussing extending the warranty beyond 100,000 miles. As early as November 2004 (2 months after Ligon's "we do not have a definitive repair action" memo), Ford had internal discussions concerning the provision of warranty assistance beyond the 100,000 miles limitation.[23] John Koszwenik, Director, North American Diesel, later confirmed that this was part of what "could be done" to deal with customers.

56.     Ultimately, Ford adopted an internal extended warranty for fleet and other special customers, providing after-warranty financial assistance up to 6 year/150,000 miles for the 6.0L Engine,[24] and a "financial assistance" program for "retail and small business" owners of Super Duty/E Series trucks, for which "the new vehicle limited warranty ha[d] expired and [which] have less than 6 year/150,000 miles."[25]

---

[21]  Colin Horbal email to Rick Renwick, et al, Feb. 20, 2007.
[22]  Colin Horbal email to Barb Samardzich, et al., July 9, 2007.
[23]  Nov. 1, 2004 presentation by Greg Smith, "Operation Diesel III: Proposed Initiative to Address Power Stroke Diesel Concerns and Brand Loyalty."
[24]  Fleet Management Company (FMC) Customer Loyalty Program (CLP), Apr. 1, 2009.
[25]  *Id.*, "NEW Super Duty/E-Series Customer Handling Program," March 16, 2009.

57.     Although Ford may contend that changes in the 6.0L Engine improved performance in later versions,[26] it told a dramatically different story when deposed by Navistar, stating that repair rates were high for the 2003, 2004, and 2005 engines and, though improved for the 2006 and 2007 engines, they "continued to be high," despite Ford's admitted initiatives to "reduce warranty spend" (as opposed to fixing the root causes).  Ford's inability to repair the 6.0L and its core problems, as well as Ford's desire to sit on the problem rather than adequately address it, is pointedly exemplified by the September 7, 2004 Frank Ligon memo warning that Ford had no definitive repair action, but that Ford must not share that information until an "official action" was announced.

58.     It seems that no "official action" was ever announced, however, as Michael Berardi admitted that the same absence of a "definitive repair action or production parts to properly address the concern universe" continued in 2005 and 2006 (Berardi could not remember whether it continued in 2007).

59.     In January 2006 (after more than 75% of the 6.0L Engines had been placed in service), Ford engineer Mark Freeland analyzed 6.0L Warranty Claims and likewise observed that it is likely that the symptoms were the result of the same root causes, and that the same root causes were responsible for the majority of all claims.[27]  Mr. Freeland concluded the symptoms were being caused by leaks between the fuel rail, the combustion chamber and the coolant jacket.[28]

60.     The leaks identified by Mr. Freeland led to poor or incomplete combustion, a systematic problem with this engine that led to components being clogged with soot from

---

[26]  Ford's list of top issues, which included problems with the root-cause-damaged components was remarkably consistent, demonstrating that regardless of the changes Ford made through the life of the engine, several top issues remained, nine of which were the same in three or all four of the model year engines analyzed (2003.25, 2004.25, 2005 and 2006).

[27]  John Koszewnik email to Frank Abkenar, Mina Shams, et al., Feb. 6, 2006.

[28]  *Id.*

coking. Ford's practice of cleaning or replacing a component clogged with soot did not address the root problem of excess soot production, but instead just prolonged the time until that component or another component failed due to excessive soot. The problem of improper combustion is caused by the defective design of the engine, and not by improper maintenance or owner misuse.

61.     Six months after Mr. Freeland's report, another Ford engineer, Mike Frommann, admitted that the 6.0L head gasket problems resulted from "exceed[ing] our own cylinder pressure specs in *normally* performing engines," warned against having Ford's cylinder pressure specs "published or documented" or "subpoenaed" because Ford might face a "***class action***," and "***recommend[ed] we all delete these emails.***"[29]

62.     Acknowledging its inability to repair the defects in the 6.0L Engines, Ford considered various pilot initiatives in an attempt to address the problem. Michael Berardi emailed Francisco "Cisco" Codina, Frank Ligon, and Bill Osborn and explained, "[p]er your request to reduce 6.0L RAVs [reacquired vehicles] (based on expanding the current "Stalls/Quit" Pilot initiative), we have developed three specific scenario's [sic]. . . ."[30] "We do need to keep in mind that these initiatives will not eliminate the RAVs, as customers will continue to come into the dealership multiple times until we can honestly eliminate all the concerns with the 6.0L."[31]

63.     However, Ford rejected the "Stalls/Quits" Pilot plan to have Ford technicians assist dealerships with repairing defects,[32] as well as the expanded "Stalls/Quits" Pilot Proposals #1 and #2.[33] Berardi's email regarding these rejected initiatives states: "Please keep in mind

---

[29]  Mike Frommann email to Mina Shams, et al., June 13, 2006.
[30]  Berardi email to Francisco "Cisco" Codina, et at., Oct. 8, 2004.
[31]  *Id.*
[32]  *Id*.
[33]  *Id.*

that the biggest concern will be finding the proper resources to implement" the program.[34] Berardi later testified that the "resources" at issue were people, and that Ford rejected the proposals.

64.     Not only did Ford reject these pilot initiatives, but when suggestions were made that Ford authorize full and complete repairs of defective engines brought into Ford dealerships for repair, Ford rejected those suggestions as too expensive.  Mr. Berardi emailed Bill Osbourne on October 8, 2004:

> You had also mentioned throwing the "Kitchen Sink" at the vehicle during the first repair attempt to help eliminate the need to come back a second time.  That particular philosophy is opposite of what we have been training our dealers to do and could lead to a very expensive warranty bill across vehicle lines.

Regarding training its dealers to do the opposite, Berardi later admitted that Ford trained its dealers to only "repair whatever component has failed as long as it wasn't customer abuse or lack of maintenance."

65.     Recognizing internally its inability to comply with its legal obligation to properly remedy the engine defects within the warranty period, Ford also probed possible options to compensate its customers beyond the original 100,000 mile warranty.  To this end, Ford initiated a new customer handling program for retail and small business owners that provided financial assistance for 6.0L Engine vehicles with expired warranties that still had less than 150,000 miles. This approach made sense, as Rick Renwick testified that the 6.0L Engine was designed to last 250,000 miles, a 100,000 mile warranty was considered a minimum in the market, and Ford was looking into providing a 150,000 mile warranty on the 6.4 engine.  Ford also created a Customer Loyalty Program, which included the 6.0L Engine, for its fleet customers, which outlined a 150,000 mileage limit for Ford diesel-engine vehicles.

---

[34] *Id.*

66.     Ford's inability to ever develop an effective repair for the defective 6.0L Engine was further confirmed by its development of the 6.4L Diesel Engine—that is, Ford solved the defects in the 6.0L by developing a wholly new engine.  In July 2006, Ford engineers explained that "the processes used to develop and launch the 6.4L Power Stroke were significantly improved over the 6.0L in all areas,"[35] and identified "Specific Design Improvements" for the 6.4L in the "usual suspects": turbo charger, fuel injectors, EGR system, and sealing.[36]

67.     Ford's warranty repair program includes numerous checks to ensure that problems caused by improper maintenance, owner misuse, accidents, etc. are excluded.  Ford's team leader for Warranty Controls and Warranty Communications attested that:

> Ford implements various internal controls to ensure that warranty claims are justified, properly supported, and in accordance with Ford's warranty policies and procedures.  Ford applies these internal controls to all warranty claims submitted by its dealers, including claims involving 6.0L engine repairs.[37]

68.     For example, Ford's Automated Claims Editing System Version II ("Aces II") User Manual, November 2007, includes among the "Service Advisor Responsibilities:"  "Make a preliminary evaluation whether work will be covered under warranty," and Ford's Warranty and Policy Manual, November 2005, expressly provides that "all returned warranty parts are inspected" and "[c]laims may be charged back" for specific reasons, including when a "part [is] damaged" "due to improper use or lack of maintenance."

69.     Through these systems, Ford has detailed information regarding each time a vehicle is brought into a Ford dealership for repair, including but not limited to the symptoms that required the unit be brought in for service, the diagnosis of the problem, the repair authorized by Ford, and the work performed on the vehicle.

---

[35]  Enio Gomes email to Bob Fascetti, et al., July 13, 2006.
[36]  *Id.* The only additional specific design improvement identified by the Ford engineers was to the "electrical system," which is not a subject of this litigation.  *Id.*
[37]  Aff. of Richard Wooten, Feb. 28, 2007.

70.     Accordingly, Ford accumulated a massive database through which it realized that the minor repairs it was authorizing were inadequate to properly repair these defective engines, and that major repairs including engine replacement were necessary to address these defects. Despite Ford's experience and knowledge of the defects, Ford continued its practice of only authorizing minor ineffective repairs of these engine defects.

71.     Ford admitted that there were specific common design defects causing the parts to fail. "For many of the engine parts, Ford, Navistar, and/or Navistar's suppliers have identified specific design . . . issues . . . that have caused the parts to fail."[38]

72.     Year after year, the same issues plagued the engine. Indeed, the consistency with which the same components on the 6.0L failed is undeniable. Ford's two Directors of its diesel product line, John Koszewnik and Bob Fascetti, identified the primary components that were having problems in early 2003 through 2004, as the injectors and fuel injection system, head gasket, turbo chargers, EGR valves, and EGR coolers. David Enerson, Ford's Product Design Engineer for Diesel Quality, produced matrices of "6.0L top issues & actions" on November 21, 2005, demonstrating that regardless of the changes made by Ford from the first version of the engine (2003.25MY) through the life of the engine, several top issues remained, including issues with the injectors, EGR valve, EGR cooler, turbocharger, oil cooler, and rear seal.[39] The consistency in the list of top issues demonstrates Ford failed to adequately determine and remedy the common defects in these engine components. In January 2007, a joint Ford-Navistar meeting involving the 6.0L Engine included an "update" on the same issues that had plagued the engine since its introduction: "Injector Induction Heat, Turbo, EGR Valve, Rear Seal, and EGR

---

[38]  Shams Aff., Feb. 28, 2007 ¶ 3 (Shams was Ford Motor Co.'s 6.0L Diesel Systems Diagnostics Supervisor and filed this affidavit in Ford's case against Navistar).

[39]  Email from David Enerson, Nov. 21, 2005. Notably, never does Enerson mention improper maintenance or engine modification as a top issue causing vehicle malfunction.

Cooler,"[40] and Ford's representative at that meeting admitted Ford was still having "quality issues" with these items. Similarly, in July 2007, a Ford Product Development Quality Review meeting discussed 6.0L "diesel warranty spend" and noted that: "Causal parts were the usual suspects: Cylinder Head/Head Gasket, Engine Assembly, EGR Cooler, EGR Valve."

73.    Ford's internal investigation into the high cost of warranty repairs on the 6.0L Engine, conducted by Mark Freeland, under the direction of John Koszewnik (Ford's then Director of North American Diesel), concluded that Customer Concern Codes ("CCCs") for engines that were difficult or slow to start, would not start, or stalled, were likely symptoms that "are all the result of the same root causes."[41] Freeland hypothesized, since the findings regarding these CCCs were "very similar to the overall shape of all CCCs combined, *that the same root cause or causes are responsible* for the majority of all claims."[42]

74.    Ford's "solution" to claims concerning the defective 6.0L was consistent if nothing else—that is, while Ford was pursuing its $493 million lawsuit against Navistar, Ford shifted its efforts from trying to repair issues with the 6.0L (which was near the end of its production life) to simply reducing Ford's warranty spend.

75.    The 6.0L Engine continuously suffered the same problems and Ford never changed its "solution" of reducing its warranty spend. That is, through its own internal investigation and its lawsuit with Navistar, Ford knew that the engine was defective, that the defect manifested itself in definitive ways during the engine's use, and that Ford's recommended repairs were only "band-aids" designed not to address the root cause defects in the engine, but merely to postpone recurrence of the malfunctions until the warranty expired and the customer—

---

[40]  International Truck & Engine IDA CTW Commodity Review, Jan. 26, 2007.
[41]  Mark Freeland powerpoint presentation entitled "6.0L Powerstroke Injector: December 2005 Warranty Claims," Jan. 31, 2006.
[42]  *Id.*

Case: 1:11-cv-02496 Document #: 231-1 Filed: 10/23/12 Page 24 of 82 PageID #:5010

not Ford—would pay for repairs. Rather than repairing the engine to eliminate damage to the damaged components, Ford simply "kicked the can down the road," and cleaned or replaced the damaged components, knowing full well that the defects in the engine would lead to the failure of the cleaned or new components.

76. Ford unfairly benefitted by this practice because Ford knew that after the warranty expired the vehicle owner, rather than Ford, would have to pay for all future repairs. Because engine replacements cost more than ten times the cost of these lesser repairs, Ford profited enormously (at the expense of its customers) by failing to authorize necessary major engine repairs or engine replacements during the warranty period, instead only authorizing cheaper services (like injector replacements) which were not adequate repairs, and would merely serve as a temporary measure until the warranty expired. Eventually, of course, Ford solved the defects in the 6.0L Engine when developing a new engine: the 6.4L Diesel Engine. In July 2006 Ford engineers prepared a presentation of the "6.4L Quality Improvements Compared to 6.0L" and noted in that presentation "the processes used to develop and launch the 6.4L Power Stroke were significantly improved over the 6.0L in all areas."[43] Further, the engineers identified "Specific Design Improvements" in the 6.4L versus the 6.0L. Virtually all of the specific design improvements were in the "usual suspects": turbo charger, fuel injectors, EGR system, and sealing.[44] The "Turbo Charger Robustness Improvement Actions" addressed the corrosion and coking issues still plaguing the 6.0L, the "Fuel Injection Equipment" improvements included an "industry standard" "common rail" injection system and "testing for robustness," and the "EGR System Robustness Improvement Actions" focused on the EGR valve sticking, failure, and fouling problems experienced with the 6.0L, plus the EGR cooler failures experienced with the

---

[43] Enio Gomes email to Bob Fascetti, et al., July 13, 2006.
[44] The only additional specific design improvement identified by the Ford engineers was to the "electrical system," which is not a subject of this litigation.

6.0L.  Finally, the "sealing" improvements in the 6.4L versus the 6.0L resulted in "most seals on the engine" being "redesigned as a result of the process."[45]

77.  Not surprisingly, the repair rates for the 6.4L diesel engine have been "a lot better" than the repair rates for the 6.0L, so much so that after only 1½ years in the field, the repair rates for the 6.4L diesel engine were already better than the "last year of the 6.0L" (which was significantly lower than prior years for the 6.0L, although a significant portion of that reduction was due to Ford's efforts to "reduce warranty spend" rather than fix the root causes, as discussed above).

78.  Because Ford never redesigned the 6.0L diesel engine and never satisfactorily addressed the root causes of the persistent and systemic engine malfunctions being experienced at unprecedented rates by vehicle owners, and, indeed, had no plan or idea how to fix the defectively designed root-cause components, it could never provide adequate warranty service for the engine.  Ford's "warranty repair," instead, amounted to nothing more than offering consumers (without telling them as much) a band-aid fix to cover-up a symptom of the malfunctioning vehicle rather than an adequate and proper repair of the actual problem plaguing the vehicles.  This band-aid fix did not remedy the defects in the 6.0L Engines, as Ford was required to do under the terms of the warranty, but merely served to postpone the problem, virtually ensuring that aggrieved owners would continue to experience engine problems from the unremedied defective root cause engine components in the near future, and, often times, delaying these repeat problems so that they conveniently (to Ford) would reoccur shortly after the warranty period expired.  By failing to adequately repair the defective engines, Ford never lived up to its warranty obligations.

---

[45]  These documents comparing the designs of the 6.0L and the 6.4L engines detail the defects in the 6.0L engines in explaining how they were eliminated in the design of the 6.4L engine.

### G.    An Arizona Company Developed a True Root Cause Solution:  Redesigned EGR and Oil Coolers

79.    While agreeing with many of Freeland's observations concerning "common defect," experts at Bullet Proof Diesel, a nationally renowned automotive and diesel specialist based in Mesa, Arizona, and diesel industry publications approached these problems from a different angle.  Recent articles in *Four Wheeler* (September 2010), *Diesel World* (November 2010), and *Off Road* (March 2010) summarize their testing and analysis, targeting the EGR and oil coolers:

*Four Wheeler*:

If you have owned a Ford Super Duty pickup with the 6.0L engine, chances are you have experienced an ***EGR cooler*** failure.  Ford released several technical bulletins to its dealer network in an attempt to resolve these problems.  However, none of them address the ***root cause*** of the problem, and though the dealership may replace faulty EGR coolers under warranty, the issues will continue to persist.[46]

*Diesel World*:

[O]ver time, many of the design weaknesses of the 6.0L Power Stroke began to surface. Topping the list was the repetitive failure of the ***EGR cooler***.[47]

\*        \*        \*        \*

Countless owners have replaced their ***EGR coolers*** two, three, or more times in the first 100,000 miles, and have installed at least one ***oil cooler*** in the truck.[48]

*Off-Road*:

We've seen two major problems that plague most Super Dutys—both of which stem from the oiling system:  fuel injection issues (the end result of multiple oiling failure possibilities) and ***EGR cooler*** issues in which the cooler plugs up with carbon.[49]

---

[46]  Robin Stover, *Power Stroke Bulletproofing Tactics*, FOUR WHEELER, Sept. 2010 (emphasis added).
[47]  Kevin Wilson, *6.0L Power Stroke Problems and Solutions, Part I*, DIESEL WORLD, Nov. 2010.
[48]  *Id.*
[49]  Jerrod Jones, *Permanently Fixing a Powerstroke*, OFF-ROAD, March 2010 (emphasis added).

80.     In November 2010, *Diesel World*, in "6.0L Power Stroke Problems and Solutions: Part I: The Truth About EGR and Oil-Cooler Failures," stated:

> [T]he root of many of the 6.0L problems can be traced to a poor **oil cooler** design. Among the common issues on 6.0L Power Strokes are **EGR cooler** failures, high engine oil temperatures and overheating, injector failure, turbo failure, high-pressure oil pump failure and blown head gaskets.  And, according to Bullet Proof Diesel, nearly all of these problems are related to the stock engine cooler.[50]

*Four Wheeler* agrees:

> "In almost every case, 6.0L engine failures can be attributed to shortcomings in the **oil cooling** system."[51]

81.     Bullet Proof Diesel has done what Ford was unwilling to do:  develop a solution for the "root causes" of the 6.0L Engine's problems:  redesigned EGR and oil coolers, which can be installed in place of Ford's standard EGR and oil coolers.  Bullet Proof Diesel is "so confident its street-legal EGR cooler is superior to the factory part, the company offers a lifetime warranty on it."[52]   The publications referenced above specifically describe how the defects in Ford's original design manifest into engine malfunctions and how Bullet Proof's redesigned components address these root causes.[53]   In fact, according to Off-Road:  "The BPD [Bullet Proof Diesel] EGR cooler is a much better design, and even one that Ford dealerships recommend to modify their trucks with!"[54]

## H.     Plaintiffs and the Class experienced these same symptoms in their 6.0L Engines, and Ford failed to repair them under warranty

82.     Plaintiffs and Class members are owners, lessees and/or operators of Ford vehicles with a 6.0L Engine.

---

[50]  Wilson, *6.0L Power Stroke Problems and Solutions, Part I* (emphasis added).
[51]  Stover, *Power Stroke Bulletproofing Tactics* (emphasis added).
[52]  Wilson, *6.0L Power Stroke Problems and Solutions, Part I*; Wilson, *6.0L Power Stroke Problems and Solutions, Part II*, DIESEL WORLD, Dec. 2010.
[53]  Wilson, *6.0L Power Stroke Problems and Solutions, Part I*; Jones, *Permanently Fixing a Powerstroke*.
[54]  Jones, *Permanently Fixing a Powerstroke*.

83.     Plaintiffs and Class members have, at all times, maintained their vehicles according to Ford's Owners Guide and Owner's Guide Supplement for 6.0L Engines.

84.     Plaintiffs experienced repeated, common issues with their engines identical to those Ford identified as symptoms brought about by "root causes" of problems in the 6.0L design—*e.g.*, injectors, head gaskets, turbo chargers, EGR valves, and EGR coolers. Indeed, each Named Plaintiff experienced problems with at least one of these components.

85.     Plaintiffs and Class members have repeatedly brought their vehicles to authorized Ford dealerships for warranty repair, but Ford has failed to fulfill its obligation under Ford's Limited Warranty to adequately adjust, repair or replace the defects in the 6.0L Engines.

86.     Plaintiffs and Class members herein complain that the engines in their vehicles are defective, forcing them to repeatedly bring their vehicles to Ford dealerships for repair, only to have the vehicles break down again due to the defective nature of the engine and/or the inability of Ford, through its dealerships, to repair them properly.

87.     Moreover, when Plaintiffs and Class members brought their vehicles to authorized Ford dealerships during the warranty period and complained about problems they were having, Ford generally failed to authorize the replacement of the defective engines despite the fact that Ford knew the engines were defective, knew that the mechanics in its dealerships were not properly repairing the engines, and knew that the limited repair work Ford authorized its dealerships to perform would not properly repair the vehicles.

88.     Ford dealerships cannot provide warranted repairs (*i.e.*, repairs at no cost to the customer) beyond those authorized by Ford.  Accordingly, Ford's routine failure to authorize the work necessary to properly repair vehicles with defective 6.0L Engines resulted in a breach of Ford's warranty obligations.

89.     Ford warranted that its authorized Ford Motor Company dealers would, without charge, repair, replace, or adjust all parts that malfunctioned or failed during normal use during the applicable coverage period due to a defect in factory-supplied materials or factory workmanship.

90.     Ford's limited warranty of repairing and replacing defects failed of its essential purpose because Ford failed to give its dealerships permission to make necessary warranted repairs.  Accordingly, they failed to properly repair Plaintiffs and Class members' vehicles.

91.     Ford Motor Company, notwithstanding its knowledge of the defects, has not conducted sufficient recalls, has not notified Plaintiffs of the extent of the engines' inadequacies, has misrepresented to Plaintiffs that the 6.0L Engine problems were caused by factors other than an inherent defect (including improper maintenance and the weather), has misrepresented the supposed attributes of the 6.0L Engine, has failed to disclose known defects in the engines, and has failed to effectively repair or replace the engines and/or parts, or to reimburse Plaintiffs for their damages.

92.     The defective 6.0L Engines have caused Plaintiffs and Class members to suffer a loss of profits as a result of the inability to use the vehicles.  Plaintiffs and Class members have also suffered diminution in the value of their vehicles; out-of-pocket expenses for ongoing necessary repairs and/or services to the units; towing costs for disabled units; deductible payments to Ford dealerships for repairs under warranty; expenses associated with leasing or renting temporary vehicles while their Ford vehicles were being repaired; expenses acquiring and maintaining additional vehicles due to unreliability of the 6.0L Engines; expenses of paying wages to drivers who are unable to work due to the lack of sufficient working vehicles,

additional costs incurred from employing additional mechanics due to the problems with the 6.0L Engine, and other damages.

93.     Any limitations and exclusions in Ford's warranty are procedurally and substantively unconscionable because they are inordinately one-sided in Ford's favor in light of the fact that Ford knew of the inherent defect in the 6.0L Engines as early as 2002 and nevertheless continued to sell vehicles and vehicle chassis with defective engines without disclosing the inherent defect.

94.     The unconscionability of Ford's remedy limitations and exclusions is exacerbated by the fact that Ford knew it was selling vehicles and vehicle chassis with defective engines, and knew that its dealerships were consistently failing to repair the defects.  Accordingly, Ford attempted to limit its customers' remedies to repairs that it knew would fail to fix the engine, and thus the limited warranty failed of its essential purpose and is unenforceable.

95.     Plaintiffs and Class members notified Ford (through authorized Ford dealerships) of the multiple problems caused by the engine defects each time Plaintiffs brought their vehicles in for repair.  Plaintiffs also notified Ford directly. Plaintiffs, however, were not required to provide such notice because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile.

96.     As stated above, the Technical Service Bulletins, internal Ford memoranda and emails, and Special Service Messages describing symptoms consistent with those experienced by the Plaintiffs and Class members, demonstrate the ongoing problems with Ford's 6.0L Engine, the fact that Ford was well aware of the problems with these engines before it ever launched the 6.0L Engine, and Ford's failure to adequately address the issues by failing to properly repair or replace these defective engines.

97. Additionally, the defective 6.0L Engines present a safety hazard and are unreasonably dangerous to consumers because the defects can cause and have caused sudden and unexpected engine stalling or complete loss of power while driving, thereby contributing to the risk of accidents, which can cause personal injury or death.

98. Because of Ford's failure to properly repair the defective engines, Plaintiffs and Class Members have spent an unprecedented amount of time and money making repeat visits to various Ford dealership service departments attempting to resolve the engine problems to no avail.

**I.      Tolling of Limitations Periods**

99. All limitations periods were tolled from the April 21, 2006 filing date of *Cox House Moving Inc v. Ford Motor Company* (Case No. 7:06-cv-01218-HMH, D.S.C.), until November 6, 2006, the date class certification was denied, then tolled again from January 8, 2010 to the present, by the filing of *Custom Underground, Inc., et al. v. Ford Motor Company* (Case No. 1:10-cv-00127, N.D. Ill.)

100. All limitations periods were also tolled by the doctrines of fraudulent concealment, the discovery rule and/or equitable tolling. As alleged herein, Ford wrongfully concealed the fact (1) that it was equipping vehicles with defective engines which Ford was unable and/or unwilling to repair, and (2) that its dealerships were making inadequate repairs incapable of addressing the root cause of the vehicles' malfunctions. Plaintiffs and Class Members did not discover the operative facts that are the basis of their claims because they were concealed in confidential and privileged documents. No amount of diligence by Plaintiffs or Class Members could have led to discovery of these facts because they were kept secret by Ford and, therefore, Plaintiffs and Class Members were not at fault for failing to discover these facts,

nor did they have actual or presumptive knowledge of facts sufficient to put them on inquiry. No class member knew, or could have known, about Ford's inability to repair the defects in its engines because, as alleged above, Ford kept this information highly confidential, even sending internal warnings not to share this information outside of Ford.

## IV. PLAINTIFFS' EXPERIENCE WITH THE CLASS VEHICLES

### A. Custom Underground, Inc.

101. Plaintiff Custom Underground is a corporation with its principal place of business in Illinois.

102. Custom Underground purchased more than 20 Ford vehicles in Illinois with 6.0L Engines that have posed repeated problems from the start.

103. While each of Custom Underground's engines were covered by the 5 year/100,000 mile warranty, the defective engines caused the vehicles to exhibit multiple symptoms, including among other things, exhibit poor engine acceleration, poor air conditioning performance, failure to withstand long periods of engine idle, rough idle, difficulty starting the engine, inability to start engine, engine stalling, and complete loss of power while driving. These symptoms were caused by the root cause defects in the engine.

104. **Engine 142**: Custom Underground purchased Engine 142, VIN 1FDWF36P15EC46009, on March 11, 2005, from a Ford dealership in Illinois. Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to authorized Ford dealerships in Wisconsin, including John Amato Ford and Havill-Spoerl Ford, on multiple occasions including the following dates, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced: July 6, 2006 (32,804 miles, EGR cooler), and January 2, 2008 (78,442 miles, injectors 1 and 7).

105. **Engine 143**: Custom Underground purchased Engine 143, VIN 1FDWF36P85EC46010, on March 11, 2005, from a Ford dealership in Illinois. Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to an authorized Ford dealership in Illinois, Uftring Ford, on June 22, 2007, and had a warranty repair performed at 72,375 miles to the EGR valve.

106. **Engine 144**: Custom Underground purchased Engine 144, VIN 1FDWF36PX5EC46011, on March 9, 2005, from a Ford dealership in Illinois. Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to authorized Ford dealerships in Illinois, including Uftring Ford, on multiple occasions including the following dates, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced: December 13, 2006 (49,776 miles, injectors 2 and 8), and January 31, 2008 (80,262 miles, injectors 1, 2, 3, and 8).

107. **Engine 146**: Custom Underground purchased Engine 146, VIN 1FDWF36P35EC46013, on March 11, 2005, from a Ford dealership in Illinois. Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to authorized Ford dealerships in Illinois, including Uftring Ford, on multiple occasions including the following dates, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced: November 21, 2006 (45,541 miles, 3 injectors), and March 19, 2007 (53,192 miles, injectors 1, 2, 3, 5, 7, and 8).

108. **Engine 147**: Custom Underground purchased Engine 147, VIN 1FDWF36P55EC46014, on March 11, 2005, from a Ford dealership in Illinois. Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to an authorized Ford

dealership in Wisconsin, Havill-Spoerl Ford, on March 29, 2007, and had a warranty repair performed at 42,820 miles on injectors 2, 4, 6, and 8.

109.  **Engine 148**: Custom Underground purchased Engine 148, VIN 1FDWF36P75EC46015, on March 11, 2005, from a Ford dealership in Illinois.  Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to an authorized Ford dealership in Wisconsin, Grinwald Ford, on November 26, 2008, and had a warranty repair performed at 95,360 miles to injectors 3 and 8.

110.  **Engine 149**: Custom Underground purchased Engine 149, VIN 1FDWF36P95EC46016, on March 11, 2005, from a Ford dealership in Illinois.  Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to authorized Ford dealerships in Illinois, including, Uftring Ford and Woodrum Ford, on multiple occasions including the following dates, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced:  March 14, 2006 (23,078 miles, injectors 1, 2, and 3), April 4, 2006  (23,315 miles, injectors 4, 5, 6, 7, and 8), and on March 27, 2006 (23,991 miles, injector leaking).

111.  **Engine 150**: Custom Underground purchased Engine 150, VIN 1FDWF36P05EC46017, on March 9, 2005, from a Ford dealership in Illinois.  Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to an authorized Ford dealership in Wisconsin, Porcaro Ford, on July 7, 2008, and had a warranty repair performed at 93,253 miles on the EGR cooler.

112.  **Engine 151**: Custom Underground purchased Engine 151, VIN 1FDWF36P25EC46018, on March 11, 2005, from a Ford dealership in Illinois.  Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to an authorized Ford

dealership in Indiana, Southworth Ford, on February 15, 2007, and had a warranty repair performed at 36,985 miles to injectors 1, 2, 3, 5, 7, and 8.

113.    **Engine 152**:   Custom   Underground   purchased   Engine   152,   VIN 1FDWF36P45EC46019, on March 11, 2005, from a Ford dealership in Illinois.  Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to authorized Ford dealerships in Wisconsin, including Tom Peck Ford, on multiple occasions including the following dates, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced:  April 18, 2007 (61,353 miles, EGR valve), March 26, 2008 (79,122 miles, injectors),  May 22, 2008 (81,333 miles, injectors), and October 28, 2008 (96,597 miles, turbo charger).

114.    **Engine 154**:   Custom   Underground   purchased   Engine   154,   VIN 1FDWF36P46EA02291, on June 3, 2005, from a Ford dealership in Illinois.  Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to an authorized Ford dealership in Illinois, Uftring Ford, on June 3, 2007, and had a warranty repair performed at 62,970 miles to multiple injectors and the turbo charger.

115.    **Engine 155**:   Custom   Underground   purchased   Engine   155,   VIN 1FDWF36P86EA02293, on June 3, 2005, from a Ford dealership in Illinois.  Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to an authorized Ford dealership in Illinois, Sterlins Ford, on May 6, 2008, and had a warranty repair performed at 86,888 miles to the EGR valve.

116.    **Engine 156**:   Custom   Underground   purchased   Engine   156,   VIN 1FDWF36PX6EA02294, on June 3, 2005, from a Ford dealership in Illinois.  Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to authorized Ford

dealerships in Illinois, including Ford of Champaign, Uftring Ford, and Demison Ford, on multiple occasions including the following dates, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced: April 26, 2006 (37,199 miles, injector 7), May 16, 2006 (38,649 miles, injectors 1, 3, and 8), June 7, 2006 (39,481 miles, injector 5), July 25, 2006 (44,827 miles, injector), November 15, 2006 (57,336 miles, EGR valve), January 18, 2007 (64,003 miles, injectors 1, 3, 5, and 7), and May 18, 2007 (73,183 miles, turbo charger).

117. **Engine 157**: Custom Underground purchased Engine 157, VIN 1FDWF36PX6EA02292, on June 3, 2005, from a Ford dealership in Illinois. Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to authorized Ford dealerships in Illinois, including Uftring Ford, on multiple occasions including the following dates, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced: January 4, 2007 (54,261 miles, injector 7), February 26, 2007 (56,768 miles, injectors 1, 3, and 5), March 10, 2008 (91,318 miles, EGR valve), and April 21, 2008 (94,895 miles, EGR cooler).

118. **Engine 159**: Custom Underground purchased Engine 159, VIN 1FDWF36P96EA02299, on June 3, 2005, from a Ford dealership in Illinois. Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to authorized Ford dealerships in Illinois, including Uftring Ford, on multiple occasions including the following dates, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced: June 5, 2007 (44,894 miles, turbo charger), and February 5, 2008 (63,785 miles, injectors).

119. **Engine 160**: Custom Underground purchased Engine 160, VIN 1FDWF36P96EA02298, on June 3, 2005, from a Ford dealership in Illinois. Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to an authorized Ford dealership in Illinois, Uftring Ford, on December 29, 2006, and had a warranty repair performed at 73,548 miles to injectors 1 and 8.

120. **Engine 161**: Custom Underground purchased Engine 161, VIN 1FDWF36P36EA02296, on June 3, 2005, from a Ford dealership in Illinois. Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to authorized Ford dealerships in Illinois, including Uftring Ford, on multiple occasions including the following dates, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced: December 13, 2006 (49,292 miles, injector 5), February 22, 2008 (89,596 miles, injectors), and April 10, 2008 (95,966 miles, injector 8).

121. **Engine 162**: Custom Underground purchased Engine 162, VIN 1FDWF36P16EA02295, on June 3, 2005, from a Ford dealership in Illinois. Pursuant to the Ford warranty, Custom Underground brought the malfunctioning vehicle to authorized Ford dealerships in Illinois, including Uftring Ford, on multiple occasions including the following dates, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced: November 16, 2005 (20,010 miles, injector 4), January 23, 2006 (21,903 miles, injector 6), February 14, 2006 (22,058 miles, injectors 1 and 7), March 3, 2006 (23,339 miles, injectors 4 and 6), July 11, 2006 (36,027 miles, injectors 2 and 6), and August 1, 2006 (38,065 miles, injectors 2, 4, and 8).

122. Each time Custom Underground complained of the aforementioned engine symptoms and requested that the vehicle be repaired.

123.    Each time, the Ford dealership did not repair the engines or performed an inadequate repair of the engines.  Thus, Ford failed to provide appropriate warranty benefits for Custom Underground's vehicles despite the fact that the vehicles fell within the warranty's eligible time and mileage periods.

124.    As a result, the engines continued to malfunction and Custom Underground was forced to repeatedly bring the malfunctioning vehicles to an authorized Ford dealership for additional repairs, as indicated above.  Each time Ford either failed to perform an adequate repair or failed to provide any repair at all.

125.    Despite knowing that the engines had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engines.

126.    As a result of Ford's failure to properly repair the engines during the warranty, after the expiration of the warranty, Custom Underground was required to incur repair expenses to address these issues, lost income due to the vehicles being unavailable, and/or suffered other direct and consequential damages.

127.    For example, regarding **Unit 144**, in addition to being damaged more than $4000 in out-of-pocket repair expenses, Custom Underground was damaged by the extensive periods, totaling more than 50 days, it was without the use of the vehicle due to Ford's inability to repair it.

128.    Regarding **Unit 146**, after the warranty expired, Custom Underground was forced to spend more than $1200 on engine repairs, including a November 13, 2008 replacement of an oil pump assembly and injector pressure regulator, and a December 17, 2009 replacement of an EGR valve.

129.     Regarding **Unit 148**, the warranty repairs did not repair the vehicle, which broke down again on November 6, 2009 when the vehicle had 104,692 miles and was out of warranty. At that point Custom Underground took the vehicle out of service and has been unable to use the vehicle since that time as a result of Ford's refusal to authorize a proper repair when the vehicle was brought in for repairs before the expiration of the warranty.

130.     Regarding **Unit 149**, in February 2010, at 112,027 miles and out of warranty, Custom Underground took the vehicle out of service and has been unable to use the vehicle since that point as a result of Ford's refusal to authorize a proper repair when the vehicle was brought in for repairs before the expiration of the warranty.

131.     Regarding **Unit 156**, on December 14, 2007, at 105,266 miles and when the vehicle was out of warranty, the engine died. From that point forward, Custom Underground spent over $5000 trying to repair the engine, which would not have been necessary had Ford authorized an engine replacement or an adequate repair of the engine on any of the multiple occasions the vehicle was brought into a Ford dealership for service when the engine was still under warranty.  Additionally, Ford's refusal to authorize an adequate repair when the engine first began exhibiting signs of its defects caused the vehicle to be out of service for more than 100 days, thus damaging Custom Underground by depriving it of the use of this vehicle.

132.     Regarding **Unit 147**, because of Ford's refusal to authorize an adequate repair, the engine did not perform properly and Custom Underground was forced to take the vehicle out of service when the warranty expired. Had Ford properly repaired the vehicle when it was brought in for service during the warranty period, Custom Underground would still have use of the vehicle today.

133.    Regarding **Unit 151**, on August 12, 2009, the vehicle continued having injector problems.  Finally, on October 6, 2009, at 108,913 miles, when the engine warranty had expired and the engine was still experiencing problems, Custom Underground had to take the vehicle out of service. Had Ford properly repaired the vehicle when it was brought in for service during the warranty period, Custom Underground would still have use of the vehicle today.

134.    Regarding **Unit 157**, on October 16, 2009, at 108,226 miles, when the engine warranty had expired and the engine was still experiencing problems (making noise, not running, running rough, exhibiting a lack of power), Custom Underground had to pay for repairs itself, spending more than $3800 at Dennison Ford, an authorized Ford dealership, on engine repairs on November 4 and December 2, 2009.

135.    Regarding **Unit 161**, after the warranty expired, on August 26, 2008 at 113,879 miles, the engine was still not operating correctly.  From that point forward, Custom Underground spent about $7000 at Marion Ford and Uftring in 2008 and 2009 attempting to repair the engine. Had Ford properly repaired the vehicle when it was brought in for service during the warranty period, Custom Underground would not have had to incur these repair expenses.

136.    Regarding **Unit 162**, after the warranty expired, on February 26, 2009 at 112,016 miles, the engine was still not operating correctly, malfunctioning in the same manner as previously.  Custom Underground was forced to spend more than $2400 at Uftring for additional post-warranty engine repairs. Had Ford properly repaired the vehicle when it was brought in for service during the warranty period, Custom Underground would not have had to incur these repair expenses.

137.     Various employees of the Ford dealerships admitted to Custom Underground that Ford knew that the engines were defective when the dealerships sold the vehicles to Custom Underground.

138.     Diesel technicians working on Custom Underground's units at the dealerships have acknowledged, in the presence of representatives of Custom Underground, the high volume of problems the Ford 6.0L Engines have experienced.

139.     Ford has actual knowledge of the details of the defects in Custom Underground's vehicles, as well as the claims and demands Custom Underground made to Ford for repair of the defects.  Custom Underground has notified Ford, either directly or through Ford's dealerships, of the issues, describing the defects and the problems caused by the defects, and giving Ford multiple opportunities to properly repair or replace the defective engine.

## B.     <u>John Barrett</u>

140.     Plaintiff John Barrett ("Barrett") is an individual who at all relevant times resided in Carlinville, Macoupin County, Illinois.

141.     Barrett, purchased a new Ford vehicle with a 6.0L Engine, VIN 1FDWE35P44HA86337, in 2004.

142.     While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms, such as exhibiting poor engine acceleration, failure to withstand long periods of engine idle, rough idle, difficulty starting the engine, inability to start engine, engine stalling and complete loss of power while driving.  These symptoms were caused by the root cause defects in the engine.

143.    Pursuant to the Ford warranty, Barrett brought the malfunctioning vehicle to authorized Ford dealerships on multiple occasions, including on August 29, 2007 when the Ford dealership only authorized an injector and EGR valve repair.

144.    This was an inadequate repair which did not adequately repair the engine. Thus, Ford failed to provide appropriate warranty benefits for Barrett's vehicle despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

145.    As a result, the engine continued to malfunction and Barrett was forced to bring the malfunctioning vehicle to an authorized Ford dealership for additional repairs. Each time Ford either failed to perform an adequate repair or failed to provide any repair at all.

146.    Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

147.    As a result of Ford's failure to properly repair the engine during the warranty, on July 3, 2009, when the vehicle had approximately 108,000 miles and was no longer under warranty, it again experienced engine problems. Barrett brought the vehicle to a Ford dealer who initially told him that the engine needed two injectors replaced, but eventually admitted that the engine could not be repaired, and that Barrett needed a complete engine replacement, at a cost of approximately $16,000.

148.    Barrett spoke with the Ford Service Manager and his top diesel mechanic who admitted that Ford knew at the time it performed the repair in 2007 that the repair was not an adequate repair of the engine. The Ford mechanic also admitted that the 6.0L Engines had a very high failure rate.

149.     Ford has actual knowledge of the details of the defects in Barrett's vehicle, as well as the claims and demands Barrett made to Ford for repair of the defects.  Barrett has notified Ford, either directly or through Ford's dealerships, of the issue, describing the defects and the problems caused by the defects, and giving Ford the opportunity to properly repair or replace the defective engine.

## C.     Scott and Heather Gray

150.     Plaintiffs Heather and Scott Gray ("Gray") are individuals who at all relevant times resided in St. Lucie County, Florida.

151.     Gray, purchased a new Ford F-350 Super Duty vehicle with a 6.0L Engine, VIN 1FTWW33P15ED38133, on May 25, 2005 at Bartow Ford in Bartow, Florida.

152.     While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms, including starting rough, not accelerating properly, and making a knocking noise in the engine.  These symptoms were caused by the root cause defects in the engine.

153.     Pursuant to the Ford warranty, Gray brought the malfunctioning vehicle to authorized Ford dealerships in Florida, including Sunrise Ford and Velde Ford, on multiple occasions including on June 9, 2008 when the EGR and Oil Cooler were repaired or replaced. Each time Gray complained of the aforementioned engine symptoms and requested that the vehicle be repaired.

154.     Each time, the Ford dealership did not repair the engine or performed an inadequate repair of the engine.  Thus, Ford failed to provide appropriate warranty benefits for Gray's vehicle despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

155.     As a result, the engine continued to malfunction and Gray was forced to repeatedly bring the malfunctioning vehicle to an authorized Ford dealership for additional repairs, as indicated above.  Each time Ford either failed to perform an adequate repair or failed to provide any repair at all.

156.     Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

157.     As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Gray was required to incur repair expenses to address these issues, lost income due to the vehicle being unavailable, and/or suffered other direct and consequential damages.

158.     For example, Gray incurred $2189.12 in repair expenses in January 2009, as well as significant expenses to rent a replacement vehicle while the Ford vehicle was inoperable.  In February 2009, Gray incurred additional expenses in an attempt to repair the turbo.  In April 2009, the vehicle broke down again, leading to the replacement of injectors.  In April 2010, Gray was forced to spend over $3500 to replace 8 injectors.  In June 2010, Gray was forced to spend over $2400 to repair the injectors and fuel modulator.

159.     Ford has actual knowledge of the details of the defects in Gray's vehicle, as well as the claims and demands Gray made to Ford for repair of the defects.  Gray has notified Ford, either directly or through Ford's dealerships, of the issue, describing the defects and the problems caused by the defects, and giving Ford the opportunity to properly repair or replace the defective engine.  For example, Gray wrote letters to Ford dealerships and Ford Motor Company complaining of the defects and Ford's inability to properly repair them.

### D.   **Gena Boggero**

160.    Plaintiff Gena Boggero ("Boggero") is an individual who at all relevant times resided in Greenwood County, South Carolina.

161.    Boggero purchased a 2006 Ford F550 truck with a 6.0L Engine, VIN 1FDAF56P66ED52236, from Ford.

162.    Beginning at about 10 days after Boggero purchased her vehicle, the engine constantly malfunctioned.

163.    While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms, such as poor engine acceleration, rough idle, difficulty starting the engine, inability to start engine, engine stalling, and complete loss of power while driving.  These symptoms were caused by the root cause defects in the engine.

164.    Pursuant to the Ford warranty, Boggero brought the malfunctioning vehicle to an authorized Ford dealership in South Carolina, including George Ballentine Ford Lincoln Mercury, multiple times, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced: December 17, 2007 (58,776 miles, EGR valve), January 7, 2008 (59,724 miles, injector pump and injectors), March 24, 2008 (64,222 miles, EGR valve), April 10, 2008 (65,082 miles, EGR valve), July 30, 2008 (72,194 miles, EGR valve), November 26, 2008 (79,742 miles, EGR cooler and EGR valve), and July 22, 2009 (98,874 miles, EGR cooler, EGR valve, and turbo).

165.    Each time, Boggero complained of the aforementioned engine symptoms, and requested that the vehicle be repaired.

166.    Each time, the Ford dealership did not repair the engine or performed an inadequate repair of the engine.  Thus, Ford failed to provide appropriate warranty benefits for

44

Boggero's vehicle despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

167.    As a result, the engine continued to malfunction.

168.    Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

169.    As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Boggero was required to incur repair expenses to address these issues, lost income due to the vehicle being unavailable, and/or suffered other direct and consequential damages.

170.    Boggero's repair expenses include replacing the turbocharger, injectors, multiple EGR coolers, the head gaskets, and the oil cooler, at the cost of more than $10,000.

171.    Ford has actual knowledge of the details of the defects in Boggero's vehicle, as well as the claims and demands Boggero made to Ford for repair of the defects.  Boggero has notified Ford, either directly or through Ford's dealerships, described the defects, the problems caused by the defects, and has repeatedly given Ford the opportunity to repair or replace the defective engine.  Specifically, Boggero has notified Ford, either directly or through Ford's dealerships, by describing the defects, the problems caused by the defects, and has repeatedly given Ford the opportunity to repair or replace the defective engine.

**E.    Charles Clark**

172.    Plaintiff Charles Clark ("Clark") is an individual who at all relevant times resided in Brooklyn, Jackson County, Michigan.

173.     On August 3, 2006, Clark purchased a 2004 Ford F350 with a 6.0L Engine, VIN 1FTSW31P04ED20285.

174.     While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms, including blowing white smoke.  These symptoms were caused by the root cause defects in the engine.

175.     Pursuant to the Ford warranty, Clark's malfunctioning vehicle was brought to authorized Ford dealerships on multiple occasions, including on April 13, 2004 where the Ford dealership repaired or replaced the turbo charger vanes and EGR valve sensor.

176.     The Ford dealership did not repair the engine or performed an inadequate repair of the engine.  Thus, Ford failed to provide appropriate warranty benefits for Clark's vehicle despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

177.     As a result, the engine continued to malfunction, including leaking coolant so excessively that it can no longer be driven and Clark cannot afford to pay for additional repairs.  Each time in the past Ford either failed to perform an adequate repair or failed to provide any repair at all.

178.     Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

179.     As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Clark is no longer able to use the vehicle, resulting in loss-of-use damages, and/or other direct and consequential damages.

180.     Ford has actual knowledge of the details of the defects in Clark's vehicle, as well as the claims and demands Clark made to Ford for repair of the defects.  Clark has notified Ford,

either directly or through Ford's dealerships, of the issue, describing the defects and the problems caused by the defects, and giving Ford the opportunity to properly repair or replace the defective engine. Ford gave Clark a "complaint number" but refused to take any action.

**F.      Dinonno Enterprises, Inc.**

181.    Plaintiff Dinonno Enterprises, Inc., d/b/a Cutting Edge Concrete Cutting ("Dinonno") is a corporation incorporated in the state of California with its principal place of business in Simi Valley, Ventura County, California.

182.    Dinonno purchased two new Ford vehicles with 6.0L Engines, a model year 2006 F550 purchased in Indiana, VIN 1FTAF56P46EA73870, on September 30, 2005, and a 2006 F550 purchased in Illinois, VIN 1FDAF56P56EA25665, on August 5, 2005. He also received a 2005 F550 in California, VIN 1FDAF56P35EB87390, on March 27, 2005 as a trade-in for a 2003 vehicle that Ford acknowledged was defective and could not be repaired.

183.    While the engines were covered by the 5 year/100,000 mile warranty, the defective engines caused the vehicles to exhibit multiple symptoms, such as poor engine acceleration, rough idle, difficulty and/or inability to start, engine stalling, and loss of power while driving. These symptoms were caused by the root cause defects in the engine.

184.    Pursuant to the Ford warranty, Dinonno brought the malfunctioning vehicles on multiple occasions to authorized Ford dealerships including Sunrise Ford in N. Hollywood, California, and Carmenita Truck Center Ford in Santa Fe Springs, California.

185.    Dinonno brought malfunctioning vehicle, VIN 1FTAF56P46EA73870, to authorized Ford dealerships on multiple occasions, including on March 13, 2007 for injector replacement.

186.    Dinonno brought malfunctioning vehicle, VIN 1FDAF56P56EA2566, to authorized Ford dealerships on multiple occasions including the following dates, each time for injector repair or replacement:  December 28, 2007, January 15, 2007, January 19, 2007, March 25, 2007.

187.    Dinonno brought malfunctioning vehicle, VIN 1FDAF56P35EB87390, to authorized Ford dealerships in California on multiple occasions including the following dates, with the indicated component(s) repaired or replaced:  March 1, 2006 (EGR cooler and EGR valve); October 2, 2006 (EGR valve, injectors, and turbo); September 24, 2008 (heads and EGR cooler) and November 7, 2008 (turbo).

188.    Each time Dinonno complained of the aforementioned engine symptoms and requested that the vehicle be repaired.

189.    Each time, the Ford dealership did not repair the engine or performed an inadequate repair of the engine.  Thus, Ford failed to provide appropriate warranty benefits for Dinonno's vehicles despite the fact that the vehicles fell within the warranty's eligible time and mileage periods.

190.    As a result, the engine continued to malfunction and Dinonno was forced to repeatedly bring the malfunctioning vehicles to authorized Ford dealerships for additional repairs, as indicated above.  Each time, Ford either failed to perform an adequate repair or failed to provide any repair at all.

191.    Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

192.    As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Dinonno was required to incur repair expenses to address these issues, lost income due to the vehicle being unavailable, and/or suffered other direct and consequential damages.

193.    Ford has actual knowledge of the details of the defects in Dinonno's vehicle, as well as the claims and demands Dinonno made to Ford for repair of the defects.  Dinonno has notified Ford, either directly or through Ford's dealerships, of the issue, describing the defects and the problems caused by the defects, and giving Ford the opportunity to properly repair or replace the defective engine.

**G.    Karl Strong**

194.    Plaintiff Karl Strong ("Strong") is an individual who at all relevant times resided in Santa Rosa, Sonoma County, California.

195.    Strong purchased a 2004 Ford F250 truck with a 6.0-liter diesel engine, VIN 1FTNX21P64ED41727, from Sebastopol Ford in Sebastopol, California on August 21, 2004.

196.    While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms, such as poor engine acceleration, poor air conditioning performance, failure to withstand long periods of engine idle, rough idle, difficulty and/or inability to start, engine stalling, and complete loss of power while driving. These symptoms were caused by the root cause defects in the engine.

197.    Pursuant to the Ford warranty, Strong brought the malfunctioning vehicle to an authorized Ford dealership, Hansel Ford in Santa Rosa, California, for repair, complaining of the aforementioned engine symptoms, and requesting that the vehicle be repaired.

198.     The Ford dealership did not repair the engine and/or performed an inadequate repair of the engine, for example, the dealership only replaced the EGR cooler and oil cooler, which did not repair the engine.  Thus, Ford failed to provide appropriate warranty benefits for Strong's vehicle despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

199.     As a result, the engine continued to malfunction.

200.     Strong was again forced to bring the malfunctioning vehicle to an authorized Ford dealership, including on February 6, 2009 to Hansel Ford.  Each time Ford either failed to perform an adequate repair or failed to provide any repair at all.

201.     Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

202.     As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Strong was required to incur repair expenses to address these issues, lost income due to the vehicle being unavailable, and/or suffered other direct and consequential damages.

203.     For example, Strong had to pay to have the EGR cooler and oil cooler replaced again, and pay for repairs to the head gaskets and EGR valve, after the warranty expired, costing Strong more than $5,900.

204.     Ford has actual knowledge of the details of the defects in Strong's vehicle, as well as the claims and demands Strong made to Ford for repair of the defects.  Strong has notified Ford, either directly or through Ford's dealerships, described the defects, the problems caused by

the defects, and has repeatedly given Ford the opportunity to repair or replace the defective engine.

**H.    Frank Brown Towing, Inc.**

205.    Plaintiff Frank Brown Towing, Inc. ("Brown") is a corporation incorporated and with its principal place of business in Buffalo, Erie County, New York.

206.    On November 30, 2005, Brown purchased a 2006 Ford F450 truck equipped with the 6.0L Engine, VIN 1FDXX46P36EB47314, in New York.

207.    While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms, such as poor engine acceleration, rough idle, difficulty and/or inability to start, engine stalling, and complete loss of power while driving. The symptoms were caused by the root cause defects in the engine.

208.    Pursuant to the Ford warranty, Brown brought the malfunctioning vehicle to authorized Ford dealerships in New York, including Steve Baldo Ford and West-Herr Ford of Amherst, for repair on multiple occasions, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced: January 2, 2008 (47,021 miles, EGR valve), April, 11 2008 (54,320  miles, EGR valve), May 23, 2008 (57,240 miles, EGR cooler), August 6, 2008 (61,174 miles, EGR valve), December 21, 2009 (89,851 miles, EGR valve),  January 6, 2010 (90,489 miles, injector), February 10, 2010 (91,763 miles, EGR cooler and oil cooler), June 29, 2010 (99,635 miles, injector), and July 15, 2010 (100,064 miles, turbo).

209.    Each time, Brown complained of the aforementioned engine symptoms, and requested that the vehicle be repaired.

210.    Each time, the Ford dealership performed inadequate repairs of the engine, none of which repaired the engine.

211.    Ford's mechanic even suggested that Brown carry a spare EGR valve onboard the truck to make repairs "on the road" should the part fail again.

212.    Thus, Ford failed to provide appropriate warranty benefits for Brown's vehicle, despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

213.    As a result, the engine continued to malfunction.

214.    Brown was forced to bring the malfunctioning vehicle to an authorized Ford dealership on multiple occasions as listed above.  Each time Ford either failed to perform an adequate repair or failed to provide any repair at all.

215.    Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

216.    Ford has now told Brown that the truck needs an entire engine replacement, which will cost around $18,000.

217.    As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Brown was required to incur repair expenses to address these issues, lost income due to the vehicle being unavailable, and/or suffered other direct and consequential damages.

218.    Ford has actual knowledge of the details of the defects in Brown's vehicle, as well as the claims and demands Brown made to Ford for repair of the defects.   Brown has notified Ford, either directly or through Ford's dealerships, described the defects, the problems caused by the defects, and has repeatedly given Ford the opportunity to repair or replace the defective engine.

Case: 1:11-cv-02496 Document #: 233-1 Filed: 10/25/12 Page 54 of 82 PageID #:5640

## I.     **Steve Santilli**

219.     Plaintiff Steve Santilli ("Santilli") is an individual who at all relevant times resided in Newington, New Haven County, Connecticut.

220.     Santilli purchased a 2005 Ford F250 truck with a 6.0-liter diesel engine, VIN 1FT5X21P95EC54862, on March 25, 2005, from Family Ford in Waterbury, Connecticut.

221.     While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms, such as poor engine acceleration, rough idle, difficulty starting the engine, inability to start engine, engine stalling, and complete loss of power while driving. These symptoms were caused by the root cause defects in the engine.

222.     In approximately November 2008, Santilli experienced problems with the truck running rough, stalling, and failing to start. Pursuant to the Ford warranty, Santilli brought the malfunctioning vehicle to Interstate Ford, an authorized Ford dealership in Connecticut, complaining of the aforementioned engine symptoms, and requesting that the vehicle be repaired.

223.     The Ford dealership did not repair the engine or performed an inadequate repair of the engine. Thus, Ford failed to provide appropriate warranty benefits for Santilli's vehicle despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

224.     As a result, the engine continued to malfunction.

225.     Santilli was again forced to bring the malfunctioning vehicle to an authorized Ford dealership due to the improper repair. Each time Ford either failed to perform an adequate repair or failed to provide any repair at all.

226. Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

227. As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Santilli was required to incur repair expenses to address these issues, lost income due to the vehicle being unavailable, and/or suffered other direct and consequential damages.

228. In particular, since his warranty expired, Santilli's vehicle has broken down, and Ford claims that the vehicle will require a new FICM, a new turbocharger, and a new EGR valve.

229. Ford has actual knowledge of the details of the defects in Santilli's vehicle, as well as the claims and demands Santilli made to Ford for repair of the defects. Santilli has notified Ford, either directly or through Ford's dealerships, described the defects, the problems caused by the defects, and has repeatedly given Ford the opportunity to repair or replace the defective engine.

**J.    John Prebish**

230. Plaintiff John Prebish ("Prebish") is an individual who at all relevant times resided in Loveland, Larimer County, Colorado.

231. Prebish purchased a 2004 Ford F350 truck with a 6.0-liter diesel engine, VIN 1FTWW33P74ED15146, on December 1, 2004, with 4,951 miles on it.

232. While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms, such as poor engine acceleration, rough idle, difficulty starting the engine, inability to start engine, engine stalling and/or complete loss of power while driving. These symptoms were caused by the root cause defects in the engine.

233.     Pursuant to the Ford warranty, Prebish brought the malfunctioning vehicle to an authorized Ford dealership (Heritage Ford-Lincoln-Mercury, Inc.) multiple times, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced: July 8, 2005 (12,911 miles, EGR valve), October 10, 2006 (31.945 miles, clean and test EGR valve), January 24, 2008 (51,750 miles, EGR valve), and September 29, 2009 (EGR valve and cooler), complaining of the aforementioned engine symptoms, and requesting that the vehicle be repaired.

234.     The Ford dealership did not repair the engine or performed an inadequate repair of the engine.  Thus, Ford failed to provide appropriate warranty benefits for Prebish's vehicle despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

235.     As a result, the engine continued to malfunction and Prebish was forced to bring the malfunctioning vehicle back for additional repairs as stated above.  Each time Ford either failed to perform an adequate repair or failed to provide any repair at all.

236.     Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

237.     As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Prebish was required to incur repair expenses to address these issues, lost income due to the vehicle being unavailable, and/or suffered other direct and consequential damages.

238.     Ford has actual knowledge of the details of the defects in Prebish's vehicle, as well as the claims and demands Prebish made to Ford for repair of the defects.  Prebish has notified Ford, either directly or through Ford's dealerships, described the defects, the problems

caused by the defects, and has repeatedly given Ford the opportunity to repair or replace the defective engine.

**K.**    **Anthony Mawyer**

239.    Plaintiff Anthony Mawyer ("Mawyer") is an individual who at all relevant times resided in Alexander County, North Carolina.

240.    On September 19, 2004, Mawyer purchased a new 2004 Ford F250 truck with a 6.0L Engine, VIN 1FTNW21P64EA09712, from Larry Schronce Ford in North Carolina.

241.    While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms, such as poor engine acceleration, poor air conditioning performance, failure to withstand long periods of engine idle, rough idle, difficulty and/or inability to start, engine stalling, and complete loss of power while driving. These symptoms were caused by the root cause defects in the engine.

242.    Pursuant to the Ford warranty, Mawyer brought the malfunctioning vehicle to authorized Ford dealerships in North Carolina, including Larry Schronce Ford, for repair on multiple occasions, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced: January 11, 2005 (6289 miles, injector), July 25, 2005 (12,590, injector), August 8, 2007 (33,123 miles, injector replaced and turbo cleaned), and September 15, 2009 (55,325 miles, EGR valve).

243.    Each time, Mawyer complained of the aforementioned engine symptoms, and requested that the vehicle be repaired.

244.    Each time, the Ford dealership performed inadequate repairs of the engine, none of which repaired the engine.

245.   Thus, Ford failed to provide appropriate warranty benefits for Mawyer's vehicle despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

246.   As a result, the engine continued to malfunction.

247.   A Ford service technician admitted to Mawyer that 9 out of 10 trucks equipped with the 6.0L Engine presented for repair exhibit the same problems as Mawyer's vehicle.

248.   Mawyer was forced to return the malfunctioning vehicle to an authorized Ford dealership.  Each time Ford either failed to perform an adequate repair or failed to provide any repair at all.

249.   Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

250.   As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Mawyer was required to incur repair expenses to address these issues, lost income due to the vehicle being unavailable, and/or suffered other direct and consequential damages.

251.   Ford has actual knowledge of the details of the defects in Mawyer's vehicle, as well as the claims and demands Mawyer made to Ford for repair of the defects.  Mawyer has notified Ford, either directly or through Ford's dealerships, described the defects, the problems caused by the defects, and has repeatedly given Ford the opportunity to repair or replace the defective engine.

## L.   <u>Georjean Vogt</u>

252.   Plaintiff Georjean Vogt ("Vogt") is an individual who at all relevant times resided in Tucson, Arizona.

253. Vogt, through a family trust, purchased a new 2003 Ford F350 truck with a 6.0-liter diesel engine, VIN 1FTSW31P83ED32943, on August 10, 2003, in Arizona.

254. While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms, including running rough, blowing black smoke, turbo whine. These symptoms were caused by the root cause defects in the engine.

255. Pursuant to the Ford warranty, Vogt brought the malfunctioning vehicle to authorized Ford dealerships in Arizona, including Oracle Ford and Holmes Tuttle Ford, on multiple occasions including the following dates, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced: October 26, 2005, (17,573 miles, turbo and EGR valve), August 22, 2006 (22,901 miles, EGR valve), September 20, 2007 (31,081 miles, EGR valve), July 31, 2008 (39,382 miles, turbo charger), and August 21, 2008 (39,641 miles, turbo charger). Each time Vogt complained of the aforementioned engine symptoms and requested that the vehicle be repaired.

256. Each time, the Ford dealership did not repair the engine or performed an inadequate repair of the engine. Thus, Ford failed to provide appropriate warranty benefits for Vogt's vehicle despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

257. As a result, the engine continued to malfunction and Vogt was forced to repeatedly bring the malfunctioning vehicle to an authorized Ford dealership for additional repairs. Each time Ford either failed to perform an adequate repair or failed to provide any repair at all.

Case: 1:11-cv-02496 Document #: 233-1 Filed: 10/23/12 Page 60 of 82 PageID #:3646

258. Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components that Ford knew would not, and in fact did not, adequately repair the engine.

259. As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Vogt was required to incur repair expenses to address these issues, lost income due to the vehicle being unavailable, and/or suffered other direct and consequential damages.

260. For example, on July 31, 2008, Vogt was billed $1,992.68 by Oracle Ford for turbocharger work and on August 22, 2008 Vogt was billed $1,127.13 by Oracle Ford for additional engine work.

261. Ford has actual knowledge of the details of the defects in Vogt's vehicle, as well as the claims and demands Vogt made to Ford for repair of the defects. Vogt has notified Ford, either directly or through Ford's dealerships, of the issue, describing the defects and the problems caused by the defects, and giving Ford the opportunity to properly repair or replace the defective engine.

**M.** **Cecil and Tressie Fulton**

262. Plaintiffs Cecil and Tressie Fulton ("Fulton") are individuals who at all relevant times resided in Manteca, San Joaquin County, California.

263. Fulton purchased a new 2004 Ford F250 truck with a 6.0-liter diesel engine, VIN 1FTNW21P14EB66788, in Livermore, California on December 14, 2004.

264. While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms, including excessive engine noise and other symptoms. The symptoms were caused by the root cause defects in the engine.

265.    Pursuant to the Ford warranty, Fulton brought the malfunctioning vehicle to an authorized Ford dealership, including Codiroli Ford in Livermore, California, on dates including November 15, 2005, December 5, 2005, January 29, 2007, September 10, 2007, March 25, 2008, April 30, 2008, May 12, 2008, April 27, 2011, and May 23, 2011, complaining of the aforementioned engine symptoms, and requesting that the vehicle be repaired.

266.    The Ford dealership performed inadequate repairs of the engine including repairs or replacements of the turbo (four times), the EGR throttle body, EGR cooler and EGR valve, EGR cooler, and head gaskets, none of which repaired the engine adequately.  Thus, Ford failed to provide appropriate warranty benefits for Fulton's vehicle despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

267.    As a result, the engine continued to malfunction.

268.    Fulton was forced to bring the malfunctioning vehicle to an authorized Ford dealership, on multiple occasions as listed above.  Each time Ford either failed to perform an adequate repair or failed to provide any repair at all.

269.    Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

270.    As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Fulton was required to incur repair expenses to address these issues, lost income due to the vehicle being unavailable, and/or suffered other direct and consequential damages.

271.    Ford has actual knowledge of the details of the defects in Fulton's vehicle, as well as the claims and demands Fulton made to Ford for repair of the defects.  Fulton has notified

Case: 1:11-cv-02496 Document #: 233-1 Filed: 10/25/12 Page 62 of 82 PageID #:3648

Ford, either directly or through Ford's dealerships, described the defects, the problems caused by the defects, and has repeatedly given Ford the opportunity to repair or replace the defective engine.

**N.    Carl Atwell**

272.    Plaintiff Carl Atwell ("Atwell") is an individual who at all relevant times resided in Mooresville, Morgan County, Indiana.

273.    On December 27, 2007, Atwell purchased a pre-owned 2005 Ford F350 truck with a 6.0L Engine, VIN 1FTWW31P85ED18948, from Ray Skillman Ford in Greenwood, Indiana.

274.    While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms including poor engine acceleration, rough idle, difficulty and/or inability to start, engine stalling, and complete loss of power while driving.  These symptoms were caused by the root cause defects in the engine.

275.    Pursuant to the Ford warranty, Atwell brought the malfunctioning vehicle to authorized Ford dealerships on multiple occasions including the following dates, with the indicated component(s) repaired or replaced:  December 17, 2008 (EGR and oil cooler), August 17, 2009 (Injectors 2 and 4), and December 1, 2009 (Injectors 1, 5 and 6).

276.    Each time Atwell complained of the aforementioned engine symptoms and requested that the vehicle be repaired.

277.    Each time, the Ford dealership did not repair the engine or performed an inadequate repair of the engine.  Thus, Ford failed to provide appropriate warranty benefits for Atwell's vehicle despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

278.     As a result, the engine continued to malfunction and Atwell was forced to repeatedly bring the malfunctioning vehicle to an authorized Ford dealership for additional repairs, as indicated above.  Each time, Ford either failed to perform an adequate repair or failed to provide any repair at all.

279.     Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

280.     As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Atwell was required to incur repair expenses to address these issues, lost income due to the vehicle being unavailable, and/or suffered other direct and consequential damages.

281.     For example, Atwell was forced to pay for the replacement of the EGR cooler and oil cooler.

282.     Ford has actual knowledge of the details of the defects in Atwell's vehicle, as well as the claims and demands Atwell made to Ford for repair of the defects.  Atwell has notified Ford, either directly or through Ford's dealerships, of the issue, describing the defects and the problems caused by the defects, and giving Ford the opportunity to properly repair or replace the defective engine.

**O.     Phillip Marcum**

283.     Plaintiff Phillip Marcum ("Marcum") is an individual who at all relevant times resided in Lucasville, Ohio.

284.     On September 28, 2007, Marcum purchased a pre-owned 2005 Ford F350 truck with a 6.0L Engine, VIN 1FTWW33P45EB17075, from Donnie Smith Auto Sales in Ohio.

285.    The vehicle had 32,100 at the time Marcum purchased the vehicle.

286.    While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms, such as poor engine acceleration, rough idle, difficulty starting the engine, inability to start engine, engine stalling and/or complete loss of power while driving.  These symptoms were caused by the root cause defects in the engine.

287.    Pursuant to the Ford warranty, Marcum brought the malfunctioning vehicle to an authorized Ford dealership in Ohio, including Barnett Ford, for repair on multiple occasions, with the indicated number of miles on the vehicle, and the indicated component(s) repaired or replaced: August 7, 2009 (60,242 miles, EGR valve), and January 26, 2010 (66,326 miles, turbo and two injectors).

288.    Each time, Marcum complained of the aforementioned engine symptoms, and requested that the vehicle be repaired.

289.    Each time, the Ford dealership did not repair the engine or performed an inadequate repair of the engine.  Thus, Ford failed to provide appropriate warranty benefits for Marcum's vehicle despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

290.    As a result, the engine continued to malfunction and Marcum was forced to bring the malfunctioning vehicle back for additional repairs.  Each time, Ford either failed to perform an adequate repair or failed to provide any repair at all.

291.    For example, in September 2010, after his vehicle's warranty had expired, Marcum returned the vehicle to an authorized dealership when the engine again malfunctioned. Upon discovering that multiple injectors needed replacement, Marcum complained to Ford

directly. Despite the expiration of the vehicle's warranty, Ford agreed to split the repair costs of replacing injectors.

292. Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

293. As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Marcum was required to incur repair expenses to address these issues, lost income due to the vehicle being unavailable, and/or suffered other direct and consequential damages.

294. Ford has actual knowledge of the details of the defects in Marcum's vehicle, as well as the claims and demands Marcum made to Ford for repair of the defects. Marcum has notified Ford, either directly or through Ford's dealerships, described the defects, the problems caused by the defects, and has repeatedly given Ford the opportunity to repair or replace the defective engine.

295. In particular, Marcum authored a letter to Ohio Attorney General Richard Cordray detailing Marcum's complaints regarding his vehicle and requesting that Ford replace his defective engine. This letter was provided to Ford as part of the Ohio Attorney general's dispute resolution program.

296. Ford responded that it was not responsible for further repairs to the vehicle after the expiration of the warranty, and that it would not comply with the Marcum's request for engine replacement.

297.     Accordingly, Marcum notified Ford of the breach within a reasonable time, and/or was not required to do so because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile.

**P.     James Hutton**

298.     Plaintiff James Hutton ("Hutton") is an individual who at all relevant times resided in Flemington, New Jersey.

299.     On September 8, 2004, Hutton purchased a new 2005 Ford F350 truck with a 6.0L Engine, VIN 1FTWW33P75EA46406, from Ditschman Flemington Ford in Flemington, New Jersey.

300.     While the engine was covered by the 5 year/100,000 mile warranty, the defective engine caused the vehicle to exhibit multiple symptoms, including poor engine acceleration, rough idle, difficulty and/or inability to start, engine stalling, and/or complete loss of power while driving.  These symptoms were caused by the root cause defects in the engine.

301.     Pursuant to the Ford warranty, Hutton brought the malfunctioning vehicle to Flemington Ford, an authorized Ford dealership in New Jersey, on June 22, 2007.  The vehicle had 70,357 miles, and Flemington Ford replaced the EGR valve and turbo charger.

302.     Hutton complained of the aforementioned engine symptoms, and requested that the vehicle be repaired.

303.     The Ford dealership did not repair the engine or performed an inadequate repair of the engine.  Thus, Ford failed to provide appropriate warranty benefits for Hutton's vehicle despite the fact that the vehicle fell within the warranty's eligible time and mileage periods.

304.     As a result, the engine continued to malfunction and Hutton was forced to repeatedly bring the malfunctioning vehicle to an authorized Ford dealership for additional

repairs.  Each time, Ford either failed to perform an adequate repair or failed to provide any repair at all.

305.    Despite knowing that the engine had major defects and needed to be replaced, Ford only authorized minor recalibrations, adjustments, and replacement of isolated components which Ford knew would not, and in fact did not, adequately repair the engine.

306.    As a result of Ford's failure to properly repair the engine during the warranty, after the expiration of the warranty, Hutton was required to incur repair expenses to address these issues, and/or suffered other direct and consequential damages.

307.    Ford has actual knowledge of the details of the defects in Hutton's vehicle, as well as the claims and demands Hutton made to Ford for repair of the defects.  Hutton has notified Ford, either directly or through Ford's dealerships, of the issue, describing the defects and the problems caused by the defects, and has given Ford the opportunity to properly repair or replace the defective engine.

## V.  CLASS ACTION ALLEGATIONS

308.    Pursuant to FED. R. CIV. P. 23, Plaintiffs bring this action for themselves and on behalf of the following class (the "Class"):

1.    All entities and natural persons in the United States (including its Territories and the District of Columbia) who currently own or lease (or who in the past owned or leased) a model year 2003-2007 non-ambulance Ford vehicle sold or leased in the United States and equipped with a 6.0-liter PowerStroke diesel engine that received one or more repairs covered by Ford's New Vehicle Limited Warranty during the vehicle's first five years in service or 100,000 miles, whichever comes first, to: a fuel injector; the exhaust gas recirculation ("EGR") valve; the EGR cooler; the oil cooler; or the turbo charger ("Class Vehicle").

2.    Excluded from the Class are:  (a) all federal court judges who have presided over this case and their spouses and anyone within three degrees of consanguinity from those judges and their spouses; (b)

all entities and natural persons who elect to exclude themselves from the Class; (c) all entities and natural persons who have previously executed and delivered to Ford Motor Company releases of all their claims, including, but not limited to, members of the settlement class in *Williams A. Ambulance, Inc., State Services of Jefferson County A, LLP, and State Services of Jasper County A, LLP, et al. v. Ford Motor Company*, Case No. 1:06-cv-776 in the United States District Court for the Eastern District of Texas, Beaumont Division; (d) all entities and natural persons who: (1) prior to the filing of the Motion for Preliminary Approval, filed an individual lawsuit (*i.e.*, a lawsuit that does not seek certification as a class action) in any court asserting causes of action of any nature, including but not limited to claims for violations of federal, state, or other law (whether in contract, tort, or otherwise, including statutory and injunctive relief, common law, property, warranty and equitable claims) based upon the 6.0L engine in a Class Vehicle, and (2) have not voluntarily dismissed such lawsuit without prejudice; and (e) Defendant's employees, officers, directors, agents, and representatives and their family members.

## A.   FED. R. CIV. P. 23(a) Prerequisites

309.   The Class is so numerous that joinder of all members is impracticable.  At this time, Plaintiffs do not know the exact size of the Class.  Based on information and belief, the Class is comprised of at least hundreds of thousands of members (the "Class Members") and is geographically dispersed throughout the country as to render joinder of all Class Members impracticable.

310.   The claims of Plaintiffs and the Class Members involve common questions of fact and law which will predominate over any individual issues.  These common issues, include, but are not limited to:

 a. Whether the subject 6.0L Engines are defective, thereby making the vehicles unable to withstand reasonably anticipated use;

 b. Whether the implied warranty of merchantability applied to the subject 6.0L Engines;

c.   Whether Defendant breached the implied warranty of merchantability with respect to the subject 6.0L Engines;

d.   Whether Defendant made express warranties regarding the subject 6.0L Engines, including the warranty that Defendant, through its authorized dealerships, would, without charge, repair, replace, or adjust all parts that malfunctioned or failed during normal use during the applicable coverage period due to a defect in factory-supplied materials or factory workmanship;

e.   Whether Defendant breached its express warranty regarding the subject 6.0L Engines when it failed to adequately repair the defects;

f.   Whether Defendant knew about the 6.0L Engine defects;

g.   When Defendant knew about the 6.0L Engine defects;

h.   Whether Defendant failed to disclose the 6.0L Engine defects;

i.   Whether Defendant concealed the 6.0L Engine defects;

j.   Whether Defendant had and/or has a duty to disclose the 6.0L Engine defects;

k.   Whether the defective nature of the 6.0L Engines constitutes a material fact; and

l.   Whether Defendant violated consumer protection statutes.

311.   The claims of Plaintiffs are typical of the other Class Members' claims. As described above, Defendant expressly warranted to all Class Members that it would, without charge, repair, replace, or adjust all parts that malfunctioned or failed during normal use during the applicable coverage period due to a defect in factory-supplied materials or factory workmanship.

312.   Defendant uniformly breached its express warranty to Plaintiffs and Class Members by failing to repair, replace, or adjust defective parts.

313.     Defendant uniformly breached the implied warranty of merchantability to Plaintiffs and all Class Members because the 6.0L Engines are inadequate and incapable of performing the very tasks they were designed to carry out.

314.     Plaintiffs, like all Class Members, used their vehicles in the normal manner for which the 6.0L Engines were designed.  Despite Plaintiffs' proper use of the engines, they malfunctioned in a manner which Defendant failed to fix by repairing, replacing or adjusting.

315.     Because of the well-known defects, which have been admitted by Ford, it is clear that the Class Members' engines are malfunctioning during normal use due to defects in factory-supplied materials and/or factory workmanship.

316.     Plaintiffs, like all Class Members, purchased and leased Ford vehicles designed, manufactured, and distributed by Ford in which the 6.0L Engine was defective.  Plaintiffs, like all Class Members, have been damaged by Ford's misconduct. Further, the factual bases of Ford's misconduct are common to all class members, as—regarding the defective nature of the 6.0L Engines—Ford made uniform misrepresentations to and uniformly withhold material information from Plaintiffs and all class members.

317.     Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs are members of the Class.  Plaintiffs' interests coincide with, and are not antagonistic to, other Class Members' interests.   Additionally, Plaintiffs have retained counsel experienced and competent in complex, commercial, multi-party, mass tort, consumer, and class action litigation. Plaintiffs' counsel has prosecuted complex class actions in state and federal courts across the country.   Plaintiffs' counsel has also prosecuted successfully a class action involving the defective 6.0L Engine.

## B.     <u>Fᴇᴅ. R. Cɪᴠ. P. 23(b) Prerequisites</u>

318.     Questions of law and fact common to the Class predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. Individual damages on the matter can be readily calculated by documented income loss and expenses caused by the defects at issue. Thus, the question of individual damages will not predominate over legal and factual questions common to the Class. Additionally, Ford has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## VI.   <u>CAUSES OF ACTION</u>

### <u>Count 1: Breach of Implied Warranty of Merchantability</u>

319.     Plaintiffs and Class Members incorporate by reference those paragraphs set out above as though fully set forth herein.

320.     Plaintiffs and Class Members purchased or leased vehicles equipped with 6.0L Engines supplied by Defendant Ford.

321.     When the subject 6.0L Engines left Defendant Ford's possession, they were unmerchantable. Plaintiffs and Class Members used their vehicles in the normal manner for which the 6.0L Engines were designed. Despite Plaintiffs' proper use of the engines, they malfunctioned in a manner that Defendant failed to fix by repairing, replacing or adjusting.

322.     The vehicles equipped with 6.0L Engines supplied by Ford are inadequate and incapable of performing the very tasks they were designed to carry out. The inadequacies of the engines include but are not limited to:

        a.     The 6.0L Engines are not equipped to withstand extended periods of engine idle;

Case: 1:11-cv-02496 Document #: 231 Filed: 10/25/12 Page 72 of 82 PageID #:5638

  b.  The 6.0L Engines have poor acceleration;

  c.  The 6.0L Engines repeatedly stall;

  d.  The 6.0L Engines are frequently incapable of starting;

  e.  The 6.0L Engines are difficult to start and run rough; and

  f.  The 6.0L Engines require prolonged periods of warm up time before acceleration is possible.

323. After having the subject vehicles repaired repeatedly, Plaintiffs notified Ford of the breach of warranty claims when they brought their vehicles to a Ford dealership, and/or contacted Ford directly, as described above. Plaintiffs contacted their local Ford dealerships and/or informed a Ford representative of the continuous mechanical malfunctions of the 6.0L Engine design and suffered repeated unsuccessful attempts by Ford dealerships to repair the problems.

324. Accordingly, Ford has actual knowledge of the specific defects associated with defective 6.0L Engines and the problems resulting therefrom.

325. To date, Ford has neither adequately cured the actual engine defects nor replaced the defective engines.

326. As a result of Ford's breach of implied warranty of merchantability, Plaintiffs suffered damages in the amount of the difference between the value of the vehicles equipped with the defective engines and the value of the vehicles if they had been equipped as warranted.

327. Plaintiffs also suffered diminution in the value of their vehicles, out-of-pocket expenditures related to the cost to repair/service the engines (including deductibles paid when repairs were covered by warranty, and the full cost of repair when they were not covered), lost profits from the inability to utilize the vehicles equipped with the defective engine (caused by the

Case: 1:11-cv-02496 Document #: 233-1 Filed: 10/25/12 Page 73 of 82 PageID #:3059

long delays as Ford dealership mechanics repeatedly and unsuccessfully attempted to diagnose and/or repair the defects), towing charges incurred due to the repeated break-downs of the vehicles, the cost of purchasing additional vehicles necessitated by the repeated problems with the 6.0L Engines, and other damages as described herein.

328.    Defendant Ford's defective 6.0L Engine was the direct and proximate cause of Plaintiffs' injuries.

### Count 2:  Breach of Express Warranty

329.    Plaintiffs incorporate by reference those paragraphs set out above as though fully set forth herein.

330.    Ford provided all Plaintiffs with the express 6.0L Powerstroke Diesel Engine warranty, which covers the engine and engine components against defects in factory-supplied materials or workmanship for five years after the warranty start date or 100,000 miles, whichever occurs first, and provides that during this coverage period, authorized Ford Motor Company dealers will repair, replace, or adjust all parts on the vehicle that are defective in factory-supplied materials or workmanship.

331.    This warranty became part of the basis of the bargain.

332.    Ford manufactured and sold vehicles equipped with the 6.0L Engine that are covered by the express warranty.

333.    Ford breached this express warranty (1) each time its dealerships failed to properly repair, replace, or adjust the malfunctioning engine and thus failed to return the vehicle to proper working condition, and (2) each time Defendant failed to authorize a Ford dealer to perform an adequate repair of a vehicle, instead only authorizing an inadequate repair which

resulted in additional engine repair or replacement expenses after the expiration of the warranty period.

334.    Ford has actual knowledge of the specific defects associated with defective 6.0L Engines and the problems resulting therefrom.

335.    Plaintiffs (or the prior owners of their Ford vehicles) notified Ford of the breach within a reasonable time and/or were not required to do so because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile.  After having the subject vehicles repaired repeatedly, Plaintiffs notified Defendant of the breach of warranty claims when they brought their vehicles into a Ford dealership, and/or contacted Ford directly, as described above.  Plaintiffs contacted their local Ford dealerships and/or informed a Ford representative of the continuous mechanical malfunctions of the 6.0L Engine design and suffered repeated unsuccessful attempts by Ford Dealerships to repair the problems.  To date, Defendant has neither adequately cured the actual engine defects nor replaced the defective engines.

336.    Ford was also on notice of the engine defects from the complaints and service requests it received from class members, from repairs of the 6.0L Engines or components thereof, through its own maintenance records, and through its own employees' communications as evidenced in numerous memoranda and email communications.

337.    As a result of Defendant Ford's breach, Plaintiffs suffered damages in the amount of the difference between the value of the vehicles equipped with the defective engines and the value of the vehicles if they had been equipped as warranted.

338.    Plaintiffs also suffered diminution in the value of their vehicles, out-of-pocket expenditures related to the cost to repair/service the engines (including deductibles paid when repairs were covered by warranty, and the full cost of repair when they were not covered), lost

profits from the inability to utilize the vehicles equipped with the defective engine (caused by the long delays as Ford dealership mechanics repeatedly and unsuccessfully attempted to diagnose and/or repair the defects), towing charges incurred due to the repeated break-downs of the vehicles, the cost of purchasing additional vehicles necessitated by the repeated problems with the 6.0L Engines, and other damages as described herein.

339.    Defendant Ford's defective 6.0L Engine is the direct and proximate cause of Plaintiffs' injuries.

340.    Plaintiffs and the other class members are entitled to legal and equitable relief against Ford, including damages, consequential damages, specific performance, rescission, attorneys' fees, costs of suit, and other relief as appropriate.

### Count 3:  Declaratory Relief Regarding Unconscionability and Unenforceability of Unilaterally Imposed Durational Limits to Ford's Express Warranty

341.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

342.    The express 6.0L Powerstroke Diesel Engine warranty was unilaterally and solely drafted by Ford without any negotiation or opportunity for input from any Plaintiffs or Class Members.  All terms of the express warranty, including the unilaterally imposed durational limits of 5 years or 100,000 miles were offered by Ford on a "take it or leave it basis," and without affording Plaintiffs and Class Members any meaningful choice in bargaining for the terms of warranty coverage.

343.    Ford, as the manufacturer of the Class Vehicles and contractee of Navistar, knew, at the time that it unilaterally imposed the terms of its express warranty (including the warranty's durational limits), that the 6.0L Engine was defective and would fail repeatedly beyond the warranty repair period.  Ford also knew, at the time that it unilaterally imposed the durational

limits on its express warranty, that Ford was unqualified and unable to perform properly the warranty service that it had contracted to offer as part of the 6.0L Powerstroke Diesel Engine warranty, thereby leaving the Class Vehicles defective both within and outside the warranty durational limits unilaterally imposed by Ford. Ford failed to disclose this knowledge to any Class Member and took affirmative steps to conceal it by continuing to tout the supposed superior attributes and qualities of the 6.0L Engine.

344. As a result of Ford's knowledge and concealment from consumers of the defects inherent in the 6.0L Engine, its propensity to fail shortly after the warranty durational limits would expire, and Ford's inability to offer appropriate warranty repair service as was called for under the terms of the express warranty, Ford was the party with superior bargaining power.

345. Ford has and continues to adhere to the durational limits of its express warranty and relies upon these unilaterally imposed durational limits to deny warranty coverage to any Class Vehicle that is presented for warranty repair service either more than 5 years since its in-service date or having more than 100,000 miles. All Plaintiffs have either had Ford deny warranty service to their vehicles as a result of these unilaterally imposed durational limits, or face the certain prospect of Ford denying warranty coverage to their vehicles once these durational limits have been reached.

346. Given that (1) there was no opportunity for bargaining the terms of the warranty (including its durational limits); (2) Ford concealed, during the transactions giving rise to the offering of the express warranty, Ford's unique and superior knowledge as to the defective nature of the Class Vehicles, their propensity to fail shortly after the durational limits, and Ford's inability to offer adequate warranty repair service; and (3) Plaintiffs and Class Members had no meaningful choice but to accept Ford's unilaterally imposed warranty terms, the durational limits

imposed unilaterally by Ford as part of its warranty contract are procedurally unconscionable, and hence unenforceable.

347.    Given the inherently defective nature of the Class Vehicles, and their propensity to malfunction (or continue to malfunction) and require inordinately expensive repairs shortly after the expiration of the warranty durational limits unilaterally imposed by Ford, and given Ford's non-disclosure and affirmative concealment of these facts, enforcement of the unilaterally imposed durational limits of the 6.0L Powerstroke Diesel Engine express warranty would so oppress and surprise the innocent end-user members of the Class as to render these durational limits substantively unconscionable, and hence unenforceable.

348.    Because all Class Members are subject to these same unilaterally imposed durational limits, and all either have been denied warranty coverage by Ford as a result of these durational limits or face the certain prospect of such denial, a real controversy exists between all members of the Class and Ford.  As such, Plaintiffs and Class Members may and do seek a declaration of their rights and Ford's obligations regarding the express warranty.  Specifically, all Plaintiffs and Class Members seek a declaration by this Court that Ford's unilaterally imposed durational limits on its 6.0L Powerstroke Diesel Engine express warranty are unconscionable and, hence, unenforceable, such that Ford may not enforce or rely on these durational limits as a basis to deny warranty coverage to Class Members or their successors or assignees in the future.

349.    Because Ford's continued enforcement of these unconscionable durational limits to the 6.0L Powerstroke Diesel Engine warranty would cause Class Members to sustain irreparable harm, all Plaintiffs and Class Members have standing to and do seek an injunction barring Ford from continuing to enforce the durational limits and relying on these unconscionable limits to deny warranty coverage.

## Count 4:  Violation of State Consumer Protection Laws

350. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

351. Plaintiffs and Class Members are consumers who purchased or leased one or more Ford vehicles equipped with a defective 6.0L Engine.

352. Ford is a person whose conduct, as set forth herein, occurred in the conduct of trade or commerce.

353. At all relevant times, as described above, the Ford vehicles equipped with the defective 6.0L Engines that Ford sold to Plaintiffs and Class Members were not of the particular sponsorship, approval, or certification because the Ford vehicles contained defective 6.0L Engines, causing the likelihood of confusion and misunderstanding.

354. By failing to disclose the defects inherent to the 6.0L Engine and failing to properly repair the defective engines, Ford engaged in unfair or deceptive acts or practices including (1) representing that the Ford vehicles equipped with defective 6.0L Engines have characteristics, use benefits, and qualities which they do not have; (2) representing that the Ford vehicles equipped with the defective 6.0L Engines are of a particular standard, quality, and grade when they are not; (3) advertising the Ford vehicles equipped with the defective 6.0L Engines with the intent not to sell them as advertised; (4) representing that a transaction involving Ford vehicles equipped with the defective 6.0L Engines confers or involves rights, remedies, and obligations which it does not; (5) representing that the subject of a transaction involving the Ford vehicles equipped with the defective 6.0L Engines has been supplied in accordance with a previous representation when it has not; and (6) representing that the Ford vehicles equipped with the defective 6.0L Engines had sponsorship, approval, characteristics, ingredients, uses, and benefits that they do not have.

355. Ford sold the vehicles equipped with the defective 6.0L Engines to Plaintiffs and Class Members with full knowledge that the Ford vehicles contained the defective 6.0L Engines at issue in the litigation.

356. Ford intended that Plaintiffs and Class Members rely on its misrepresentations and omissions, so that Plaintiffs and Class Members would purchase Ford vehicles equipped with the defective 6.0L Engines.

357. Ford owed Plaintiffs and Class Members a duty to disclose the defects in the Ford vehicles equipped with the defective 6.0L Engines, because it possessed exclusive and superior knowledge of the defects and did not disclose these defects.

358. Information regarding these defects, which result in substantial additional repair costs, decreased vehicle performance, and/or vehicle failure, is material to a reasonable consumer in deciding to purchase a vehicle and considering how much to pay for a vehicle.

359. A reasonable consumer who had known of the defective nature of the 6.0L Engines would not have purchased Ford vehicles equipped with the engine or would have paid less for them.

360. Ford's unfair or deceptive acts or practices were therefore likely to or had a tendency or capacity to deceive reasonable consumers about the true nature of the Ford vehicles equipped with the defective 6.0L Engines.

361. Ford's actions impact the public interest because Plaintiffs and Class Members were injured in exactly the same way as thousands of others who purchased and/or leased Ford vehicles equipped with the defective 6.0L Engines as a result of and pursuant to Ford's generalized course of deception.

362.    Ford's conduct was knowing, intentional, and with malice, and demonstrated complete carelessness and recklessness and was in conscious disregard for the rights of Plaintiffs and Class Members.

363.    As a result of the foregoing acts, omissions, Ford violated the Consumer Fraud Acts of all jurisdictions, and Plaintiffs and Class Members suffered actual damages as described herein, and these Class Members are entitled to recover such damages, together with punitive damages, equitable relief, injunctive relief, diminution of value, reasonable attorneys' fees, costs of suit, and such other relief set forth below.

## VII.  DAMAGES

364.    Plaintiffs incorporate the allegations set out above as though fully set forth herein.

365.    Plaintiffs would further show that as a result of the acts and/or omissions of Ford, Plaintiffs have suffered and continue to suffer at least the following damages for which Plaintiffs now sue:

   a.    Out of pocket damages for expenditures related to the cost to repair/service the engines;

   b.    deductibles paid when repairs were covered by warranty;

   c.    towing charges incurred from having incapacitated vehicles towed in for repair;

   d.    lost profits from the inability to utilize vehicles equipped with said engine, due to the engine being inoperable, the vehicle being stored at a Ford dealership awaiting a Ford mechanic to repair it, or the vehicle being insufficiently reliable to be put into service;

   e.    cost to overhaul and/or replace the engine in all vehicles equipped with 6.0L Engines;

   f.    diminution in value of the vehicles attributable to the defect;

   g.    decreased value received for vehicles, as a result of the defect, when trading in or selling the vehicle;

  h.  increased equipment expenses caused by the need to purchase additional vehicles to keep in reserve (due to the unreliability of the 6.0L Engine and the fact that units spend a large amount of time incapacitated awaiting repair at Ford dealerships);

  i.  increased salary expenses caused by the need to hire additional mechanics to deal with the repeated problems with the 6.0L Engine; and

  j.  increased expenses caused by the need to keep additional tools and parts on hand to deal with the repeated problems with the 6.0L Engine.

366. The damages set forth above are sought by Plaintiffs and Class Members from and against Defendant.

367. WHEREFORE, Plaintiffs pray for judgment against Defendant, Ford Motor Company, for past and future economic losses, declaratory and injunctive relief, reasonable attorneys' fees, prejudgment and post-judgment interest, costs, equitable relief, and such other relief the Court may deem proper.

Dated:  October 23, 2012               Respectfully submitted,

By:    <u>/s/   Michael A. Caddell</u>
Michael A. Caddell
Cynthia B. Chapman
Cory S. Fein
Caddell & Chapman
1331 Lamar, Suite 1070
Houston TX 77010-3027
Telephone:  (713) 751-0400
Facsimile:  (713) 751-0906

**MDL LEAD COUNSEL FOR PLAINTIFFS**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on October 23, 2012, this document was filed electronically via the Court's ECF system and thereby served on all counsel of record.

<u>/s/ Cynthia B. Chapman</u>
Cynthia B. Chapman

# Exhibit B

## Amy Tabor

**Subject:**    FW: Consent to Motion to Amend Complaint

**From:** "Anderson, Brian" <banderson@omm.com>
**Date:** October 22, 2012 4:44:16 PM PDT
**To:** "Cynthia B. Chapman (CBC@caddellchapman.com)" <CBC@caddellchapman.com>
**Cc:** "Anderson, Brian" <banderson@omm.com>, "Hammack, Scott" <shammack@omm.com>
**Subject: Consent to Motion to Amend Complaint**

Cynthia:

  We have reviewed plaintiffs' proposed Amended Master Class Action Complaint and plaintiffs' proposed motion for leave to file that complaint.  Ford consents to plaintiffs' motion on the understanding that the stay currently in place eliminates any obligation by Ford to answer or otherwise respond to the proposed new complaint.

### Brian C. Anderson
**O'MELVENY & MYERS LLP**
1625 Eye Street, N.W.
Washington, D.C. 20006
202-383-5309 (o)
202-383-5414 (f)
banderson@omm.com